1   DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
2   AMEET D. PATEL, State Bar No. 343413
apatel@aghwlaw.com
3   ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
4   San Francisco, CA  94104
Telephone:     (415) 697-2000
5   Facsimile:     (415) 813-2045

6   Attorney for Defendant
CITY OF REDDING, GARRETT MAXWELL, AND
7   MATTHEW BRUCE

8

9               UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

11  VERONICA MCLEOD, individually and        Case No. 2:22-cv-00585-WBS-JDP
    as successor in interest to decedent,
12  DOLORES HERNANDEZ; AMADO
    HERNANADEZ; individually and as          **DECLARATION OF AMEET D. PATEL IN**
13  successor in interest to decedent,        **SUPPORT OF DEFENDANTS' MOTION FOR**
    DOLORES HERNANDEZ; and YSIDRA            **SUMMARY JUDGMENT, OR IN THE**
14  REGALDO, individually,                    **ALTERNATIVE, SUMMARY**
                                              **ADJUDICATION [F.R.C.P. 56]**
15                    Plaintiff,
                                              Hon. WILLIAM B. SHUBB
16          v.
                                              Date:    June 10, 2024.
17  CITY OF REDDING; GARRETT                  Time:    1:30 p.m.
    MAXWELL, an individual; MATTHEW          Ctrm:    5
18  BRUCE, an individual; and DOES 2-10,
    inclusive,                                Trial:   September 10, 2024
19
                      Defendants.
20

21  I, Ameet D. Patel, declare as follows:

22  1.  I am an attorney licensed to practice law in the State of California. I am an associate at the

23      law firm of Allen, Glaessner, Hazelwood & Werth LLP, and am counsel of record for

24      defendants City of Redding, Garrett Maxwell and Matthew Bruce (collectively,

25      "Defendants") in this matter.

26  2.  I have personal knowledge of the statements made in this declaration and could competently

27      testify to them if called as a witness.

28

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

656058.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

3. Marked as Exhibit "A" is a true and correct copy of the relevant portion of the deposition transcript of Garrett Maxwell, taken on January 19, 2023.

4. Marked as Exhibit "B" is a true and correct copy of the relevant portion of the deposition transcript of Melody Graham, taken on February 28, 2024.

5. Marked as Exhibit "C" is a true and correct copy of the video captured by witness Melody Graham[1] on December 2, 2020 (*Incident Video*).

6. Marked as Exhibit "D" is a true and correct copy of the relevant portion of the deposition transcript of Matthew Bruce, taken on April 27, 2023.

7. Marked as Exhibit "E" is a true and correct copy of the relevant portion of the deposition transcript of Jennifer Hoberg, taken on February 22, 2024.

8. Marked as Exhibit "F" is a true and correct copy of the relevant portion of the deposition transcript of Ryan Hoberg, taken on February 22, 2024.

9. Marked as Exhibit "G" is a true and correct copy of Defendants'' Rule 26 Expert Disclosure, served on February 9, 2024.

10. Marked as Exhibit "H" is a true and correct copy of a dispatch audio clip from the subject incident (*Maxwell Audio Clip*), dated December 12, 2020 (produced to Plaintiffs as bates stamp COR (McLeod) 000280.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my own personal knowledge. Signed this 24th day of April 2024 in the City of Dublin, California.

Respectfully submitted,

Dated:  April 24, 2024

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP

By:   */s/ Ameet D. Patel*
    AMEET D. PATEL, Declarant

---

[1] Defendants point out that on the date of incident, Melody Graham was named Melody Raudman but had married/changed her name at the time of her deposition

656058.1

**EXHIBIT "A"**

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF CALIFORNIA

3

4 VERONICA MCLEOD, individually and as )
  succesor in interest to decedent,  )
5 DOLORES HERNANDEZ; AMADO HERNANDEZ, )
  individually and as successor in  )
6 interest to decedent, DOLORES  )
  HERNANDEZ; and YSIDRA REGALDO,  )
7 individually,    )
          )
8   Plaintiffs,  )
          )
9   vs.    ) Case No.
        ) 2:22-CV-00585-WBS-JDP
10 CITY OF REDDING; GARETT MAXWELL, )
  an individual; and DOES 1-10,  )
11 inclusive,    )
          )
12   Defendants.  )
 _____)

13

14

15

16   REMOTE VIDEOCONFERENCE DEPOSITION OF

17    GARETT MAXWELL

18    THURSDAY, JANUARY 19, 2023

19

20

21

22

23 Reported Stenographically By:

24 Jinna Grace Kim, CSR No. 14151

25 Job No.: 430166

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
**Garett Maxwell on 01/19/2023**                    Page 2

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3

4   VERONICA MCLEOD, individually and as  )
    succesor in interest to decedent,    )
5   DOLORES HERNANDEZ; AMADO HERNANDEZ,   )
    individually and as successor in     )
6   interest to decedent, DOLORES        )
    HERNANDEZ; and YSIDRA REGALDO,       )
7   individually,                        )
                                         )
8          Plaintiffs,                   )
                                         )
9          vs.                  ) Case No.
                       ) 2:22-CV-00585-WBS-JDP
10   CITY OF REDDING; GARETT MAXWELL,     )
     an individual; and DOES 1-10,       )
11   inclusive,                          )
                                         )
12          Defendants.         )
    _____)

13

14

15

16          The remote videoconference deposition of GARETT

17   MAXWELL, taken on behalf of the Plaintiffs, beginning at 1:32

18   p.m., and ending at 4:02 p.m., on Thursday, January 19, 2023,

19   before Jinna Grace Kim, a Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22

23

24

25

1     A.  Just so I'm clear, prior to this incident we're

2   speaking of?

3     Q.  Correct.

4     A.  I don't believe so.

5     Q.  Have you responded to scenes of officer-involved

6   shootings before this incident?

7     A.  Yes, I have.

8     Q.  On how many occasions, approximately?

9     A.  I would say between outside the ones we spoke of,

10  between three and four.

11    Q.  And were those other incidents involving Redding in

12  some way?

13    A.  Yes.

14    Q.  So I'm assuming that you had some information

15  regarding the call, and now I'm back to the shooting of the

16  woman.

17        You had some information regarding the call before

18  you went to the scene?

19    A.  Yes, sir.

20    Q.  And did you get some of that over your police

21  radio?

22    A.  The way I received the information was actually from

23  our patrol cars.  We call it an MDC, but it's a computer

24  that's in the vehicle.

25    Q.  Were you alone in your vehicle or with another

1        I've seen the video --

2      A.   Okay --

3      Q.   -- I'm kind of asking in the time frame before the

4    car started moving.  You might have gotten information from

5    the reporting party from your partner, from additional

6    updates on the MDC or the police radio.

7        I'm just wondering what additional information, if

8    any, you received.

9      A.   So when I initially arrived, I saw my partner

10   speaking with the female.  I in turn went over and met with a

11   security guard who my understanding was a person that called

12   us to come respond.  And I began discussing with him the

13   nature of this disturbance.

14     Q.   And what did he say?

15     A.   He initially started talking about the female being,

16   for lack of better terms, belligerent, cursing at him,

17   causing a disturbance inside of the Mod Pizza business.

18     Q.   Anything else you recall about what the security

19   officer told you?

20     A.   I didn't get a chance to complete that discussion

21   with him.

22     Q.   Any other additional information that you had?

23     A.   As I was standing there, trying to have that

24   discussion in totally with him, I began to notice the

25   interaction the female was having with my partner.

1     A.   At this moment I don't recall anything additional,

2   no.

3     Q.   What type of vehicle was she in, if you recall?

4     A.   Four-door, Toyota.

5     Q.   Was it in a parking space when she was having this

6   conversation with your partner?

7     A.   Yes, it was.

8     Q.   And do you know if the car was on or off at that

9   time that they were having this conversation?

10     A.   I don't recall.

11     Q.   Do you recall if the lights were on or off in the

12   car?

13     A.   I don't recall at that moment if they were on or

14   off, no.

15     Q.   And how far away were you standing when they were

16   having this conversation?

17     A.   Are you referring to when I was initially speaking

18   with the security guard?

19     Q.   Yes.

20     A.   I'll give you my best estimate; between 5 and 15 or

21   20 feet.

22     Q.   Did you have body cam on you at the time?

23     A.   No, sir.

24     Q.   Does your department have body cams now?

25     A.   We are in the process of implementing them, but

1    A.  Is that your question --

2    Q.  Yes --

3    A.  Sorry.  I did not.

4    Q.  Did you get any specifics as to what the disturbance

5    was exactly before the shooting incident took place?

6    A.  Well, the security guard was attempting to provide

7    that information.  There's, again, discussion about her

8    causing a disturbance inside of Mod Pizza.  He mentioned that

9    the female was belligerent or something to that effect, and

10   cursing at him.

11   Q.  That was the general description you were given?

12   A.  That was the initial part of it.  Again, I didn't

13   get to complete that discussion with him due to the actions

14   of the female.

15   Q.  And is it -- was it your understanding that they

16   wanted her to leave?

17   A.  We were trying to get to that determination

18   on-scene.

19   Q.  And you were still in the process of your

20   investigation; is that fair?

21   A.  Yes.

22   Q.  So the window went up.

23       And are you still this 5 or 15 feet away?

24   A.  I had been drawn closer, again, due to the -- I

25   could observe that behavior starting to escalate on her

1    A.  I was working swing shift, and I don't recall

2  exactly my start times.  I believe it was noon, but you would

3  have to refer to our personnel files to get that.

4    Q.  Okay.

5        MR. GALIPO:  He's giving me a lot of follow-up

6  homework to do.

7        Have you noticed that, Dale?

8        MR. ALLEN:  Well, you know, Dale, you do get -- we

9  got a lot of material to you last night.

10       MR. GALIPO:  Oh, thanks.  I appreciate that.

11       I appreciate the timeliness.

12       MR. ALLEN:  Yeah.  It was due yesterday.

13       So we tried to get everything to you yesterday, and

14  it does include statements and includes a great deal of what

15  you're inquiring about right now.

16       MR. GALIPO:  Okay.  Thank you.

17  BY MR. GALIPO:

18    Q.  So after you saw the window go up, what do you do

19  next?

20    A.  Well, I was standing on the sidewalk in proximity to

21  the other officer, and I was contemplating where the

22  investigation was going to go next.

23    Q.  And did you approach your partner at that point, or

24  kind of stay stationary?

25    A.  Well, again, moving back to kind of what I

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                      **Page 36**

1   previously discussed, after speaking with the security guard

2   and watching the behavior begin to escalate, that's when I

3   had initially moved closer to my partner, and I witnessed --

4   that was when, you know, the window was moving up as she had

5   basically said, "F you," and I watched the vehicle start to

6   back out.

7       Q.   And what did you do as the vehicle started backing

8   out?

9       A.   Physically?

10      Q.   Yes.

11      A.   Physically I paused, assessed if the vehicle was

12   going to just -- my thought was that it was going to just

13   leave the parking lot.  And I was going to move into the

14   parking lot to get a better vantage point of the parking

15   area.

16      Q.   How far did the vehicle back up, approximately?

17      A.   In feet?

18      Q.   Yes.  Or any other way you want to describe it.

19      A.   Well, again, I would have to give you my best

20   estimate.  Unfortunately, it's going to be a range.

21          It probably backed up between 5 and 15 feet

22   initially.

23      Q.   Was that the first time you saw the vehicle move?

24      A.   Yes.

25      Q.   And did it back straight out or in some type of an

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 48

1    Q.  What was he saying?

2    A.  He would have to testify to specifics, but I recall

3   something to the effect of "Now you're trying to run us

4   over," something to that effect.

5    Q.  Do you recall your partner saying anything other

6   than, "Now you're trying to run us over?"

7    A.  I remember him talking or yelling, but I don't

8   recall specific words he was using.

9    Q.  Did you hear your partner say, "Now you're trying to

10  run us over" before he started impacting the window with his

11  baton?

12   A.  Yes.

13   Q.  Was there any tactical plan discussed with your

14  partner at that time?

15   A.  There was no time to discuss tactical plan.

16   Q.  Did he tell you that he is going to try to break out

17  the window?

18   A.  There was no time to have a discussion about moving

19  towards what his intents was -- I'm sorry.

20   Q.  Did you form the impression that he was trying to

21  break out the window?

22   A.  Yes.

23   Q.  And did you in your mind think this would help the

24  situation if he could break out the window?

25   A.  It was a step to take towards a resolution.

1       (Video paused.)

2  BY MR. GALIPO:

3     Q.   So did you see that the vehicle after the three

4  strikes moved backwards?

5     A.   Yes.  In a sweeping left motion, yes.

6     Q.   Right.  And then your partner who was positioned

7  where he was at the time got partially pinned by the left

8  front tire.

9          Was that your perception?

10     A.   Of the video, yes.  He was crushed by that front

11  left tire, being crushed by it.

12     Q.   Now, at this point was the tire -- could you see if

13  the tire was on any part of his body?

14     A.   So we're clear, are you referencing where the video

15  frame is right now, or when I turned from the back tire?

16     Q.   When you turned, I want to know what you saw at the

17  time.

18     A.   Sure.  So I had been focused on that back left tire

19  in the intent of deflating it.  Once I was successful in

20  that, I stood my pocket knife, stood up and pivoted around

21  towards where Officer Bruce had been.

22          At that point I realized that he was up underneath

23  the front left tire.  From my vantage point at that instant,

24  it appeared it was on his lower torso.  I would not be able

25  to say it was on his leg or his pelvis, but it was crushing

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 61

1   part of his body that was significant and substantial.

2      Q.   Now, in order to release the tire from him, the car

3   would have to move forward at that point; is that true?

4        MR. ALLEN:  Objection.  Calls for speculation.

5        You can answer.

6        THE WITNESS:  You would have -- there would have to

7   be a method to get it off of him.  As far as how that was

8   conducted, it doesn't necessarily mean it has to be rolled

9   off.  There's options.

10   BY MR. GALIPO:

11     Q.   What options?

12     A.   Put a jack under it, lift it up.

13        Again, it requires the vehicle to be static and us

14   to be in control of it to do that in a controlled fashion.

15     Q.   Now, at that point did you tell the driver, you

16   know, stop the car, turn off the car, or I'll shoot you, or

17   words to that effect?

18     A.  I did not have time to do that.

19     Q.   Would you agree the car was not moving when you

20   started firing?

21        And I could play the video for you if you want.

22     A.  Please do.

23     Q.  Okay.

24        (Video playing.)

25        MR. GALIPO:  Do we have the video with audio on it,

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                              Page 62

1   Karen?  I think it would be a lot easier to hear the timing

2   of the shots.

3        THE WITNESS:  It would.

4        (Video playing.)

5        MR. GALIPO:  So I don't know if I need to make this

6   Exhibit 2 with the audio.

7        MR. ALLEN:  You're going to have to, Dale, because

8   you had been using it without the audio prior.

9        (Exhibit 2 was marked for identification.)

10       MR. GALIPO:  Yeah.  This will be Exhibit 2, Dale,

11   with the audio.

12       (Video paused.)

13       MR. GALIPO:  Okay.  Thank you.

14   BY MR. GALIPO:

15    Q.   So could you make out -- did you hear the shots in

16   that sequence?

17    A.   Yes.  I heard shots in that video.

18       MR. GALIPO:  You can stop that now, please.

19   BY MR. GALIPO:

20    Q.   And I think you told me earlier you fired seven

21   shots?

22    A.   Yes.

23    Q.   And it looks like at least sometime during the

24   shots, the vehicle started going back forward?

25    A.   The vehicle was moving during the course of my

VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.
Garett Maxwell on 01/19/2023                                    Page 63

1   firing, yes.

2       Q.   Which way?

3       A.   It appeared it lurched forward and then continued

4   forward.

5       Q.   And when it went forward, did it at some point based

6   on your observations, release the tire contact from Officer

7   Bruce?

8       A.   In the video it's apparent that that's what

9   happened, but on the scene I did not know how he got out from

10  under that vehicle.  I didn't -- I was focused on the

11  driver.

12      Q.   And I think you've already told me this, but you did

13  not give any commands or verbal warning to the driver prior

14  to firing?

15      A.   I didn't have time to, no.

16      Q.   Where were you aiming on her person when you fired

17  the shots?

18      A.   I believe I previously testified center mass which

19  was the upper left portion of her torso as it was presented

20  to me.

21      Q.   Did you notice whether the window shattered at any

22  time during the shots?

23      A.   The window did break as a result of my shot.

24      Q.   Could you see her in the car while you were

25  shooting?

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 64

1     A.   Yes.  Through the circle that was created by the

2   first shot that went through.  Initially through the actual

3   opaque glass and then it was through the circle created by

4   the first shot that went through.

5     Q.   Did you hear her say anything immediately before you

6   fired or during the shots?

7     A.   I don't recall hearing aside from the shots because

8   they're loud, her saying anything during the shots.

9     Q.   Now, did your partner tell you to do something

10   before you started firing?

11     A.   During my initial observations of him, at some point

12   he told me to shoot her.

13     Q.   And when he told you to shoot her, where was your

14   gun?

15     A.   I had either just drawn it or was preparing to draw,

16   but at this point I don't recall.  My firearm was already

17   out.  I know as soon as I -- my recollection is as soon as I

18   witnessed him pinned under the car, I started to draw the

19   firearm.

20     Q.   And would it be fair to say that you may have drawn

21   the firearm after your partner said "Shoot her?"

22     A.   I don't think that's fair to say.

23       I independently came to the decision to use force.

24     Q.   No.  I'm not asking about the independent decision.

25       I'm just trying to get the ordering.

1      What do you recall?

2      A.   She was trying to operate the vehicle is what I

3   recall.

4      Q.   And was she sitting upright in the seat facing

5   towards, or in some other position?

6      A.   Generally speaking, she was seated facing in the

7   front of the vehicle.

8      Q.   After the shooting did you approach the woman at

9   some point in the driver's seat?

10      A.   At some point, yes.

11      Q.   And did you observe any injuries on her?

12      A.   Yes.

13      Q.   What did you observe?

14      A.   I observed significant gunshots trauma to her upper

15   torso area.

16      Q.   Do you recall what parts of her body?

17      A.   Neck, upper chest, shoulder.

18      Q.   And did you observe bleeding?

19      A.   Yes.

20      Q.   How soon did you approach her after you fired the

21   shots?

22      A.   As soon as I was able to, but again, you would have

23   to refer to my audio recorder to get that specific time

24   line.

25      Q.   Did you turn your audio recorder on at some point?

1              CERTIFICATE

2                   OF

3        CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5        I, JINNA GRACE KIM, CSR No. 14151, a Certified

6   Stenographic Shorthand Reporter of the State of California,

7   do hereby certify:

8        That the foregoing proceedings were taken before me

9   at the time and place herein set forth;

10        That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12        That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15        Further, that the foregoing is an accurate

16   transcription thereof.

17        I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21        IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  January 19, 2023.

23

24        _____

        Jinna Grace Kim, CSR No. 14151
25

# EXHIBIT "B"

# Deposition Transcript

Case Number: 2:22-cv-00585-WBS-JDP
Date: February 28, 2024

In the matter of:

# MCLEOD, et al. v CITY OF REDDING, et al.

# MELODY GRAHAM



**CERTIFIED COPY**

Reported by:

Lynette L. Chase
Notary Public

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1                    UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF CALIFORNIA

 3      _____

 4      VERONICA MCLEOD, individually    :

 5      and as successor in interest     :

 6      to decedent, DOLORES HERNANDEZ;  :

 7      AMADO HERNANDEZ; individually    :

 8      and as successor in interest to  :

 9      decedent, DOLORES HERNANDEZ;     :

10      and YSIDRA REGALDO, individually,:

11               Plaintiffs,             :

12      v.                               :   Case No.:

13      CITY OF REDDING; GARRETT MAXWELL,:   2:22-cv-00585-WBS-JDP

14      an individual; MATTHEW BRUCE, an :

15      individual; and DOES 2-10,       :

16      inclusive,                       :

17               Defendants.             :
        _____

18

19

20           REMOTE VIDEOTAPED DEPOSITION OF MELODY GRAHAM,

21      commencing at 2:01 P.M. PST, on WEDNESDAY, FEBRUARY 28,

22      2024, before LYNETTE L. CHASE, Notary Public in and for the

23      State of New York.

24

25
```

02:47:39  1  vehicle turned towards either one or both of the officers at

02:47:45  2  some point it looked like she was doing that on purpose, is

02:47:49  3  that correct?

02:47:50  4       A    It did look like that she was -- the way that she

02:47:54  5  moved out of the parking spot, to me it made it appear as

02:47:58  6  though she was intentionally trying to knock the officer

02:48:01  7  down or hit him with her vehicle.  If she was -- she did not

02:48:06  8  back straight out.  She turned the wheels specifically in a

02:48:11  9  manner that looked like she was trying to hit the officer.

02:48:17  10      Q    And you mentioned that there was a parked car on

02:48:20  11  the left driver's side or east side of the woman's car,

02:48:24  12  correct?

02:48:25  13      A    That's correct.

02:48:26  14      Q    Okay.  Is that part of the reason why you think

02:48:28  15  it was odd for the woman to start angling immediately when

02:48:32  16  she backed out?

02:48:34  17      A    Yes.

02:48:35  18      Q    Okay.

02:49:05  19           Okay.  And, Melody, the cell phone video that you

02:49:08  20  took that evening, was that with your cell phone?

02:49:09  21      A    It was with my cell phone.

02:49:11  22      Q    Okay.  And you said that that was provided to the

02:49:13  23  police on that same evening, correct?

02:49:15  24      A    Yes.

02:49:16  25      Q    Okay.  Bear with me just a second.  I'm going to

STENO.COM

| | | |
|---|---|---|
| 02:49:23 | 1 | try to get -- I understand that you're concerned -- or your |
| 02:49:27 | 2 | worriedness about watching it again, but are you willing to |
| 02:49:30 | 3 | watch a portion of it or watch it just at least once at |
| 02:49:35 | 4 | least for -- for my questioning? |
| 02:49:38 | 5 | A   Yes.  Absolutely. |
| 02:49:39 | 6 | Q   Okay.  Thank you. |
| 02:49:41 | 7 | I'm going to -- I don't want you guys to hear |
| 02:49:43 | 8 | any -- okay? |
| 02:49:44 | 9 | A   (No verbal response.) |
| 02:49:45 | 10 | Q   All right.  What I'm going to do here, because I |
| 02:50:48 | 11 | can't upload the video, Melody, is I'm going to share screen |
| 02:50:51 | 12 | again here in a second and when I do just go ahead and let |
| 02:50:53 | 13 | me know that you see it -- |
| 02:50:55 | 14 | A   Okay. |
| 02:50:56 | 15 | Q   -- on your screen, okay? |
| 02:50:57 | 16 | And just for the record, this cell phone video |
| 02:51:02 | 17 | that I will be playing is Bates -- I'm sorry.  Bates number |
| 02:51:05 | 18 | 000272.  I'm going to start playing it at a timestamp of |
| 02:51:17 | 19 | 01 minutes and 12 seconds. |
| 02:51:31 | 20 | (GRAHAM Deposition Exhibit 2 was marked for |
| 02:51:31 | 21 | identification and is attached to the transcript.) |
| 02:51:33 | 22 | Q   All right.  Do you see that pop up on your end, |
| 02:51:34 | 23 | Melody? |
| 02:51:36 | 24 | A   Yes. |
| 02:51:37 | 25 | Q   All right.  And do you recognize this as a paused |

02:51:44   1   portion of the video that you took that day?

02:51:47   2        A    I do.

02:51:47   3        Q    Okay.  And is that vehicle that's depicted in

02:51:52   4   this video that's paused right now the woman's car we've

02:51:56   5   been speaking about today?

02:51:57   6        A    Yes.

02:51:58   7        Q    Okay.  And are the two gentleman that are

02:52:01   8   standing right here by the driver's door the two officers

02:52:03   9   you saw there that day?

02:52:06  10        A    Yes.

02:52:06  11        Q    Okay.  And, Melody, would you believe, just based

02:52:12  12   on the time that's elapsed between when you gave your

02:52:16  13   statement to the officers and now, that viewing this video

02:52:21  14   would refresh your recollection and memory of what happened?

02:52:24  15        A    Yes.  Absolutely.

02:52:26  16        Q    Okay.  If for any reason -- I'm going to play

02:52:33  17   this once and then I'll note the timestamp where I stop it,

02:52:35  18   once I do if you had any problems viewing or listening to it

02:52:39  19   just let me know, okay?

02:52:41  20        A    Sure.

02:52:42  21        Q    Okay.  And what I'm going to do, Melody, is I'm

02:52:50  22   going to play maybe just a couple seconds.  Can you let me

02:52:54  23   know if you hear an audio in it because I might have to stop

02:52:56  24   screen share and hit the share audio thing I didn't hit the

02:52:57  25   first time.  If you hear it let me know, okay?

1              CERTIFICATE OF REPORTER

2                      ---oOo---

3      I, the undersigned, being empowered to administer oaths

4  and affirmations remotely, do hereby certify:

5           That the foregoing proceedings were taken remotely

6  before me at the time and place herein set forth; that any

7  witness in the foregoing proceedings, prior to testifying,

8  were placed under oath; that a verbatim record of the

9  proceedings was made by me using machine shorthand which was

10 thereafter transcribed under my direction; further, that the

11 foregoing is an accurate transcription thereof.

12          I further certify that I am neither financially

13 interested in the action nor a relative or employee of any

14 attorney or any of the parties.

15          Further, that if the foregoing pertains to the

16 original transcript of a deposition in a Federal Case,

17 before completion of the proceedings, review of the

18 transcript [ ] was [ ] was not requested.

19    IN WITNESS WHEREOF, I have this date subscribed my name.

20

21 DATED:  March 12, 2024

22                            Lynette L. Chase

23

24

25                    STENO.COM

**EXHIBIT "C"**

DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
AMEET D. PATEL, State Bar No. 343413
apatel@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:    (415) 697-2000
Facsimile:    (415) 813-2045

Attorney for Defendant
CITY OF REDDING, GARRETT MAXWELL, AND
MATTHEW BRUCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA MCLEOD, individually and as successor in interest to decedent, DOLORES HERNANDEZ; AMADO HERNANADEZ; individually and as successor in interest to decedent, DOLORES HERNANDEZ; and YSIDRA REGALDO, individually, | Case No. 2:22-CV-00585-WBS-JDP **NOTICE OF MANUAL FILING/LODGING OF DIGITAL EXHIBIT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION [F.R.C.P. 56]** |
| Plaintiffs, | Hon. WILLIAM B. SHUBB |
| v. | Date:    June 10, 2024<br>Time:    1:30 p.m.<br>Ctrm:    5 |
| CITY OF REDDING; GARRETT MAXWELL, an individual; MATTHEW BRUCE, an individual; and DOES 2-10, inclusive, | Trial:    September 10, 2024 |
| Defendants. | |

PLEASE TAKE NOTICE THAT regarding Exhibit "C" and Exhibit "H" to the Declaration of Ameet D. Patel, filed concurrently with this notice, the ECF filing is in physical form only, and in place of Exhibit "C", a video file, and Exhibit "H," an audio file.

Plaintiffs are already in possession of the contents of this filing. For information on retrieving the filing directly from the Court, please see the court's webpage at www.caed.uscourts.gov.

/ / /

/ / /

MSJ – DEFENDANTS' SSUMF
2:22-CV-00585-WBS-JDP

656310.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1    The filing was not e-filed for the following reasons:

2    The files are a non-graphical/text; they are a video and audio file of the incident, copied

3 onto a CD.

4

5                                                    Respectfully submitted,

6 Dated:  April 24, 2024                    ALLEN, GLAESSNER,
                                                       HAZELWOOD & WERTH, LLP
7

8                                             By:   _/s/ Ameet D. Patel_____
                                                        DALE L. ALLEN, JR.
9                                                       AMEET D. PATEL
                                                        Attorneys for Defendants
10                                                      CITY OF REDDING, GARRETT
                                                        MAXWELL and MATTHEW BRUCE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MSJ – DEFENDANTS' SSUMF
2:22-CV-00585-WBS-JDP

656310.1

**ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP**
180 Montgomery Street, Suite 1200
San Francisco, California 94104

# EXHIBIT "D"

1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF CALIFORNIA

3

4   VERONICA MCLEOD, individually and as  )
    succesor in interest to decedent,     )
5   DOLORES HERNANDEZ; AMADO HERNANDEZ,    )
    individually and as successor in      )
6   interest to decedent, DOLORES         )
    HERNANDEZ; and YSIDRA REGALDO,        )
7   individually,                         )
                                          )
8                  Plaintiffs,            )
                                          )
9                  vs.                    ) Case No.
                                          ) 2:22-CV-00585-WBS-JDP
10  CITY OF REDDING; GARETT MAXWELL,      )
    an individual; and DOES 1-10,         )
11  inclusive,                            )
                                          )
12                  Defendants.           )
    _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    MATTHEW BRUCE

18              THURSDAY, APRIL 27, 2023

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  450075

```
 1                UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF CALIFORNIA

 3

 4   VERONICA MCLEOD, individually and as  )
     succesor in interest to decedent,     )
 5   DOLORES HERNANDEZ; AMADO HERNANDEZ,    )
     individually and as successor in      )
 6   interest to decedent, DOLORES         )
     HERNANDEZ; and YSIDRA REGALDO,        )
 7   individually,                         )
                                           )
 8                 Plaintiffs,             )
                                           )
 9                 vs.                     ) Case No.
                                           ) 2:22-CV-00585-WBS-JDP
10   CITY OF REDDING; GARETT MAXWELL,      )
     an individual; and DOES 1-10,         )
11   inclusive,                            )
                                           )
12                 Defendants.             )
     _____)

13

14

15

16          The remote videoconference deposition of MATTHEW

17   BRUCE, taken on behalf of the Plaintiffs, beginning at 2:42

18   p.m., and ending at 4:32 p.m., on Thursday, April 27, 2023,

19   before Jinna Grace Kim, a Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22

23

24

25
```

1      A.   -- assisted with emergency situations such as

2   officer-involved shootings.

3      Q.   I understand.  But was this the first time you were

4   ever actually present when an officer fired their weapon at

5   another human being?

6      A.   Yes.

7      Q.   And were you solo in your vehicle?

8      A.   I was.

9      Q.   And when you arrived at the scene, at some point did

10   you observe this woman and the vehicle she was in?

11      A.   I did.

12      Q.   Was it in a parking space?

13      A.   Yes, it was.

14      Q.   Do you know which way the front of her vehicle was

15   facing directionally, initially?

16      A.   Yes.  Not -- not due south, but facing south towards

17   the business Mod Pizza.

18      Q.   So would the front of the business -- would the

19   front of the vehicle be generally south and the rear

20   generally north?

21      A.   Generally, yeah.

22      Q.   And it was in a parking space at least initially?

23      A.   It was.

24      Q.   And the parking space to the left of the vehicle,

25   which I guess would be to the east if I had my directions

```
 1        Q.    Yes, you know.  And no, it did not?

 2        A.    No.  The answer is no, it did not.

 3              And yes, I would know if there was a dash cam, yes.

 4        Q.    Okay.  Did you have any recording device on your

 5   person --

 6        A.    I did not --

 7        Q.    -- audio recording?

 8        A.    No.

 9        Q.    To your knowledge, is any of the conversations

10   between you and this woman recorded anywhere?

11        A.    Not to my knowledge.

12        Q.    Did you talk to anyone at the scene before talking

13   to the woman?

14        A.    No.

15        Q.    Were you aware that your partner had arrived at some

16   point?

17        A.    Yeah.  When I arrived I noticed my partner shortly

18   behind me.

19        Q.    Did you have any conversations with your partner

20   before you began speaking to the woman?

21        A.    No.  I kind of waited for him to make our approach,

22   but there was no conversation had.

23        Q.    And what do you recall initially saying to the

24   woman?

25        A.    I walked up to the car and engaged her, and she
```

 1   turned and faced me, and then I asked her what her problem

 2   was, why -- why I was being called there to speak with her.

 3       Q.   And when you asked her what her problem was, did she

 4   respond?

 5       A.   She did.

 6       Q.   What did --

 7       A.   She -- she told me that she didn't have to tell me

 8   shit, and that I was a murderer, and that she didn't have to

 9   talk to me.

10       Q.   Okay --

11       A.   I -- I -- I responded to her, and I said, "Hey,

12   ma'am, you don't know me, you've never met me before, I'm not

13   a murderer."  And that I was only there to find out what was

14   wrong, and --

15       Q.   Okay --

16       A.   -- and, she then continued to kind of -- well,

17   she -- she said to me, again, she said, "No, I do know you,

18   you're all murderers, and you're going to be brought to

19   justice before Jesus Christ."

20       Q.   Okay.  So let me stop you right there.

21            During this part of the conversation between you and

22   this woman, I'm assuming she was still seated in the car of

23   the driver seat?

24       A.   Yes.

25       Q.   Do you recall if the car was on or off at that

 1  point?

 2     A.   It was on.

 3     Q.   **And do you know what gear the car it was in at that**

 4  **point?**

 5     A.   I believed that I did look at it, and it was in

 6  park.

 7     Q.   **Do you recall where the gear shift was, whether it**

 8  **was up, high, by the steering column, or in between the**

 9  **seats?**

10     A.   I remember checking to see what position it was in,

11  and I don't remember if I checked by noticing the lights

12  because, you know, when you put a car in reverse the backup

13  lights come on, or if I looked at the gear shift lever.

14         I don't -- I couldn't really tell you how exactly I

15  knew that it was in park.  I knew that the reverse lights

16  were not on, that the brake lights were on, and I might have

17  just assumed because of that situation, that it was in park,

18  but I also possibly -- I don't 100 percent recall looking at

19  the -- the shift lever because when I'm going back through my

20  mind, I can't remember if it had one of those shift levers

21  that's in the middle, or if it's the one on the column.

22         So I couldn't -- I couldn't tell you for certain

23  what position the shift lever was in.  I don't remember where

24  it was located in the car.

25     Q.   Okay.  The window on the driver side during this

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Matthew Bruce on 04/27/2023                                    Page 17

```
 1    initially conversations, was it up, or down, or somewhere in

 2    between?

 3        A.   When I first contacted her, it was all the way up.

 4             I then shined my flashlight in vehicle because she

 5    wasn't looking at me.  She was looking straight forward.  So

 6    I shined my flashlight into the vehicle to get her attention.

 7    Then she turned and she lowered the -- the window

 8    approximately two inches.

 9        Q.   Do you know if she was wearing her seat belt or

10    not?

11        A.   I do not.

12        Q.   Do you know if -- do you recall if there was music

13    playing in the car or the radio was on?

14        A.   Yes.  The radio was on and she as playing music

15    very, very loudly.

16        Q.   Okay.  So when you initially approached, would it be

17    correct that the driver's window was all the way up?

18        A.   Yes.

19        Q.   And then at some point after you tried to make

20    contact and flashed your flashlight at her, she lowered the

21    driver's side window just slightly, maybe a few inches?

22        A.   Yes.

23        Q.   And your impression was the car was on, but it was

24    in park?

25        A.   Yes.
```

1      Q.   And you could hear loud music playing in the car?

2      A.   Yes.

3      Q.   And you would have been standing just outside the

4   driver's door at this point?

5      A.   I was.

6      Q.   Are you familiar with the A-Pillar and the B-

7   Pillar?

8      A.   I am.

9      Q.   Where were you generally in relation to the car

10   during this initial conversation?

11      A.   I was standing almost directly to the B-Pillar

12   approximate -- a couple inches, maybe a foot away from the

13   actual body of the vehicle.

14      Q.   Okay.  And the B-Pillar just so we're on the same

15   page, do you consider that to be the portion, the division

16   between the front door and the rear door on the driver

17   side?

18      A.   Yes.  From, you know, a picture would probably be

19   about halfway in the car.

20      Q.   Okay.  And you've already told me about some of the

21   initial conversation; is that correct?

22      A.   Yes.

23      Q.   Do you know where your partner was when you were

24   having this initial conversation with the woman?

25      A.   I originally saw my partner had I guess it would

1  be -- well, a couple steps away from me on towards like a

2  sidewalk area to my east to speak with security guard.

3       Q.   Did you see a security guard out there at some

4  point?

5       A.   Yes.  He was standing at an adjacent business.

6       Q.   Was it your impression that your partner was talking

7  to the security officer to get more information?

8       A.   I don't know if he was talking to him to get more

9  information, or I don't -- I can't really specifically say

10 what my partner was doing.  I was more focused on what I was

11 doing.

12      Q.   Did you know at point who the reporting party or

13 parties were?

14      A.   From the dispatch call it was a security guard.

15      Q.   Okay.

16      A.   I don't know if it was the exact security guard we

17 were dealing with.  We often, you know, show up and deal with

18 a different security guard, or they have their own dispatch

19 system, but through the reporting system, it was a security

20 guard who made the phone call.

21      Q.   At some point did you observe this car go

22 backwards?

23      A.   Yes.

24      Q.   And I'm talking about the initial backing out or

25 partially backing out of the stall.

1          You observed that at some point?

2     A.   Yeah.  I saw -- I saw her actions in putting the car

3     into gear and then it started to reverse.

4     Q.   Okay.  Do you have a sense just timing wise how much

5     time passed between you getting on-scene and out of your car,

6     to you starting your conversation with this woman?

7     A.   I know -- I can -- I can generalize, you know, maybe

8     several seconds.  It -- it -- it didn't -- it's -- it's hard

9     to put a feel on exactly how long it took -- are -- are you

10    asking me from the time I walked out of my vehicle to the

11    time that she put it in reverse, or --

12    Q.   No.  I'm going to ask you that too.

13         And listen, I know you were not looking at your stop

14    watch --

15    A.   Yeah --

16    Q.   -- I'm just trying to get a general estimate.

17         And it could be a range.  You could say, look, from

18    the time I got out of my car to the time I approach her on

19    the driver side was maybe ten or fifteen seconds,

20    approximately, for example --

21    A.   Sure, yeah.  I'm sure --

22    Q.   -- and then from the time I approached her to the

23    time she put it in reverse was approximately how long?

24         What would you say?

25    A.   I mean from the time that I stepped out of my

1   vehicle, walked over to her vehicle, had the conversation,

2   and she put it in reverse, I can tell you it felt like maybe

3   20 seconds.  I know the video would probably have it down to

4   it the half second or whatever, but I mean I could tell you

5   it -- it -- it did feel like I was standing there for a

6   while, so.

7       Q.   Okay.  That's helpful.

8            And prior to the car going in reverse, did you have

9   any conversation with your partner about the situation?

10      A.   No.

11      Q.   Any discussion with the security guard?

12      A.   No.

13      Q.   Any discussion with anyone else at the scene?

14      A.   No.

15      Q.   Did you have a general understanding that the

16  complaining party, in this case the security guard, wanted

17  her to leave the premises?

18      A.   General understanding, that there was nothing said

19  in the CAD call from what I remember.  So I couldn't say.

20      Q.   Okay --

21      A.   I can't -- I can't recall whether or not anything

22  was mentioned about wanting her to leave.

23      Q.   Prior to her car backing up, did you tell her at any

24  time, for example, she was under arrest?

25      A.   No.

1    Q.   Did you tell her she was not free to go?

2    A.   No.

3    Q.   Were you intending to arrest her at that point for

4    anything prior to her initially backing up?

5    A.   No.

6    Q.   In your mind, did you think if she wants to leave,

7    go ahead and let her.

8         Was that your basic thinking at the time?

9    A.   Yes.

10   Q.   Okay.  Now, when she put the car from drive into

11   reverse, it sounds like you were still on the driver's

12   side?

13   A.   I was --

14   Q.   And you saw -- I'm sorry.

15        I didn't mean to cut you off.  Go ahead.

16   A.   That's okay.  Standing same position approximately

17   B-Pillar about a foot away, foot and a half away, something

18   like that.

19   Q.   Did you have an impression as to where your partner

20   was at that time when she put the car into reverse?

21   A.   No.

22   Q.   And when the car started going backwards, did you

23   remain in the same spot, initially?

24   A.   It's -- it's hard to say.  I -- if I recall

25   correctly, I did start to move away.  I -- I remember my

 1   mindset when she began backing up was that she was problem

 2   solved; she's free to leave, and that I was going to meet up

 3   with my partner, look for my partner, and talk to him about

 4   what had occurred, and what she had said, but I don't know --

 5   yeah, that's -- that's what I recall.

 6       Q.   In terms of your conversation with her, do you

 7   recall anything else during the conversation?

 8            Because you told me about the initial part of it.

 9            Anything else that was said between you and her

10   before she started backing up other than what you've already

11   told me?

12       A.   I -- I do remember asking her for her driver's

13   license.

14       Q.   And do you recall her response?

15       A.   She told me that she wasn't going to give me shit,

16   and I didn't have the authority, and that she wasn't

17   driving.

18       Q.   Did you say anything in response to that?

19       A.   When she started backing up, I -- I waved at her,

20   and I told her that she was now driving.

21       Q.   So right now I just want to focus before she starts

22   backing up, and then we're going to go through what happened

23   next, but --

24       A.   Okay.

25       Q.   -- it sounds like you said that after she started

 1   backing up.

 2       A.   No.  The -- precisely how I remember it, I asked for

 3   the driver's license; she told me that I didn't have the

 4   authority, and that she wasn't going to give it to me, and

 5   that she was parked, and that she wasn't driving.

 6            And then as soon as I asked for that, she then put

 7   the vehicle immediately in reverse and started backing up.

 8            And then I waved at her, and I told her you're

 9   driving.

10       Q.   I see.  In other words, she said she wasn't driving,

11   and then you just pointed out the obvious, that she was

12   driving?

13       A.   That she was moving, yes.

14       Q.   Okay.  And it sounds like at that point you were

15   just going to let her go.

16       A.   Yes.

17       Q.   Had she verbally threatened to harm you in

18   any way --

19       A.   No.

20       Q.   -- up to that point --

21       A.   No.  Other -- other than the strange conversation

22   about being a murderer, accusing me of being a murderer, and

23   that all -- I'm assuming she meant all law enforcement are

24   murderers, other than that strange conversation, no, no

25   threats were made.

1       A.   I don't know if I looked over my right shoulder or

2    left shoulder.  I can't specifically say in what position I

3    was walking or I had looked away.  I don't know if like I had

4    just turned my body and, you know, I really wasn't paying

5    that close of attention to my body position to know if I

6    looked to my right or my left.  I just saw the headlight and

7    looked at what was -- when you -- when you see movement in

8    your peripheral vision, you kind of just turn and look into

9    it.

10       I -- I didn't really -- I don't recall whether it

11   was right or left or over the shoulder or how I had spotted

12   him.

13       Q.   And when you looked, did you observe the car moving

14   forward in your direction?

15       A.   Yes.

16       Q.   And do you know at that point whether you were in

17   the parking space the car originally was in, or the next one

18   over?

19       A.   I couldn't say for -- for 100 percent certainty,

20   certainty, but as I remember it, I was in the parking space

21   next to the one.  I began walking east.

22       Q.   Did you have an impression as to where your partner

23   was at that point?

24       A.   I knew he was east of me.

25       Q.   And would that be to your right?

1        A.   So if I was looking at the -- if I was looking up at

2    the business which would be facing south like the vehicle

3    was, that would be to my left.

4        Q.   Okay.  But I got the impression that after the

5    vehicle started to turn, that you at some point -- started to

6    back up, you at some point turned and started walking more

7    north?

8        A.   It would have been more I guess east, but --

9        Q.   Okay --

10       A.   So -- so there was a -- there was a parked car maybe

11   one or two spots down, and because that's all I could use for

12   reference right now.  I don't stare at my feet when I walk.

13   So I couldn't tell you exactly where in the parking stalls I

14   was in reference to where I was standing originally.  I just

15   know I started to move towards that parked car, and that

16   parked car is the area in which I had last saw my partner.

17            So I was just -- I was assuming or I saw him, and

18   that was the general direction that I was heading.

19       Q.   And it the parked car that you're referring to a

20   parked car that would have been east of the space that the

21   woman's car was in?

22       A.   Yes.

23       Q.   Okay.  With that one, at least one space in

24   between?

25       A.   Yeah.  At least one space in between.

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**

**Matthew Bruce on 04/27/2023**        **Page 30**

 1     Q.   So did the car make contact with you when it moved

 2   forward?

 3     A.   No.  The initial time that it moved forward, it did

 4   not.

 5     Q.   And when it moved forward, at some point did it come

 6   to a stop again?

 7     A.   Yes.

 8     Q.   And was there an angle at that point?

 9     A.   Yes.  When -- when it came back in initially and I

10   turned and spotted the headlights, I could see the front end

11   of the car, and it was -- and like I said, I'm just guessing

12   because I was more so focused on the vehicle than its actual

13   positioning on -- on the parking spaces, but as I remember

14   it, it was approximately probably less than 45, but maybe at

15   a 45-degree angle with the front of the vehicle facing me,

16   and I had jumped out of the way which would have been towards

17   the driver's side.

18         Or if I was -- it's hard to explain.

19         If I was standing where the license, front license

20   plate was, I would have gone north towards the driver side of

21   the vehicle to get out of the way.

22     Q.   And did you move out of the way?

23     A.   I did.

24     Q.   And that was kind of a natural reaction?

25     A.   Yes.

```
 1      Q.    And then did the vehicle momentarily stop?

 2      A.    Yes.

 3      Q.    And when it was stopped in that position, did you

 4   approach the vehicle again?

 5      A.    I didn't approach the vehicle at that point.

 6            I noticed the driver had two middle fingers up in

 7   the air and was screaming.  I couldn't hear what she was

 8   scheming.  Obviously, the music was turned up, but she, you

 9   know, visibly was screaming, and I believe what she screamed

10   was, "Fuck you," and to middle fingers.

11            And then that's -- that's right at when the vehicle

12   stopped.  I just stepped out of the way; vehicle stopped; she

13   gave me two middle fingers and said, "Fuck you," like

14   screamed it.

15            I obviously couldn't hear it, but you know how when

16   you see somebody yelling, you can read their lips and you

17   know what they're saying.

18      Q.    Do you know if the window was up or down at that

19   point?

20      A.    I don't recall if it was still cracked, but I know

21   it was up.

22      Q.    So are you saying --

23      A.    So it might have been still down two inches or it

24   might have been all the way up, but it was definitely up more

25   than three quarters of the way up.
```

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Matthew Bruce on 04/27/2023                                        Page 32

1      Q.    So you're saying that you saw her give you in

2   essence the middle finger with both hands at that point?

3      A.    Yeah, two middle fingers.

4      Q.    So her hands would have been off the steering wheel

5   at that point?

6      A.    Yes.

7      Q.    And the vehicle was at a stop?

8      A.    At a stop.

9      Q.    And you didn't actually hear the words "Fuck you,"

10   but that was your impression?

11      A.    That's what I read off of her lips.

12      Q.    Okay.  So and the car was still in this stopped

13   position at this angle you described?

14      A.    Yes.

15      Q.    And then what did you do next?

16      A.    I started to approach the vehicle.

17      Q.    For what purpose?

18      A.    I had -- I'd come to -- at that point that's was

19   not -- it's not a kind of normal behavior.  I was -- I was

20   afraid obviously because I had just noticed the car graze my

21   legs, and I said this is -- this is not good behavior, and I

22   needed to stop this person from driving.

23           And so I made the -- I formed the -- I knew I had to

24   stop the car.  I knew I had to stop her from driving.

25           And so I like quickly just thought I need to break

 1   the window, and I need to go in, and I need to stop the car;

 2   I need to stop her from being able to drive.

 3        Q.   And how did you want to break the window?

 4        A.   I -- without even giving it two thoughts, I grabbed

 5   the baton which I carry right here on my vest, and I began

 6   striking the window with -- with the bottom of the baton.

 7        Q.   What type of baton was it?

 8        A.   This is a -- it's a 26 inch -- I forget the brand

 9   name.  It's a collapsible aluminum baton.

10        Q.   Okay.  And how many times did you strike the window

11   with the baton?

12        A.   I believe three times, two or three times.

13        Q.   And when the car moved forward as you described and

14   then came to a stop, do you know what distance it moved

15   forward, approximately?

16        A.   From -- do you mean from when I got out of the way?

17             Because it stopped after I got out of the way.

18        Q.   Right.  I guess what I'm getting at, and maybe

19   you're not sure, you saw it back up the first four or five

20   feet, and then you looked away; is that correct?

21        A.   Yes, that's correct.

22        Q.   I'm just wondering, when you looked back, how far

23   did it move forward before stopping?

24        A.   From when I noticed it -- from -- from when I picked

25   it up in my peripheral view, peripheral view, the light

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Matthew Bruce on 04/27/2023                                    Page 34

 1   coming in, from what I saw was -- and -- and once again, just

 2   an estimate, maybe two feet.

 3          Enough to go past my leg to the upper portion of the

 4   bumper.

 5   Q.   Okay --

 6   A.   So I mean so from where I picked it up to one foot

 7   past on -- if I had been standing in the same position, my

 8   feet would have been one -- my legs would have been inserted

 9   one foot into the bumper if that makes sense if I would have

10   just remained standing there.

11          So it drove -- my feet were here, my feet were

12   standing still, it would have drove one foot past where my

13   feet were.

14   Q.   So --

15   A.   -- step out of the way.

16   Q.   -- so when the vehicle is stopped, you then approach

17   it and strike the driver side window two or three times with

18   your baton?

19   A.   Yes.

20   Q.   And what you're thinking is you want to break the

21   window; is that correct?

22   A.   That's correct.

23   Q.   And you were thinking of breaking the window, then

24   grabbing her, and pulling her out of the vehicle?

25   A.   I would -- not -- not grabbing her and pulling her

1    out of the vehicle, but putting the vehicle in park, turning

2    it off, preventing it from driving.

3        Q.   Did you -- how much time do you think passed between

4    the vehicle coming to a stop and you approaching the window

5    and striking it with your baton?

6        A.   It felt like -- it felt like milliseconds.

7             I mean -- I -- I could not even give you an accurate

8    representation of time.  It just felt like it just happened,

9    like there was no --

10       Q.   Okay --

11       A.   -- maybe -- maybe a second, maybe two.

12       Q.   Had you ever done that before in your career, try to

13   strike the window of a vehicle that was occupied with the

14   engine on?

15       A.   I've never been able to break a window to -- but

16   I had successfully climbed through a driver's side window and

17   turned the vehicle off, but the window was down.

18            That's the difference.

19       Q.   I'm just wondering whether you have had ever --

20       A.   Broken a window out?

21       Q.   -- yeah.  Broken a window out while the driver was

22   in the car and the engine was on?

23       A.   No.

24       Q.   But that's what you were trying to do in this

25   instance?

 1      A.   That was my plan.

 2      Q.   Did you say anything to the woman before you started

 3  striking the window such as "Stop" or "Turn your engine off,"

 4  or anything like that?

 5      A.   No.

 6      Q.   Did you give her any warning that you were going to

 7  strike or start striking her window with your baton?

 8      A.   No.

 9      Q.   Were you aware based on past experience that if you

10  did shatter the window, some of the glass could go in the car

11  on her?

12      A.   I've done quite a bit of testing on safety glass on

13  vehicles, and they're generally pretty safe when -- when you

14  break therm.  They break up into little pellets, but I

15  wasn't -- I think I was thinking more of like me having to

16  climb through that window in which I was willing to do and

17  not really fearing glass cuts or anything like that.

18      Q.   Did you ever try to open the car door.

19      A.   No.  It was -- it was pretty clear to me when she

20  pulled out because when I was speaking with her, the doors

21  were locked, that the doors were still locked.

22      Q.   And when you were hitting the driver side window

23  with your baton, I think you've already told me this, but

24  what part of the baton were you using to strike it?

25      A.   The bottom.

1    Q.   Okay.  And do you know, in other words, did you have

2    a sense at the time how that happened, whether the car had

3    moved and that caused it to happen, and you were not sure?

4    A.   I was not sure what happened, what brought me off my

5    feet, but I quickly figured out as the tire rolled over my

6    leg, what had happened.

7    Q.   And what did you think had happened at that point?

8    A.   I thought I was getting run over at that point.

9    Q.   You thought the wheel went over a portion of your

10   body?

11   A.   I could see the wheel on my leg.

12   Q.   Okay.  What portion of your leg was the wheel on at

13   that point?

14   A.   At that point it -- I watched the wheel come -- I

15   remember pretty vividly the moment that I realized exactly

16   what position I was in, and I looked down at my left leg, and

17   I could see the tire cupping over my knee.

18   Q.   Do you remember trying to back out of the way when

19   the car starting going in reverse?

20   A.   Which time?

21   Q.   I guess the first time it went in reverse, as I

22   understand it, you just watched it go about four or five feet

23   and then looked away?

24   A.   Yes.

25   Q.   The second time it went in reverse, if I'm

1    understanding your testimony, would be after you tried to

2    break the window with your baton?

3        A.   I don't remember or recall if the vehicle was moving

4    when I was attempting to break the window.  So I don't know

5    if it was going forward or backwards.  I couldn't tell you.

6            I do know that when I saw it run over my leg, I knew

7    it was going backwards.

8        Q.   And did it feel like it had grabbed your foot and

9    pulled you down?

10       A.   It happened so quickly.  I didn't know how I had

11   gotten pulled down, and then I saw the tire on my leg, and I

12   knew at that point.

13       Q.   And were both of your legs together at that point?

14       A.   They were next to each other, yeah.

15       Q.   And was the tire essentially kind of on your knee or

16   a portion of your knee?

17       A.   Yes.  I believe it was -- it's kind of stopped

18   almost perfectly on the center of my knee, just above it.

19       Q.   Would that be your left knee?

20       A.   Left knee, yes.

21       Q.   And at that point did the car -- was the car

22   stopped?

23       A.   Yes.  The car did stop on my knee.

24       Q.   So I'm assuming you're hoping that the car didn't

25   move at that point?

1      Q.   Look at your response on Lines 869 to 871.

2      A.   Yeah.  Okay.

3           So reading that, no.  It was pinned with it.

4           I -- I think they're talking about my right knee.

5      Q.   Okay --

6      A.   They're asking -- they're asking me if my right leg

7    was free, and I said, "No, it was pinned with it."

8           So the two legs were -- the two legs were together,

9    but the weight of the vehicle was not on my right leg.

10     Q.   Okay.  So you're now in this position, and then do

11   you say anything to the woman at all at this point?

12     A.   No.

13     Q.   So it sounds like from the time she initially

14   starting backing up to the time you're down in the position

15   you described, you did not say anything to her; is that a

16   fair statement?

17     A.   From the time that she backed up initially, put it

18   in reverse and I thought she was leaving to the time that I

19   got ran over, no, no comments.  I made no communication with

20   her other than banging on her window.

21     Q.   And after the front wheel was in contact with you,

22   with your leg, did you say anything to her at that point?

23     A.   No.

24     Q.   And did you say anything to your partner at that

25   point?

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Matthew Bruce on 04/27/2023                                    Page 46

1        A.   Initially, when I found myself on the ground I

2    didn't see my partner until what felt like moments later, but

3    he came back around the vehicle towards me, and I looked up

4    at him, and I told him to shoot her.

5        Q.   Okay.  You were telling your partner to shoot the

6    woman who was driving the car?

7        A.   Yes.

8        Q.   And I'm assuming you were meaning with his

9    firearm?

10       A.   Yes.

11       Q.   And was your thinking at the time that for him to

12   shoot her, he would have to shoot through the driver side

13   window?

14       A.   I wasn't thinking anything about how he was going to

15   do it.  I just knew that I was thinking the whole time that I

16   was going to get killed.

17       Q.   So in your mind you were directing your partner to

18   shoot this woman; is that a fair statement?

19       A.   That's a fair statement.

20       Q.   And were you aware that if your partner followed

21   your command or request, that this would woman would be

22   seriously injured or killed?

23       A.   I'm aware of that.

24       Q.   And did you expect your partner to follow your

25   command or request to shoot her?

1        A.   My -- I didn't expect -- it wasn't an order.

2             It was a statement.  So I -- I wouldn't order my

3    fellow officer to take a shot and expect him to just do it.

4             It was a statement to him that I was being run over

5    and that I needed his help, and the only -- the only way I

6    saw myself getting not killed was for him to kill her.

7        **Q.   Okay.  So you were --**

8        A.   It's easy for us to sit back and, you know, look at

9    this situation now as I look back at it, but in that moment

10   that's the only thing I could think to say to him.

11       **Q.   I understand.  But I just want to be clear when you**

12   **told your partner to shoot her, your expectation is that he**

13   **would?**

14       A.   No.  I don't -- I think you misunderstand.

15            Being -- being crushed by a car, actively crushed by

16   a car, what I was feeling was immense pain traveling up my

17   leg.  I mean like pain and -- pain and pressure that I've

18   never felt before in my life, and it was -- it was getting so

19   bad I could -- I could literally feeling -- feel it crawling

20   up my body, and I felt like I was being crushed to death, and

21   in that moment I saw my partner, and the only thing that I

22   could think of was that in order for him to save my life,

23   she had to be shot.

24            Now, whether that -- you -- you -- and that's it.

25   Like, there was no -- I think you're asking me if -- if I had

1  like planned out some sort of like tactical mission to take

2  this out.  I was thinking about dying, and I was thinking

3  about getting out of there alive, and that was it.

4       So my statement to him, "Shoot her" was a cry for

5  help, not an order, if that helps.

6  **Q.   Okay.  Did you consider that if he started firing at**

7  **the woman, the car could go further in reverse and injure you**

8  **further?**

9  A.   The entire time I was thinking that no matter what

10 happens, I need to get this car off my leg and run as far as

11 I can out of the way.

12 **Q.   And --**

13 A.   That's -- that's the only thing I was thinking.

14 **Q.   How much time passed from you telling your partner**

15 **to shoot her and you hearing gunshots?**

16 A.   It's hard to say.  Like I said, in -- in the moment,

17 it felt like -- it felt like forever, but after seeing the

18 video I know it was only seconds, like a millisecond.

19      I don't know.  I couldn't say.  I know that in that

20 moment like I -- like I keep reiterating, I was thinking I'm

21 going to die the entire time.  I could feel pain worse than

22 I've ever felt.  I felt like I was being crushed to death.

23      I was scared.  I was trying to figure a way to get

24 out from underneath the car so that I could run away and

25 avoid getting struck in any other direction, and my partner

```
 1      A.   No.  I did not know where may partner was.

 2      Q.   When did you become aware your partner was to your

 3   right?

 4      A.   When I saw him come around the backside of the

 5   vehicle.

 6      Q.   Were you aware at the time that your partner was

 7   trying to put a knife through the rear tire of the vehicle?

 8      A.   I was not aware of what my partner was doing.

 9      Q.   Did you learn that at some point after the fact?

10      A.   I don't know if I heard the story of it when -- when

11   I was doing my investigation, or if it was when I reviewed

12   the video for the first time that I noticed it, but I

13   don't -- in the moment I didn't recall anything that he was

14   doing.  I was focused on purely what I was doing.

15      Q.   Did you make any tactical plan or have any

16   discussion with your partner after the vehicle moved forward

17   towards you, but before you bashed the window?

18      A.   No.

19      Q.   Did you tell your partner you were going to bash the

20   window?

21      A.   No.

22      Q.   Have you heard the term before "situational

23   awareness?"

24      A.   I have heard it before.

25      Q.   Is it kind of referring to being aware of what it
```

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
**Matthew Bruce on 04/27/2023**                                                   Page 58

1   before?

2      A.   As far as breaking out a window and stopping

3   somebody from driving, in my experience not that I can recall

4   with a window up.

5           However, it had worked several times where the

6   window was down.

7      Q.   Yeah.  But if the window was down, you would not

8   have to smash it, would you?

9      A.   If the window was down, I wouldn't have to smash

10  it.

11     Q.   Right.  Have you heard the term "de-escalation?"

12     A.   I have.

13     Q.   And is that generally mean trying to calm a

14  situation down if you can?

15     A.   I guess in -- it's a roundabout definition of what

16  de-escalation means.

17     Q.   It sounds like when she backed up, initially you

18  were okay with her leaving; is that a fair statement?

19     A.   It's a fair statement.

20     Q.   At that point she was not under arrest; is that

21  correct?

22     A.   That's correct.

23     Q.   And you were not trying to detain her at that

24  point?

25     A.   That's correct.

1      Q.   And it sounds like -- do you know how many shots

2   were fired?

3      A.   I only heard two.  I know I heard the first one, and

4   I felt the vehicle -- I heard two back to back, and then I

5   felt the vehicle come off my leg, and that's the extent of

6   it, and it was extremely muffled.  I -- yeah.

7      Q.   So I guess at least we know now that the vehicle

8   went further back at an angle which caused you to get in the

9   position you were relative to the left front tire; is that

10  fair?

11     A.   Yes.  I believe that's fair.

12     Q.   And it sounds like your impression was if the

13  vehicle went further back with you in that position, it would

14  not have been good for you?

15     A.   I remember thinking while under the vehicle with my

16  leg pinned, that it was going to be bad either way, that

17  if -- if she went forward, that she would see me on the

18  ground, and that she would be able to hit me with the back

19  wheels of the vehicle, and that if she went -- and that's if

20  she backed up, she would see me on the ground and she would

21  be able to come forward at me again.

22     Q.   Well, would it be fair to say that you were hoping

23  the vehicle would move a little forward off of your leg?

24     A.   My only hope was that it would get off the -- off of

25  my leg so I could escape.

1    to what happened after that until I came back around my

2    vehicle to check on my partner.

3         Q.   I get it.  But would it be fair to say that the car

4    must have went from reverse into some other gear in order to

5    go forward after the shooting?

6         A.   I couldn't say.  It could have gone in a neutral.

7              I could have -- I don't -- I don't know.  I don't

8    know how the vehicle got off my leg.  I was only thankful it

9    did.

10        Q.   Okay.  Well, I'm thankful it did too.  I could tell

11   you that.  I'm not happy about the result for this woman, but

12   I certainly wouldn't want you to be seriously injured.

13             And the back tires obviously never hit you, true?

14        A.   True.

15        Q.   So once you got up after the shots, where did you

16   go?

17        A.   I immediately went north to where my patrol car was

18   parked along the red curb, and I came around the backside of

19   -- I -- I was using -- I didn't know what she was doing.

20             So I was worried that she was going to see that I

21   was injured and that she would try to come in and hit me

22   again with the front of her vehicle.  And so my plan was to

23   run using my vehicle as a shield, and then I came around the

24   front of my vehicle down the side, and then I came around the

25   trunk, I saw my partner standing there, and I asked him if he

1    was okay.  And --

2         Q.   You thought -- go ahead.

3         A.   Go ahead.  I'm all done.

4         Q.   Did you think she was going to run you over after

5    she was shot multiple times?

6         A.   I can tell you for 100 percent certainty that I

7    didn't know if she was shot.  I heard two shots, and they

8    didn't even sound like bullets.  It sounded like a muffled

9    bang, bang, and then I -- I ran because the vehicle got off

10   my leg.

11        I did not look up at the vehicle.  I didn't look at

12   my partner.  I didn't know anything about that.  The entire

13   time I was thinking I need to get away from here.  I'm going

14   to get killed.  So that's immediately my first reaction when

15   the vehicle got off me, I immediately went across to my

16   police car and got behind my police car.

17        Q.   Did you hear your partner give this woman any verbal

18   warning he was going to shoot her?

19        A.   I didn't hear anything but bang, bang.

20        Q.   Do you now know there were multiple shots fired?

21        A.   I don't know how many shots were fired.

22        I -- I know that I heard two.

23        Q.   At some point did you realize the woman had been

24   shot?

25        A.   Yes.  My -- when my partner -- when I came around

```
 1                         CERTIFICATE

 2                             OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  April 27, 2023.

23
                              _____
24                            Jinna Grace Kim, CSR No. 14151

25
```

**EXHIBIT "E"**

# Deposition Transcript

Case Number: 2:22-cv-00585-WBS-JDP

Date: February 22, 2024

In the matter of:

# MCLEOD, et al. v CITY OF REDDING, et al.

# JENNIFER HOBERG

**CERTIFIED COPY**

Reported by:

Valerie D. Granillo
CSR No. 11469



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4     _____
                                     )
 5     VERONICA MCLEOD, individually)
       and as successor-in-interest )
 6     to decedent, DOLORES          )
       HERNANDEZ; AMADO HERNANDEZ,   )
 7     individually and as           )
       successor-in-interest to      )
 8     decedent, DOLORES HERNANDEZ;  )
       and YSIDRA REGALDO,           )
 9     individually,                 )
                                     )
10              Plaintiffs,          )
                                     )
11        vs.                        ) No. 2:22-cv-00585-WBS-JDP
                                     )
12     CITY OF REDDING; GARRETT      )
       MAXWELL, an individual;       )
13     MATTHEW BRUCE, an individual;)
       and DOES 2-10, inclusive,     )
14                                   )
                Defendants.          )
15     _____)

16          REMOTE DEPOSITION OF JENNIFER HOBERG

17              Thursday, February 22, 2024

18                     Volume I

19

20

21

22     Reported by:
       VALERIE D. GRANILLO
23     CSR No. 11469
       Job No. 873974

24

25     PAGES 1 - 66
```

```
 1                 UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4     _____
                                       )
 5     VERONICA MCLEOD, individually)
       and as successor-in-interest )
 6     to decedent, DOLORES          )
       HERNANDEZ; AMADO HERNANDEZ,   )
 7     individually and as           )
       successor-in-interest to      )
 8     decedent, DOLORES HERNANDEZ; )
       and YSIDRA REGALDO,           )
 9     individually,                 )
                                     )
10            Plaintiffs,            )
                                     )
11        vs.                        ) No. 2:22-cv-00585-WBS-JDP
                                     )
12     CITY OF REDDING; GARRETT      )
       MAXWELL, an individual;       )
13     MATTHEW BRUCE, an individual;)
       and DOES 2-10, inclusive,     )
14                                   )
              Defendants.            )
15     _____)

16

17              Deposition of JENNIFER HOBERG, Volume I,

18     taken on behalf of Defendant, beginning at 10:03 a.m. and

19     ending at 11:50 a.m., on Thursday, February 22, 2024,

20     before VALERIE D. GRANILLO, Certified Shorthand Reporter

21     No. 11469.

22

23

24     STENO
       Concierge@Steno.com
25     (888) 707-8366
```

1     Q    Okay.  Did they arrive together or did they -- or

2  do you remember if they arrived at different times?

3     A    To my knowledge, they arrived together.

4     Q    Okay.

10:37  5     A    Or at the same time.

6     Q    Okay.  And can you tell me what these officers

7  did when they arrived on scene?

8     A    They walked over and spoke with the security

9  guard.

10:37 10     Q    Okay.  Now, did both officers speak with the

11  security guard or did only one of them?

12     A    Briefly the two officers spoke with him.  But one

13  walked over to address the woman, and the other one stayed

14  with the officer.

10:38 15     Q    Okay.  Could you hear what either officer was

16  saying or -- to the whichever party that they were talking

17  to?

18     A    No.  At one point I did hear one of the police

19  officers ask the lady to just leave.  And he said -- moved

10:38 20  his hands saying, "Just leave," very calmly.

21     Q    Okay.  Could you see what the woman in the car

22  was doing while she was interacting with the officer that

23  was speaking with her?

24     A    At that moment she was just turned to talk with

10:38 25  him.

```
 1                    I, the undersigned, a Certified Shorthand

 2   Reporter of the State of California, do hereby

 3   certify:

 4                    That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were administered an oath; that

 8   a record of the proceedings was made by me using

 9   machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12                    Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [ ] was not requested.

16                    I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19                    IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 29th day of February 2024.

23

24                              VALERIE D. GRANILLO
                                CSR No. 11469

25
```

**EXHIBIT "F"**

# Deposition Transcript

Case Number: 2:22-cv-00585-WBS-JDP

Date: February 22, 2024

In the matter of:

# MCLEOD, et al. v CITY OF REDDING, et al.

# RYAN HOBERG

**CERTIFIED COPY**

Reported by:

Valerie D. Granillo

CSR No. 11469



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4     _____
                                      )
5     VERONICA MCLEOD, individually)
      and as successor-in-interest )
6     to decedent, DOLORES              )
      HERNANDEZ; AMADO HERNANDEZ,  )
7     individually and as               )
      successor-in-interest to      )
8     decedent, DOLORES HERNANDEZ; )
      and YSIDRA REGALDO,               )
9     individually,                     )
                                        )
10            Plaintiffs,               )
                                        )
11       vs.                            ) No. 2:22-cv-00585-WBS-JDP
                                        )
12    CITY OF REDDING; GARRETT          )
      MAXWELL, an individual;           )
13    MATTHEW BRUCE, an individual;)
      and DOES 2-10, inclusive,         )
14                                      )
              Defendants.               )
15    _____)

16            REMOTE DEPOSITION OF RYAN HOBERG

17              Thursday, February 22, 2024

18                    Volume I

19

20

21

22    Reported by:
      VALERIE D. GRANILLO
23    CSR No. 11469
      Job No. 873933

24

25    PAGES 1 - 51

RYAN HOBERG                                                    JOB NO. 873933
FEBRUARY 22, 2024

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4     _____
                                      )
 5     VERONICA MCLEOD, individually)
       and as successor-in-interest )
 6     to decedent, DOLORES          )
       HERNANDEZ; AMADO HERNANDEZ,   )
 7     individually and as           )
       successor-in-interest to      )
 8     decedent, DOLORES HERNANDEZ; )
       and YSIDRA REGALDO,           )
 9     individually,                 )
                                      )
10          Plaintiffs,              )
                                      )
11        vs.                        ) No. 2:22-cv-00585-WBS-JDP
                                      )
12     CITY OF REDDING; GARRETT      )
       MAXWELL, an individual;       )
13     MATTHEW BRUCE, an individual;)
       and DOES 2-10, inclusive,     )
14                                    )
            Defendants.              )
15     _____)

16

17              Deposition of RYAN HOBERG, Volume I, taken

18     on behalf of Defendant, beginning at 1:01 p.m. and ending

19     at 2:09 p.m., on Thursday, February 22, 2024, before

20     VALERIE D. GRANILLO, Certified Shorthand Reporter No.

21     11469.

22

23

24     STENO
       Concierge@Steno.com
25     (888) 707-8366
```

1   music or did she turn it down?

2       A    I don't -- no.  I remember specifically she still

3   had the music up, you know.

4       Q    Okay.

01:18  5    A    Kinda loud.

6       Q    All right.  And could you hear any of the

7   conversation that took place between that officer and the

8   woman?

9       A    No.

01:18  10   Q    No?

11      A    I mean, very, very, few.  I mean, I heard the

12  officer.  Then they talked for some time, and eventually

13  he said -- I just heard him say something to the effect,

14  "Good.  Good, then go.  Like, leave," you know.

01:19  15   Q    Okay.

16      A    But other than that, no, I could not hear any

17  specifics.

18      Q    Did you hear the woman in the car swear or cuss

19  at the officer at all?

01:19  20   A    I don't remember.

21      Q    Okay.  All right.  And I know it kind of fast

22  forwards a little bit, but sometime either that night of

23  the incident or shortly thereafter did you provide a

24  statement to the police regarding what happened that

01:19  25  night?

RYAN HOBERG                                                      JOB NO. 873933
FEBRUARY 22, 2024

1            I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4            That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12           Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [ ] was not requested.

16           I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19           IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 2/29/2024.

23                          VALERIE D. GRANILLO

24                          CSR No. 11469

25

**EXHIBIT "G"**

1   DALE L. ALLEN, JR., State Bar No. 145279
    dallen@aghwlaw.com
2   AMEET D. PATEL, State Bar No. 343413
    apatel@aghwlaw.com
3   ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
    180 Berg Street, Suite 1200
4   San Francisco, CA  94104
    Telephone:      (415) 697-2000
5   Facsimile:      (415) 813-2045

6   Attorney for Defendant
    CITY OF REDDING; GARRETT MAXWELL AND
7   MATTHEW BRUCE

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11

12  VERONICA MCLEOD, individually and    Case No. 2:22-cv-00585-WBS-JDP
    as successor in interest to decedent,
13  DOLORES HERNANDEZ; AMADO             **DEFENDANTS CITY OF REDDING,**
    HERNANADEZ; individually and as      **GARRETT MAXWELL, AND MATTHEW**
14  successor in interest to decedent,    **BRUCE'S EXPERT DISCLOSURE**
    DOLORES HERNANDEZ; and YSIDRA        **PURSUANT TO F.R.C.P. RULE 26(A)(2)**
    REGALDO, individually,
15
                    Plaintiff,
16
        v.
17
    CITY OF REDDING; GARRETT
18  MAXWELL, an individual; MATTHEW
    BRUCE, an individual; and DOES 2-10,
19  inclusive,

20                  Defendants.

21

22      Pursuant to Federal Rule of Civil Procedure 26(a)(2), defendants CITY OF REDDING,

23  GARRETT MAXWELL, AND MATTHEW BRUCE (hereinafter collectively "Defendants")

24  hereby disclose the following expert witnesses they intend to call at trial:

25                          **RETAINED EXPERTS**

26      1.      Steve Papenfuhs, Police Practices Expert, 3303 Palantino Way, San Jose, CA

27  95135; Telephone: (408) 621-3955.

28      All documents required to be disclosed under FRCP 26(a)(2)(B) are attached hereto as

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

DEFENDANTS' EXPERT DISCLOSURES
2:22-CV-00585-WBS-JDP

641181.1

Exhibit A.

Mr. Papenfuhs reserve the right to supplement his expert reports based upon new information, including but not limited to, outstanding discovery, future depositions, and deposition transcripts.

2.      Rajeev Kelkar, Ph.D., InSciTech, 5050 El Camino Real, Suite 108, Los Altos, California 94022; Telephone (650) 713-3437.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached hereto as Exhibit B.

Dr. Kelkar reserves the right to supplement his expert reports based upon new information, including but not limited to: outstanding discovery, future depositions, and deposition transcripts not yet received.

Defendants may also call any non-retained experts designated by other parties.

Defendants reserve the right to call additional expert witnesses in their case in chief or in rebuttal required to refute he testimony of expert witnesses who are called by Plaintiff.

Defendants reserve the right to call as expert witness any persons whose testimony is needed to present an adequate defense in rebuttal to the allegations in contentions of the Plaintiff.

Defendant reserves the right to call s expert witnesses any expert designated by other parties to this action.

Additional expert witnesses may be retained to testify. If this occurs, their identities will be disclosed immediately, pursuant to the provisions set forth in FRCP 26(a)(2).

**NON-RETAINED EXPERT**

**1.**      Police Detective Brian Berg, Redding Police Department.

Police Detective Berg is a defensive tactics and critical incident response trainer for the Redding police department.  Police Detective Berg will offer testimony to the foundational training given to all officers in the area of response to calls for service involving potential armed subjects, safety, and defensive tactics while engaging with a subject suspected of possessing a concealed firearm, verbal commands, cover and approach and securing of a subject suspected of having a concealed firearm, and control and search techniques to determine if a subject is in

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

DEFENDANTS' EXPERT DISCLOSURES
2:22-CV-00585-WBS-JDP

641181.1

possession of a concealed firearm.

Respectfully submitted,

Dated:  February 7, 2024

ALLEN, GLAESSNER,
HAZELWOOD & WERTH, LLP


By:    /s/ DALE L. ALLEN, JR.
        DALE L. ALLEN, JR
        AMEET D. PATEL
        Attorneys for Defendant
        CITY OF REDDING, GARRETT
        MAXWELL, AND MATTHEW BRUCE

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

3

DEFENDANTS' EXPERT DISCLOSURES
2:22-CV-00585-WBS-JDP

641181.1

**PROOF OF SERVICE**

*Veronica McLeod, et al v. City of Redding, et al*
Northern District of California, Case No. 2:22-cv-00585-WBS-JDP

I am a resident of the State of California, over 18 years of age and not a party to the within action. I am employed in the County of San Francisco; my business address is: 180 Montgomery Street, Suite 1200, San Francisco, CA 94104. On February 9, 2024, I served the within:

**DEFENDANTS CITY OF REDDING, GARRETT MAXWELL, AND MATTHEW BRUCE'S EXPERT DISCLOSURE PURSUANT TO F.R.C.P. RULE 26(A)(2)**

on all parties in this action, as addressed below, by causing a true copy thereof to be distributed as follows:

SEE ATTACHED SERVICE LIST

☐   By United States Mail: I enclosed the document in a sealed envelope or package addressed to the persons at the addresses listed above and placed the envelope/package for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing documents for mailing. On the same day that the document is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing an affidavit.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California.

☐   By Overnight Delivery: I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the persons listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☒   By E-Mail or Electronic Transmission: Based on a court order or an agreement of the parties to accept service by email or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒   *(FEDERAL)* I declare under the laws of the United States of America that I am employed in the office of a member of the Bar of this court at whose direction the service was made and that the foregoing is true and correct.

Executed on February 9, 2024, at San Francisco, California.

_____
Evelyn Rodas

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

4

DEFENDANTS' EXPERT DISCLOSURES
2:22-CV-00585-WBS-JDP

641181.1

**SERVICE LIST**

Dale K. Galipo                                  Attorneys for Plaintiff
Hang D. Le                                      Telephone:  (818) 347-3333
Law Offices of Dale K. Galipo                   Facsimile:  (818) 347-4118
21800 Burbank Boulevard, Suite 310              Email:  dalekgalipo@yahoo.com
Woodland Hills, CA 91367                        Email:  hlee@galipolaw.com
                                                Email: kslyapich@galipolaw.com
                                                Email: blevine@galipolaw.com

Stewart Katz                                    Attorneys for Plaintiff
Law Offices if Stewart Katz                     Telephone:  (916) 444-5678
555 University Avenue, Suite 270                Email: stewartkatzlaw@gmail.com
Sacramento, CA 95825

DEFENDANTS' EXPERT DISCLOSURES
2:22-CV-00585-WBS-JDP

641181.1

# EXHIBIT "H"

DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
AMEET D. PATEL, State Bar No. 343413
apatel@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:      (415) 697-2000
Facsimile:      (415) 813-2045

Attorney for Defendant
CITY OF REDDING, GARRETT MAXWELL, AND
MATTHEW BRUCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA MCLEOD, individually and as successor in interest to decedent, DOLORES HERNANDEZ; AMADO HERNANADEZ; individually and as successor in interest to decedent, DOLORES HERNANDEZ; and YSIDRA REGALDO, individually,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF REDDING; GARRETT MAXWELL, an individual; MATTHEW BRUCE, an individual; and DOES 2-10, inclusive,<br><br>Defendants. | Case No. 2:22-CV-00585-WBS-JDP<br><br>**NOTICE OF MANUAL FILING/LODGING OF DIGITAL EXHIBIT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION [F.R.C.P. 56]**<br><br>Hon. WILLIAM B. SHUBB<br><br>Date:      June 10, 2024<br>Time:     1:30 p.m.<br>Ctrm:     5<br><br>Trial:      September 10, 2024 |

PLEASE TAKE NOTICE THAT regarding Exhibit "C" and Exhibit "H" to the Declaration of Ameet D. Patel, filed concurrently with this notice, the ECF filing is in physical form only, and in place of Exhibit "C", a video file, and Exhibit "H," an audio file.

Plaintiffs are already in possession of the contents of this filing. For information on retrieving the filing directly from the Court, please see the court's webpage at www.caed.uscourts.gov.

/ / /

/ / /

656310.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1    The filing was not e-filed for the following reasons:

2    The files are a non-graphical/text; they are a video and audio file of the incident, copied

3    onto a CD.

4

5                                          Respectfully submitted,

6    Dated:  April 24, 2024                ALLEN, GLAESSNER,
                                           HAZELWOOD & WERTH, LLP
7

8                                          By:   /s/ Ameet D. Patel
                                                 DALE L. ALLEN, JR.
9                                                AMEET D. PATEL
                                                 Attorneys for Defendants
10                                               CITY OF REDDING, GARRETT
                                                 MAXWELL and MATTHEW BRUCE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

656310.1

MSJ – DEFENDANTS' SSUMF
2:22-CV-00585-WBS-JDP