**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

**LAW OFFICE OF STEWART KATZ**
Stewart Katz, State Bar #127425
555 University Avenue, Suite 270
Sacramento, California 95825
Telephone: (916) 444-5678

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA MCLEOD, individually and as successor in interest to decedent, DOLORES HERNANDEZ; AMADO HERNANDEZ, individually and as successor in interest to decedent, DOLORES HERNANDEZ; and YSIDRA REGALDO, individually,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CITY OF REDDING; GARRETT MAXWELL, an individual; MATTHEW BRUCE, an individual; and DOES 1-10, inclusive,<br><br>                    Defendants. | Case No. 2:22-cv-00585-WBS-JDP<br><br>*Honorable William B. Shubb*<br>*Hon. Magistrate Jeremy D. Peterson*<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>[*Filed concurrently with Plaintiffs' Response to Defendants' Statement and Statement of Disputed Facts; Declarations of Hang D. Le and Scott DeFoe; and exhibits thereto*]<br><br>Date:  June 10, 2024<br>Time:  1:30 p.m.<br>Ctrm:  5<br><br>Trial:  September 10, 2024 |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.   Bruce and Maxwell Respond to a Call Regarding a Disturbance and Bruce Makes Contact with Decedent .................................................................. 3

    B.   Decedent Attempts to Leave the Shopping Plaza ......................................... 4

    C.   The Officers Escalate the Encounter in an Attempt to Take Decedent into Custody ................................................................................................... 5

    D.   Maxwell Shoots and Kills Decedent ........................................................... 6

    E.   The Officers' Pre-Force Conduct and Uses of Force Violated Standard Police Practices and Training ....................................................................... 7

III.   LEGAL STANDARD ............................................................................................ 9

IV.   ARGUMENT ...................................................................................................... 11

    A.   Maxwell and Bruce Unreasonably Seized Decedent When Bruce Struck Decedent's Window and Maxwell Deflated Decedent's Tire with His Knife ........ 11

    B.   Maxwell and Bruce Used Excessive and Unreasonable Force, Including Deadly Force .............................................................................................. 12

        1.   Decedent Had Not Committed a Crime ...................................... 13

        2.   Decedent was Not Actively Resisting Arrest or Attempting to Evade Arrest by Flight .............................................................. 13

        3.   Bruce's Baton Strikes were Excessive and Unreasonable ......................... 14

        4.   The Shooting of Decedent was Excessive and Unreasonable .................... 16

        5.   Bruce Integrally Participated in the Use of Deadly Force Against Decedent ................................................................................... 18

        6.   Additional Factors Weigh Against the Reasonableness of the Uses of Force, Including Maxwell's Use of Deadly Force ................................ 18

        7.   The Cases Cited by Defendants in Support of Their Argument are Materially Distinguishable from the Facts of this Case ............................ 20

    C.   Maxwell and Bruce are Not Entitled to Qualified Immunity Under Plaintiffs' Fourth Amendment Excessive Force Claim .......................................... 22

        1.   It was Clearly Established that Bruce's Baton Strikes Violated the Constitution ............................................................................... 23

        2.   It was Clearly Established that the Shooting of Decedent Violated the Constitution ............................................................................... 25

D.   Maxwell and Bruce Violated Plaintiffs' Fourteenth Amendment Right to Against Unlawful Interference with Familial Relations ......................................... 26

E.   Summary Judgment Must Be Denied on Plaintiffs' State Law Battery Claim ....... 28

F.   Maxwell and Bruce were Negligent in Their Pre-Force Conduct and Use of Force ......................................................................................................................... 29

G.   Maxwell and Bruce Violated the Bane Act ............................................................ 31

V.   CONCLUSION ................................................................................................................ 32

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

Cases

*A.D. v. State of Cal. Highway Patrol*,
    712 F.3d 446 (9th Cir. 2013) ..................................................................... 24, 27

*A.K.H. v. City of Tustin*,
    837 F.3d 1005 (9th Cir. 2016) ............................................................................ 16

*Acosta v. City & Cnty. of San Francisco*,
    83 F.3d 1143 (9th Cir. 1996) .............................................................................. 25

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) .......................................................................................... 10

*Aguirre v. City of West Convina*,
    187 F. App'x 655 (9th Cir. 2006) ....................................................................... 17

*Anderson v. Creighton*,
    483 U.S. 635 (1987) .......................................................................................... 22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .......................................................................................... 10

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) .......................................................................................... 22

*B.B. v. Cnty. of Los Angeles*,
    10 Cal. 5th 1 (2020) .......................................................................................... 31

*B.B. v. Cnty. of Los Angeles*,
    25 Cal. App. 5th 115 (2018) .............................................................................. 31

*Blankenhorn v. City of Orange*,
    485 F.3d 463 (9th Cir. 2007) .............................................................................. 18

*Boyd v. Benton Cnty.*,
    374 F.3d 773 (9th Cir. 2004) .............................................................................. 18

*Branscum v. San Ramon Police Dep't*,
    505 Fed. App'x 860 (9th Cir. 2005) ................................................................... 11

*Brosseau v. Haugen*,
    543 U.S. 194 (2004) .......................................................................................... 22

*Bryan v. MacPherson*,
    630 F.3d 805 (9th Cir. 2010) ................................................................. 13, 14, 19

*Chuman v. Wright*,
    76 F.3d 292, 294-95 (9th Cir. 1996) .................................................................. 18

*Cnty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .......................................................................................... 26

*Deorle v. Rutherford*,
  272 F.3d 1272 (9th Cir. 2001) .................................................................................. 15, 22

*Drummond v. City of Anaheim*,
  343 F.3d 1052 (9th Cir. 2003) ........................................................................................ 19

*Estate of Aguirre v. Cnty. of Riverside*,
  29 F.4th 624 (9th Cir. 2022) ........................................................................................... 24

*Estate of Lopez v. Gelhaus*,
  871 F.3d 998 (9th Cir. 2017) .......................................................................................... 22

*Fewell v. California*,
  CV 16-1934 DSF (JEMx), 2017 WL 6043080 (C.D. Cal. Apr. 11, 2017) ........................ 21

*Ford v. City of Yakima*,
  706 F.3d 1188 (9th Cir. 2013) ........................................................................................ 22

*Funke v. Hatten*,
  Case No. 2:19-cv-01335-RFB-EJY, 2021 WL 2346003 (D. Nev. June 8, 2021) ............... 17

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) .......................................................................................... 26

*Glenn v. Washington Cnty.*,
  673 F.3d 864 (9th Cir. 2011) .......................................................................................... 19

*Gonzalez v. City of Anaheim*,
  747 F.3d 789 (9th Cir. 2014) .......................................................................................... 10

*Graham v. Connor*,
  490 U.S. 386 (1989) ................................................................................................. 12, 13

*Grudt v. City of Los Angeles*,
  2 Cal.3d 575 (1970) ....................................................................................................... 30

*Haugen v. Brosseau*,
  339 F.3d 857 (9th Cir. 2003) .......................................................................................... 23

*Hayes v. Cnty. of San Diego*,
  57 Cal.4th 622 (2013) ............................................................................................... 29, 30

*Holland v. Azevedo*,
  Case No. 14-cv-01349-JST, 2016 WL 1754446 (N.D. Cal. May 3, 2016) ....................... 21

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ................................................................................................. 23, 24

*Hughes v. Rodriguez*,
  31 F.4th 1211 (9th Cir. 2022) ......................................................................................... 31

*Johnson v. White*,
  725 F. App'x 868 (9th Cir. 2018) .................................................................................... 23

*K.H. Through Murphy v. Morgan*,
    914 F.2d 846 (7th Cir. 1990)............................................................................ 22

*Kirby v. Duva*,
    530 F.3d 475 (6th Cir. 2008).......................................................................... 25

*Kosakoff v. City of San Diego*,
    No. 08-CV-1819, 2010 WL 1759455 (S.D. Cal. Apr. 29, 2010) ...................... 26

*Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,
    841 F.2d 872 (9th Cir. 1987).......................................................................... 10

*Liston v. Cnty. of Riverside*,
    120 F.3d 965 (9th Cir. 1997).......................................................................... 10

*Mendez v. Cnty. of Los Angeles*,
    897 F.3d 1067 (9th Cir. 2018)........................................................................ 30

*Monzon v. City of Murrieta*,
    978 F.3d 1150 (9th Cir. 2020)........................................................................ 20

*Morgan v. Woessner*,
    997 F.2d 1244 (9th Cir. 1993)........................................................................ 11

*Mulligan v. Nichols*,
    835 F.3d 983 (9th Cir. 2016).......................................................................... 30

*Munoz v. City of Union City*,
    120 Cal. App. 4th 1077 (2004)...................................................................... 28

*Munoz v. Olin*,
    24 Cal. 3d 629 (1979).................................................................................... 30

*Orn v. City of Tacoma*,
    949 F.3d 1167 (9th Cir. 2020)........................................................... 16, 19, 25

*Patterson v. City of Wildwood*,
    354 Fed. App'x 695 (3d Cir. 2009)................................................................ 11

*Price v. Sery*,
    513 F.3d 952 (9th Cir. 2008).......................................................................... 16

*Prison Legal News v. Lehman*,
    397 F.3d 692 (9th Cir. 2005).......................................................................... 22

*Reese v. Cnty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018)........................................................................ 31

*Rivas-Villegas v. Cortesluna*,
    595 U.S. 1 (2021) .......................................................................................... 24

*Robbins v. Chronister*,
    156 F. Supp. 2d 1211 (D. Kansas 2001) ........................................................ 24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Rosenbaum v. Washoe Cnty.*,
    663 F.3d 1071 (9th Cir. 2011) ............................................................... 11

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) .......................................................... 18, 19

*Salvato v. Miley*,
    790 F.3d 1286 (11th Cir. 2015) ............................................................. 13

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) ........................................................... 10, 13

*Saucier v. Katz*,
    533 U.S. 194 (2001) ......................................................................... 22, 25

*Scott v. Harris*,
    550 U.S. 372 (2007) ............................................................................... 10

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994) ................................................................... 10

*Shreve v. Franklin Cnty., Ohio*,
    743 F.3d 126 (6th Cir. 2014) ................................................................. 11

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) ................................................................. 10

*Smith v. Cupp*,
    430 F.3d 766 (6th Cir. 2005) ................................................................. 25

*Sorrels v. McKee*,
    290 F.3d 965 (9th Cir. 2002) ................................................................. 22

*Tabares v. City of Huntington Beach*,
    988 F.3d 1119 (9th Cir. 2021) .......................................................... 17, 30

*Taylor v. Riojas*,
    592 U.S. 7 (2020) .................................................................................. 24

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .................................................................................. 16

*Tennison v. City & Cnty. of San Francisco*,
    570 F.3d 1078 (9th Cir. 2009) ............................................................... 26

*U.S. v. Smith*,
    790 F.2d 789 (9th Cir. 1986) ................................................................. 11

*Villanueva v. California*,
    986 F.3d 1158 (9th Cir. 2021) .......................................................... 16, 25

*Vos v. City of Newport Beach*,
    992 F.3d 1024 (9th Cit. 2019) .......................................................... 10, 11

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ................................................................... 22

*White v. Pauly,*
    137 S. Ct. 548 (2017) ................................................................................. 26

*Wilkinson v. Torres,*
    610 F.3d 546 (9th Cir. 2010) ............................................................... 21, 26

*Young v. Cnty. of Los Angeles,*
    655 F.3d 1156 (9th Cir. 2011) ............................................................. 14, 15

*Zion v. Cnty. of Orange,*
    874 F.3d 1072 (9th Cir. 2017) ................................................................... 17

<u>Other Authorities</u>

Judicial Council of California Civil Jury Instructions No. 1305B, Battery by Peace Officer
    (Deadly Force) – Essential Factual Elements (2023) .................................... 28, 29

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

This civil rights case arises out of City of Redding police officer encounter with Dolores Hernandez ("Decedent") that resulted in her shooting death on December 2, 2020. Officers Garret Maxwell ("Maxwell") and Matthew Bruce ("Bruce") responded to a general disturbance call in a shopping plaza in Redding, California and proceeded to have an encounter with Decedent. Viewing the evidence in the light most favorable to Plaintiffs as required at the summary judgment stage, Decedent had not committed a crime nor was she resisting arrest nor attempting to flee when Bruce and Maxwell approached Decedent's vehicle to terminate the vehicle's movement, and without any attempts at communication, commands, or warning. Bruce used a baton to strike Decedent's driver side window in an attempt to smash the window open and pull Decedent out while Maxwell used a knife to deflate Decedent's left rear tire. While the officers were using excessive and unreasonable force to unreasonably detain Decedent, the vehicle reversed and Bruce fell to the ground near the vehicle's left front tire. Bruce then directed Maxwell to shoot Decedent and Maxwell discharged his firearm seven times into the car—with all seven shots striking Decedent. Decedent did not pose an immediate threat of death or serious bodily injury to Bruce or anyone else at the time of the shooting as Bruce was not pinned underneath the car, was not in the direct pathway of the car, and the vehicle was not moving when Maxwell opened fire. The number of shots fired by Maxwell was also excessive and unreasonable as it was clear that the first two shots struck and incapacitated Decedent, which caused Decedent to lose control of the vehicle and allow the car to move forward.

Throughout the encounter, Decedent exhibited indicators of having a mental illness and the officers knew or should have known, pursuant to their training, that Decedent potentially was suffering from a mental illness or mental health crisis and should have used de-escalation techniques and defused the situation as they are trained regarding encounters with mentally-ill persons.  The officers failed to do so and instead, escalated the encounter and failed to use any de-escalation techniques, including moving to a position of cover and out of the potential pathway of

the vehicle, communicating with Decedent and giving Decedent commands and a chance to comply with those commands before resorting to force.

Decedent's adult children, Veronica McLeod and Amado Hernandez, and Decedent's mother, Ysidra Regaldo, filed this instant action, alleging the following claims: (1) Violation of the Fourth Amendment—Detention and Arrest (42 U.S.C. § 1983); (2) Violation of the Fourth Amendment—Excessive Force (42 U.S.C. § 1983); (3) Violation of the Fourth Amendment—Denial of Medical Care (42 U.S.C. § 1983); (4) Violation of Substantive Due Process (42 U.S.C. § 1983); (5) Municipal Liability—Ratification (42 U.S.C. § 1983); (6) Municipal Liability—Inadequate Training (42 U.S.C. § 1983); (7) Municipal Liability—Unconstitutional Custom, Practice, and Policy (42 U.S.C. § 1983); (8) Battery (Wrongful Death); (9) Negligence (Wrongful Death); and (10) Violation of California Civil Code § 52 (Bane Act). *See* First Amended Complaint for Damages, Dkt. No. 13. Defendants City of Redding, Garret Maxwell, and Matthew Bruce have now filed a Motion for Summary Judgment, or in the Alternative Summary Adjudication on all claims. Because under Plaintiffs' facts, Maxwell and Bruce unreasonably detained Decedent—who had committed no crime, used excessive and unreasonable force against Decedent when she did not pose an immediate threat to anyone and certainly not an immediate threat of death or serious bodily injury, and were negligent in the pre-force conduct and use of force, summary judgment should be denied as to Plaintiff's Fourth Amendment claims for Detention and Arrest and Excessive Force, Fourteenth Amendment substantive due process claim, and state law claims for battery, negligence and violation of the Bane Act.[1]

//

//

//

//

//

---

[1] Plaintiffs voluntarily dismiss Plaintiffs' Fourth Amendment Denial of Medical Care claim and Municipal Liability claims (Ratification, Inadequate Training, and Unconstitutional Custom, Practice or Policy).

II.    **STATEMENT OF FACTS**

A.   Bruce and Maxwell Respond to a Call Regarding a Disturbance and Bruce Makes Contact with Decedent

Bruce and Maxwell responded to a general disturbance call regarding a woman using foul language, causing a disturbance at a location, and refusing to leave the area. Plaintiffs' Additional Material Facts ("PAMF") 40. When Bruce responded to the call, he did not have any information that anyone had been verbally threatened, that anyone had been injured, or that any weapon had been involved. PAMF 41. Bruce did not speak with anyone at the scene before speaking with Decedent. PAMF 42. Bruce was aware that Maxwell had arrived shortly behind him and waited for Maxwell to make their approach but did not have a conversation with Maxwell prior to making the approach. PAMF 43-44.

When Bruce initially contacted Decedent in her vehicle, the driver's window was all the way up. PAMF 45. Maxwell then arrived on scene and made contact with a security guard who informed him that the Decedent had caused a disturbance inside the Mod Pizza business and claims she had been belligerent. PAMF 46. In order to get Decedent's attention, Bruce knocked on Decedent's window three times then shined his flashlight into her car, to which Decedent lowered her window a few inches. PAMF 47. Bruce did not recognize Decedent and had never had contact with Decedent prior to the incident. PAMF 48. Bruce also did not see any weapons in the car. PAMF 49.

While speaking with Decedent, Bruce knew something was not right with Decedent and that she was not in her right mind. PAMF 50. As Bruce continued to speak with Decedent, he could tell that he was agitating her. PAMF 51. Bruce was unable to assess whether Decedent was under the influence of drugs or alcohol. PAMF 55. However, as he continued to interact with her, Bruce started to build a suspicion that Decedent possibly had a mental health problem. PAMF 52. After Decedent accused Bruce of being a murderer, he claims he started to become more aware that Decedent was not safe. PAMF 53. While speaking with the security guard, Maxwell claims he noticed that Decedent was angry and cursing at Bruce. PAMF 56. Thus, Maxwell moved off the sidewalk and positioned himself near Bruce as Bruce continued to speak with Decedent. PAMF

57. Decedent never made any verbal threat to Bruce during her conversation with him. PAMF 54. In response to Bruce's request to see Decedent's license, Decedent refused and began to reverse the car. PAMF 58.

      B.  <u>Decedent Attempts to Leave the Shopping Plaza</u>

      When Decedent started backing up the vehicle, Bruce waved to her and told her that she was now driving. PAMF 59. Bruce believed that Decedent was free to leave because he did not have enough to detain or arrest her and was going to go look for Maxwell to speak with him about what had occurred. PAMF 60. At this time, Bruce had no intention of arresting Decedent and was going to let her go. PAMF 61. This was because Bruce did not have enough to determine if she was something more than just crazy, and being crazy is not a crime. PAMF 62. As the vehicle began to back out, Maxwell moved into the parking lot area to get a better vantage point of the parking area. PAMF 63. Maxwell intended to let Decedent leave the shopping plaza and then initiate a traffic stop on Decedent at a later location PAMF 64. Neither officer had discussed their intentions with regards to Decedent, as Bruce admitted that he did not even know where Maxwell was at the time Decedent put her vehicle in reverse and intended to go look for Maxwell to discuss. PAMF 65.

      At some point while backing out, the vehicle came to a stop and then moved forward as the officers walked alongside the driver's side of the vehicle, before coming to another stop. PAMF 66. The vehicle did not come close to striking any officer and neither officer was in the pathway of the vehicle when it moved forward. PAMF 67. Neither Bruce nor Maxwell was struck by the vehicle. PAMF 68. After Decedent moved the vehicle forward and then came to a stop, Bruce claims that he thought that Decedent was agitated at this point. PAMF 69. Bruce cannot recall whether Decedent's car windows were all the way up and concedes that the window may have been down a few inches still. PAMF 70. After the car reversed and then moved forward, Maxwell claims he heard Bruce say things to the driver before Bruce began to hit the window with his baton. PAMF 71. After coming to a stop, the vehicle began to reverse again. PAMF 72.

//

//

C.   <u>The Officers Escalate the Encounter in an Attempt to Take Decedent into Custody</u>

As the vehicle reversed, Bruce approached the driver's side door and started to strike the driver's side window with the bottom of his baton, while positioning his left foot extended forward near the front left tire. PAMF 73. A reasonable officer acting pursuant to standard police practices and training would not have believed that there was reasonable suspicion to detain or probable cause to arrest at this point in time. PAMF 74. Bruce's plan was to bash open the driver's side window and pull Decedent out of the vehicle. PAMF 75. Bruce did not make tactical plan or have any discussion with Maxwell prior to bashing the vehicle's window. PAMF 76. Bruce has never been able to successfully break window while the driver was in the car and the engine was on, nor has he ever seen an officer successfully smash a window open and stop someone from driving while the vehicle is on, in gear, and the driver is in the vehicle. PAMF 77-78.

Prior to striking the window with his baton, Bruce did not give Decedent any commands or a warning that he was going to strike her window. PAMF 79. Bruce also did not make any gestures with his hands in an attempt to communicate with Decedent that he wanted her to stop. PAMF 80. Bruce made the decision to not give any commands or gestures prior to approaching to smash the window. PAMF 81. He claims that the reasons he did not try to give Decedent a command or gesture to let her know he wanted her to stop prior to approaching to stop her window was because he was purely focused on the task at hand. PAMF 82.

Bruce claims that he anticipated that the car was going to move while he was smashing the window and planned that if the car were to move forward or backward, he would move along with the vehicle and make its angle while continuing to smash the window. PAMF 84-85. However, Bruce admitted that he was not aware of whether the vehicle was moving or not while he was focused on breaking the driver's side window. PAMF 83. Bruce also admitted that he did not know where Maxwell was while he was smashing the window with his baton and was not aware of what Maxwell was doing. PAMF 86.

While Bruce was striking the driver's side window, Maxwell approached the moving vehicle's left rear tire and stabbed the tire with his knife. PAMF 87. Maxwell observed Bruce using his expandable baton to try and break the window before Maxwell got to the rear tire.

PAMF 88. Bruce struck the vehicle's window three times with his baton. PAMF 89. After Bruce's third baton strike, the car reversed further, and Bruce fell to the ground near the front left tire. PAMF 90. Bruce found himself on the ground and initially did not know what had brought him off his feet. PAMF 91. After falling to the ground, Bruce was positioned on all fours, with his arms and legs apart. PAMF 93. The vehicle's left front tire did not stop on Bruce and Bruce was not pinned underneath the vehicle. PAMF 94. After Bruce went to the ground, he did not try to say anything to Decedent. PAMF 95. Bruce concedes that if he had not gone up to smash the vehicle's window, he would not have been in the position to end up where he did on the ground. PAMF 92.

D.  <u>Maxwell Shoots and Kills Decedent</u>

Moments after Bruce went to the ground, Bruce looked at Maxwell and told Maxwell to shoot Decedent with his firearm, believing that he was directing Maxwell to shoot Decedent. PAMF 96-97. After stabbing the left rear tire twice, Maxwell turned his attention to Bruce, unholstered his firearm and pointed it at the driver's side window. PAMF 98. There was a gap of time from when Maxwell drew his firearm to when he engaged his firearm during which Maxwell assessed the situation. PAMF 99. According to Maxwell, approximately three to five seconds passed between the time Maxwell got to the car window and when he began shooting. PAMF 100. Maxwell discharged his firearm into the driver's side window. PAMF 101. The vehicle was not moving when the shooting started. PAMF 102. Maxwell never said anything to Decedent, including any commands to stop or a warning that he was going to shoot, prior to the shooting. PAMF 103.

Maxwell aimed at Decedent's upper left torso. PAMF 104. Maxwell was able to see Decedent in the car through the circle that was created after the first shot. PAMF 105. Maxwell had the impression that his shots were striking Decedent in the car because he could see the initial impact as he began shooting and could see that his continued shots appeared to be striking her. PAMF 106. After the first or second shot, Decedent's head fell forward and landed on the steering wheel. PAMF 107. After the first two shots, Decedent's head and upper body moved away from the driver's side and down towards passenger seat area. PAMF 108. The car also slowly moved forward in a straight line and Bruce moved away from near the front left tire. PAMF 109. Bruce

was not in the direct pathway of the vehicle when it started to move forward. PAMF 110. The car never attempted to make a turn when it moved forward; it generally moved in a straight direction the entire time. PAMF 111. When the car rolled forward, it was moving at approximately 2 miles per hour. PAMF 112. Bruce claims he heard two back-to-back shots and then felt the vehicle move off his leg. PAMF 113. Maxwell fired five additional shots after the initial two shots for a total of seven shots. PAMF 114. Maxwell claims he would not have had to shoot if Decedent had stopped and complied with directions after driving forward in the officers' direction, PAMF 115, but as previously discussed, both Maxwell and Bruce admitted that they never gave any commands to Decedent, PAMF 79-81, 95, 103. Maxwell claims he would not have used his firearm against Decedent had Decedent not been manipulating her car or looked like she was going to comply after striking Bruce, PAMF 116, but a reasonable jury could find under the evidence that Decedent was not manipulating the car because the car was stopped during the first two shots and Decedent lost control of the vehicle when she was struck by the first two shots, *see* PAMF 106-08.

Decedent sustained seven gunshot wounds to her body. PAMF 117. One of the gunshot wounds entered her left mid-back and had a back to front, left to right, and sharply upward trajectory. PAMF 118. Another gunshot wound entered the lateral left torso and had a left to right, slightly front to back, and sharply upward trajectory. PAMF 119. The bullets broke Decedent's jaw and left upper arm, damaged structures in her neck, and tore through her left lung with resultant accumulation of blood in her left chest cavity. PAMF 120. Decedent died as a result of her gunshot wounds. PAMF 121.

Bruce did not sustain any broken bones or any injury that required surgical intervention as a result of the incident. PAMF 122. Bruce only sustained abrasions and contusions to his left knee, right knee, and abrasions to his hands PAMF 123.

E.   The Officers' Pre-Force Conduct and Uses of Force Violated Standard Police Practices and Training

Plaintiffs' police practices expert, Scott DeFoe, opined that based on the circumstances of this incident, a reasonable police office acting consistent with standard police practices and

training would have initially determined that Decedent was mentally ill or experiencing a mental health crisis. PAMF 124. The officers failed to do so despite Decedent exhibiting indicators of a mental illness. PAMF 126. Officers are trained to recognize cues and other indicators of a mental illness in order to make appropriate decisions regarding intervention strategies. PAMF 125. A reasonable officer acting consistent with standard police practices would have acted according to their training regarding how to deal will mentally ill persons or persons experiencing a mental crisis and would have attempted to deescalate and utilize proper defusing techniques. PAMF 131.

Mr. DeFoe further opined that there was a gross lack of situational awareness and fundamental tactical errors made by Maxwell and Bruce in this incident. PAFM 127. The officers failed to formulate a tactical plan prior to their initial approach Decedent and prior to approaching Decedent to detain her. PAMF 128. The poor tactical choices and errors made by the officers during this incident include failing to recognize that Decedent may have a mental illness and responding appropriately pursuant to their training, failing to tactically position themselves in a position of cover and away from Decedent's vehicle when it began moving, failing to communicate with each other during the incident, positioning themselves near or in the pathway of a moving vehicle despite anticipating that the vehicle would continue to move, unnecessarily escalating the situation by using force without attempting to communicate, give commands, or give warnings, and not being aware of where their partner was during the incident. PAMF 129. Mr. DeFoe opined that had the officers not made such poor tactical decisions and errors, the shooting would not have happened. PAMF 130.

Additionally, Bruce's use of the baton to strike the driver's side window violated standard police practices and training and unnecessarily escalated the situation. PAMF 132. Moreover, a reasonable officer acting consistent with police practices and training, confronted with the facts of this incident, would not have used lethal force in this situation. PAMF 132. This was not an immediate defense of life situation and under the facts of this case, Maxwell could not shoot Decedent after Bruce was not under the vehicle or in a position where he or Maxwell could be immediately struck by the vehicle. PAMF 134. Officers are trained that shooting at a moving vehicle is rarely effective and that officers should move out of the path of an approaching vehicle

instead of discharging their firearm because if a driver is wounded or killed while operating a vehicle, the driver could lose control of the vehicle, making it more dangerous for those around the vehicle. PAMF 135-36. Further, the Redding Police Department Policy 300.4.1 advises officers that they should only discharge a firearm at a moving vehicle if the officer reasonably believes there are no other means available to avert the imminent threat or if deadly force other than the vehicle is directed at others. PAMF 148. Here, Maxwell never saw Decedent with a gun or pointing a gun at anyone. PAMF 149.

Officers are trained that lethal force must be a last resort and used only in the direst of circumstances. PAMF 138. Officers are further trained that they must show a reverence for human life and to consider other reasonable measures available prior to using lethal force. PAMF 139. Maxwell had other reasonable measures available to him at the time he used lethal force, including but not limited to issuing commands and warnings and moving to a position of cover. PAMF 140. Officers are also trained that they are responsible for justifying every shot, that subjective fear is insufficient to justify deadly force, and that an overreaction in using force is excessive force. PAMF 141-42. Mr. DeFoe opined that the number of shots by Maxwell violated standard police practices and training as it was clear to Maxwell that his initial shots struck Decedent, Decedent was incapacitated by the initial shots, and Bruce was able to move away from the vehicle after the initial two shots. PAMF 143.

Lastly, officers are trained to give a warning, when feasible, prior to using force in order to give the suspect the opportunity to comply and avoid the use of force. PAMF 144. Here, it was feasible for Bruce and Maxwell to provide commands and a warning prior to their deployment of forces but they failed to do so. PAMF 145-46. Mr. DeFoe opined that a reasonable officer acting pursuant to standard police practices and training would have given a warning prior to striking the driver's side window with a baton and prior using deadly force under the circumstances of this incident. PAMF 147.

## III.   LEGAL STANDARD

In ruling on a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H.*

1    *Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,

2    841 F.2d 872, 875 (9th Cir. 1987). Even where the basic facts are undisputed, summary judgment

3    should be denied if reasonable minds could differ on the inferences to be drawn from those facts.

4    *Adickes*, 398 U.S. at 158-59; *Lake Nacimiento Ranch Co.*, 841 F.2d at 875. "Credibility

5    determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

6    facts are jury functions, not those of a judge . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

7    255 (1986).

8        "Because [the excessive force inquiry] nearly always requires a jury to sift through

9    disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] held on many

10   occasions that summary judgment or judgment as a matter of law in excessive force cases should

11   be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *accord Liston v. Cnty.*

12   *of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that

13   the reasonableness of force used is ordinarily a question of fact for the jury."). "This is because

14   such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394

15   F.3d 689, 701 (9th Cir. 2005). Thus, "[t]he [court] must carefully examine all the evidence in the

16   record . . . and the available physical evidence, as well as any expert testimony proffered by the

17   plaintiff, to determine whether the officer's story is internally consistent and consistent with the

18   known facts." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("*Scott 1994*"); *accord Gonzalez*

19   *v. City of Anaheim*, 747 F.3d 789, 794-95  (9th Cir. 2014) (en banc). This includes "circumstantial

20   evidence that, if believed, would tend to discredit the police officer's story." *Scott 1994*, 39 F.3d at

21   915. While courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision

22   of hindsight,' nor does the Constitution forgive an officer's every mistake." *Scott 1994*, 39 F.3d at

23   915.

24       Where there is video evidence of the incident, the court must "view[] the facts in the light

25   depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) ("*Scott 2007*"); *Vos v.*

26   *City of Newport Beach*, 992 F.3d 1024, 1028 (9th Cit. 2019) ("The record is view in the light most

27   favorable to the nonmovants. . . , so long as their version of the facts is not blatantly contradicted

28   by the video evidence." (citations omitted)). However, even where video evidence exists, "courts

1   have declined to apply the limited exception set for in *Scott v. Harris* where a videotape… does

2   not capture the who incident… or whether the video… is susceptible to multiple reasonable

3   interpretations. *Patterson v. City of Wildwood*, 354 Fed. App'x 695, 698 (3d Cir. 2009); *see Vos*,

4   892 F.3d at 1028 ("The mere existence of video footage of the incident does not foreclose a

5   genuine factual dispute as to the reasonable inferences that can be drawn from that footage");

6   *Branscum v. San Ramon Police Dep't*, 505 Fed. App'x 860, 862 (9th Cir. 2005) (determining that

7   *Scott v. Harris* did not apply where footage was susceptible to more than one interpretation);

8   *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 143 (6th Cir. 2014) (accepting the nonmovant's

9   interpretation of a video because a reasonable jury could view the video and believe the

10  nonmovant's version of the facts).

## IV.   **ARGUMENT**

### A.   Maxwell and Bruce Unreasonably Seized Decedent When Bruce Struck Decedent's Window and Maxwell Deflated Decedent's Tire with His Knife

Stops under the Fourth Amendment fall into three categories: First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave. Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures."). "…Second, the police may "seize" citizens for brief, investigatory stops. This class of stops is not consensual, and such stops must be supported by "reasonable suspicion." Finally, police stops may be full-scale arrests. These stops, of course, are seizures, and must be supported by probable cause.

*Morgan v. Woessner*, 997 F.2d 1244, 1252 (9th Cir. 1993) (citations omitted)). "An officer has probable cause to make a warrantless arrest when the facts and circumstances within his knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (citation omitted). In determine whether there was probable cause to arrest, courts look to "the totality of the circumstances known to the arresting officers [to determine if] a prudent person would have concluded there was a fair probability that [the suspect] had committed a crime." *U.S. v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986).

The officers had neither reasonable suspicion to detain nor probable cause to arrest Decedent at the time Bruce approached the vehicle and began striking the driver's side window with his baton while Maxwell approached the left rear tire and stabbed it with his knife. The officers' encounter with Decedent started as a consensual encounter. The officers responded to a general disturbance call but admitted that when Decedent started backing out of the parking space, they had neither reasonable suspicion to detain nor probable cause to arrest Decedent. Bruce testified that when the vehicle started to reverse, Decedent was free to leave and that he intended to leave Decedent leave because he did not have enough to detain or arrest Decedent. Despite this admission, seconds later Bruce claims he attempted to arrest Decedent by striking her driver's side window several times with his baton with the intention to smash open the window and pull Decedent out of the vehicle. Mr. DeFoe opined that a reasonable officer acting pursuant to standard police practices and training would not have believed that there was reasonable suspicion to detain or probable cause to arrest Decedent at that time. Viewing the bystander video of the incident, Decedent does not appear to intentionally try to strike any of the officers with her vehicle in between the time she started to reverse her vehicle and when Bruce approached the vehicle and began striking the driver's side door with his baton. Moreover, neither officer had been struck by the vehicle at this point in time. And, as will be discussed later, Bruce's baton strikes was inappropriate and a poor tactical choice that unnecessarily escalated the situation. Accordingly, the officers unreasonably seized Decedent without reasonable suspicion or probable cause when Bruce approached and struck the driver's side window with his baton and when Maxwell stabbed and deflated the left rear tire with his knife.

B.   <u>Maxwell and Bruce Used Excessive and Unreasonable Force, Including Deadly Force</u>

A constitutional claim for excessive force is evaluated through the Fourth Amendment's reasonableness standard, considering "whether the officers' actions [we]re 'objectionably reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The "nature and quality of the intrusion" is weighed against the "countervailing governmental interests at stake." *Id.* at 396. Government interest factors to balance against the type of force used include "(1) the severity of the crime at issue, (2) whether the

suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* While it is true that "not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive." *Santos*, 287 F.3d at 853 (internal quotation marks and citations omitted).

### 1. Decedent Had Not Committed a Crime

The officers were not responding to a serious crime when they initially responded to the scene and Decedent had not committed a crime when the officers moved to arrest her. *Cf. Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (analyzing only the initial crime that the decedent was initially seized for—"yelling and cussing at passing cars"—and not any alleged crime that occurred after the initial seizure, even though the decedent struck the officers multiple times). The call for service was for a general disturbance and a desire to have the subject leave the area. Officer Bruce admitted that in between the time he made initial contact with Decedent and when Decedent started to back her car up, he did not have enough to detain or arrest Decedent for a crime. Additionally, the officers did not have reasonable suspicion to detain or probable cause to arrest Decedent in between the time Decedent initially backed up and when Officer Bruce approached the vehicle and began striking the driver's side window with his baton. While Defendants contend that Officer Bruce believed that Decedent had tried to assault him with her car, this fact is disputed and viewing the video evidence in the light most favorable to Plaintiffs, Decedent was not attempting to assault the officers with her car when the car moved forward. Accordingly, under Plaintiffs' facts, Decedent had not committed a crime.

### 2. Decedent was Not Actively Resisting Arrest or Attempting to Evade Arrest by Flight

"'Resistance' [] should not be understood as a binary state, with resistance being either completely passive of active. Rather, it runs the gamut from purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). "[T]he level of force an individual's resistance will support is

dependent on the factual circumstances underlying that resistance." *Id.* Where an officer failed to inform the suspect that she was under arrest or give orders until after the force deployment, "there can [] be no failure to comply with orders, and [the suspect's] actions cannot be viewed as even passive non-compliance. *Nelson v. City of Davis*, 685 F.3d at 881-82 (assuming plaintiff's facts that the officers did not give orders until after the force deployment, plaintiff was not passively resisting; even assuming the officers' facts in which they issued orders, failure to fully or immediately comply with an officer's command is not active resistance).

Here, it is undisputed that neither Officer Bruce nor Officer Maxwell ever informed Decedent that she was under arrest and attempted to communicate with Decedent and give commands or a warning prior striking Decedent's driver's side window with the baton and prior to the use of deadly force. While Defendants contend that it was not feasible to give commands or a warning, under Plaintiffs' facts, the officers had the opportunity and the time to give commands and a warning since Bruce testified that he *made the decision* to not try to communicate with Decedent with gestures, commands or a warning prior to using his baton to strike her window because he was "purely focused on the task at hand," and Maxwell testified that there was a gap in time from when he drew his firearm to when he engaged his firearm during which he assessed the situation but admitted that he did not say anything to Decedent, including any commands to stop or a warning that he was going to shoot. Additionally, while Decedent's vehicle does move a short distance between the time Bruce started striking the driver's side window and when Maxwell discharged his firearm, a reasonable jury could conclude that the vehicle only moved in a startle response to the officers' quick escalation of the situation with the baton strikes, knife stabs, and use of deadly force. Accordingly, viewing the evidence in the light most favorable to Plaintiffs, Decedent was not actively resisting or attempting to evade arrest by flight at the time of the baton strikes and the shooting.

### 3. Bruce's Baton Strikes were Excessive and Unreasonable

Baton strikes are also a "significant use of force that is capable of causing pain and bodily injury, and therefore, baton blows, like pepper spray, are considered a form of 'intermediate force.'" *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1162 (9th Cir. 2011). The Ninth Circuit has

1   acknowledged evidence that batons should only be used as a response to aggressive or combative

2   acts. *Id.* The Ninth Circuit in *Young* recognize that striking a subject multiple times with a baton

3   "is a sufficiently serious intrusion upon liberty that must be justified by a commensurately serious

4   state interest." *Id.*  "A desire to resolve quickly a potentially dangerous is not the type of

5   governmental interest that, standing alone, justifies the use of force that may cause serious injury."

6   *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001).

7          As previously discussed, Bruce did not have reasonable suspicion to detain nor probable

8   cause to arrest Decedent at the time he approached the vehicle and struck the driver's side window

9   several times with his baton. A reasonable jury could conclude that it was not reasonable for Bruce

10   to believe that Decedent was trying to assault him with her car when the car moved forward.

11   Moreover, it is undisputed that Bruce did not try to give commands or a warning prior to using his

12   baton to strike the window. At the time Bruce approached the car to strike the window with his

13   baton, he was not in the pathway of the vehicle, and no one was in danger of being struck by the

14   vehicle as the vehicle slowly began to move in reverse. Under these facts, Bruce was not

15   responding to any aggressive or combative act by Decedent when he used his baton and a

16   reasonable jury could find that Bruce's use of the baton was based on his desire to quickly resolve

17   a *potentially* dangerous situation and failure to attempt to deescalate the situation with

18   communication and commands despite it being feasible to do so. Thus, a reasonable jury could

19   find that Bruce's use of the baton was excessive and unreasonable under the circumstances.

20          Indeed a reasonable jury could find that if not for Bruce's unjustifiable and unnecessary

21   attempts to break Decedent's window with the baton, for which Decedent had some expected

22   reaction, the subsequent shooting would not have occurred. Bruce did not even try to attempt to

23   deescalate to situation by issuing commands or at the very least, communicating with Decedent

24   that he intended to detain her. While Defendants contend that Bruce could not have effectively

25   done so due to the music playing in Decedent's car, this is disputed by the fact that Bruce could

26   have used gestures, like he did when he waved at Decedent and told her she was driving, and

27   evidence showing that Bruce did believe he could communicate with Decedent since Maxwell

28   claims he heard Bruce speaking to Decedent prior to his approach to the vehicle to strike the

15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

window with his baton. Bruce even admitted that had he not gone up to smash the vehicle's window, he would not have been in the position to end up where he did on the ground. Under these facts, a reasonable jury could not only find that Bruce's baton strikes were excessive and unreasonable under the Fourth Amendment (and Plaintiffs' battery and negligence claims), but that his quick escalation to significant force without provocation shocked the conscience and violated Decedent's and Plaintiffs' substantive due process under the Fourteenth Amendment.

> ### 4.   The Shooting of Decedent was Excessive and Unreasonable

"The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in [her] own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Maxwell deprived Decedent of the "fundamental interest in her own life." *Id.* "[T]o justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required." *Price v. Sery*, 513 F.3d 952, 969 (9th Cir. 2008).

"A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020). The Ninth Circuit has "consistently found use of deadly forced to stop a slow-moving vehicle unreasonable when the officers could have easily stepped out of the vehicle's path to avoid danger." *Villanueva v. California*, 986 F.3d 1158, 1170 (9th Cir. 2021) (citing *Orn*, 949 F.3d at 1175). "In contrast, [the Ninth Circuit has] found use of deadly force against a stopped or slow-moving vehicle reasonable only when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle." *Villanueva*, 986 F.3d at 1170 (citations omitted).

Here, Decedent did not pose an immediate threat of death or serious bodily injury under the totality of the circumstances at the time of Maxwell's use of deadly force and it was not reasonable for Maxwell to believe otherwise. The officers did not have any information that Decedent had ever verbally threatened anybody, had injured anyone, or was armed with a weapon.

1   Importantly, under Plaintiffs' facts, Decedent had not tried to assault the officers with her vehicle

2   and Bruce was not pinned underneath the vehicle nor was he in danger of being run over by the

3   vehicle at the time of the shooting. While Defendants contend that the vehicle could have run over

4   Bruce's head and body *if* the vehicle had been driven forward *with* counterclockwise steering,

5   there is no evidence that such an event was about to occur and posed such an immediate threat to

6   Bruce. "The inquiry is not whether someone could *potentially* be an "immediate threat" but

7   whether the person is actually an immediate threat at the time the deadly force was used." *Funke v.*

8   *Hatten*, Case No. 2:19-cv-01335-RFB-EJY, 2021 WL 2346003, at *6 (D. Nev. June 8, 2021)

9   (citing *Aguirre v. City of West Convina*, 187 F. App'x 655, 757 (9th Cir. 2006)). There are no

10  objective facts to support Defendants' contention that the vehicle was about to move forward with

11  counterclockwise steering and run over Bruce's body and head. Additionally, the vehicle was not

12  attempting to evade arrest in an aggressive manner at the time of the shooting as the officers never

13  informed Decedent that she was under arrest nor give Decedent any commands, the vehicle was

14  not moving when the shooting started, and a reasonable jury could find that the vehicle only rolled

15  forward at a speed of approximately two miles per hour after the first two shots because Decedent

16  had been struck by the shots, was incapacitated, and had lost control of the vehicle.

17      Moreover, even if the Court were to assume that Maxwell reasonably believed Decedent to

18  be an immediate threat of death or serious bodily injury when he started firing, the objective facts

19  show that the number of shots fired in total was excessive and unreasonable. Officers are trained

20  that they must justify every shot, that subjective fear is insufficient to justify the use of deadly

21  force, and that an overreaction is excessive force. Here, Maxwell firing seven shots at Decedent

22  (all of which struck Decedent) was an overreaction and use of excessive force. In *Tabares v. City*

23  *of Huntington Beach*, the Ninth Circuit held that a reasonable jury could find the "number of

24  shots" fired by the officer to be unreasonable "even had an initial threat existed," where the

25  suspect had already been shot multiple times and the officer "did not give [the suspect] any time to

26  understand or comply with [his] command before firing the [final] shot." 988 F.3d 1119, 1130 (9th

27  Cir. 2021) (citing *Zion v. Cnty. of Orange*, 874 F.3d 1072 (9th Cir. 2017)). Here, Maxwell fired

28  his five additional shots despite it being clear that his initial shots had struck Decedent, Decedent

was incapacitated after the initial two shots as her head fell forward and struck the steering wheel and her head and upper body then fell towards the front passenger seat, and Bruce was able to move away from the vehicle after the initial two shots.

### 5. Bruce Integrally Participated in the Use of Deadly Force Against Decedent

An officer's liability under section 1983 may be predicated on his "integral participation" in the alleged violation. *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir. 1996). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). In *Blankenhorn v. City of Orange*, the Ninth Circuit determined that the officer who ordered another officer to use hobble restraints—restraints which a reasonable jury could find to be excessive—may be held liable for that alleged use of excessive force. 485 F.3d 463, 480, 481 n.12 (9th Cir. 2007). Here, it is undisputed that Bruce told Maxwell to shoot Decedent and in doing so, believed that he was directing Maxwell to shoot. A reasonable jury could find that Maxwell shot at Bruce's direction and thus, Bruce integrally participated in the use of deadly force against Decedent.

### 6. Additional Factors Weigh Against the Reasonableness of the Uses of Force, Including Maxwell's Use of Deadly Force

Additional factors to consider in evaluating the reasonableness of the use of force are whether the officer provided adequate commands prior to deploying forceful measures; whether, if feasible, a warning that failure to comply would result in deadly force; and the availability of alternative methods to effectuate an arrest. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1137-38 (9th Cir. 2019). Under Plaintiffs' facts, all three factors weigh against the reasonableness of Bruce's baton strikes and Maxwell's use of deadly force. It is undisputed that the officers did not attempt to communicate with Decedent, provide any commands prior to deploying the baton and shooting Decedent, or provide a warning that they would deploy any force. The officers failed to do so despite the fact that it was feasible to do so as Bruce had time to give commands and a warning because no one was in danger or being struck or run over by the vehicle at the time he deployed his baton and the vehicle was just starting to slowly reverse and Bruce admitted he made the decision not to do so because he was so focused on smashing open the window; and Maxwell

admitted there was a gap in time between when he unholstered his firearm and when he discharged the firearm and had the time to assess the situation. Moreover under Plaintiffs' facts, the officers had other reasonable alternatives available, including giving commands and moving away from the vehicle and into a position of cover.

Additionally, the Ninth Circuit has emphasized that when police engage with persons whom they know or should know to be mentally ill, the calculus for reasonable and necessary force is different. *See, e.g., Glenn v. Washington Cnty.*, 673 F.3d 864, 875 (9th Cir. 2011) ("circumstance relevant to our analysis is whether the officers were or should have been aware that [decedent] was emotionally disturbed. Viewing the facts in the required light, it is clear that…[decedent] was obviously emotionally disturbed, a factor to which the officers should have assigned greater weight.") (citations omitted); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003) ("mental illness must be reflected in any assessment of the government's interest in the use of force."); *Bryan*, 630 F.3d at 829 ["[E]ven when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted ... with a mentally ill individual."] [citation marks omitted].) Under Plaintiffs' facts, the officers knew or should have known that Decedent was mentally ill and acted pursuant to their training to deescalate the situation rather than quickly escalate the situation, resulting in the shooting and killing of Plaintiff.

Lastly, the Ninth Circuit has stated that, "[w]here a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive." *Orn*, 949 F.3d at 1176 n.1. "Reasonable triers of fact can, taking the totality of the circumstances into account, conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, with undue haste." *S.R. Nehad*, 929 F.3d at 1135. Mr. DeFoe opined the Bruce and Maxwell's decision to walk near the moving vehicle as it began to back out was tactically unsound and that a reasonable officer would have moved away from the vehicle and to a position of cover. Additionally, Bruce and Maxwell's decision to approach Decedent's slow-moving vehicle and strike her window with the baton while deflating the left rear tire with a knife was unreasonable

and created a situation where they placed themselves in potential harm's way. There was no urgency in needing to disable Decedent's vehicle at the time they used the baton strikes and knife stabs as they had yet to try to communicate with her or give her any commands and the car was moving very slowly and not in a position to escape at that moment. As Mr. DeFoe opined, officers made poor tactical decisions and fundamental tactical errors in approaching Decedent's vehicle to disable it instead of tactically repositioning in a position of cover and away from Decedent's car despite anticipating that the car would continue to move. A reasonable officer acting consistent with standard police practices would have acted according to their training regarding how to deal will mentally ill persons or persons experiencing a mental crisis and would have attempted to deescalate and utilize proper defusing techniques. Mr. DeFoe concluded that had the officers not made such poor tactical decisions and errors, the shooting would not have happened.

Accordingly, these additional factors weigh against the reasonableness of Bruce's baton deployment and Maxwell's use of deadly force.

### 7. The Cases Cited by Defendants in Support of Their Argument are Materially Distinguishable from the Facts of this Case

Defendants rely on two published Ninth Circuit opinions and two unpublished district court opinions in arguing that similar cases have held that an officer's use of deadly force was reasonable. Defendants' reliance on these cases are misplaced as the material facts of those cases are distinguishable from the facts of this case.

In *Monzon v. City of Murrieta*, the Ninth Circuit held that the officers reasonably used deadly force when they shot at a vehicle that was accelerating towards them after the driver had led the officers on a dangerous high-speed chase and refused commands to stop his vehicle. 978 F.3d 1150, 1157 (9th Cir. 2020). Under these facts, the Ninth Circuit found that the driver posed an immediate threat to the safety of the officers and was actively resisting arrest and attempting to resist arrest by flight. *Id.* Here, there was no dangerous high-speed chase the precipitated the use of deadly force and under Plaintiffs' facts, Decedent was neither resisting arrest nor attempting to evade arrest by flight as neither Bruce nor Maxwell ever attempted to communicate with Decedent, give Decedent commands, or give a warning that force would be use before they

attempted to disable Decedent's vehicle and shot and killed Decedent. Importantly, neither Bruce nor Maxwell was in the pathway of the vehicle at the time Maxwell used deadly force and the vehicle was not accelerating towards anyone.

In *Wilkinson v. Torres*, the Ninth Circuit held that the officer's use of deadly force was reasonable because the driver had failed to yield to police sirens and direct commands to stop the vehicle, the vehicle was accelerating with its tires spinning and throwing up mud in close quarters of two officers on foot, and the shooting officer reasonably believed that his partner was in the pathway of the vehicle. 610 F.3d 546, 551 (9th Cir. 2010). Here, the officers never told Decedent she was understand nor attempted to give Decedent any commands to stop the vehicle. Additionally, the vehicle was not accelerating nor attempting to accelerate towards any officer and neither officer was in the pathway of the vehicle at the time of the shooting.

The two unpublished district court decisions are even less persuasive. In *Fewell v. California*, the district court determined that the officer's use of deadly force was reasonable because the officers had information that the driver had driven recklessly, the driver had failed to obey repeated commands, and the truck suddenly and rapidly accelerated towards the officer at the time of the shooting. CV 16-1934 DSF (JEMx), 2017 WL 6043080, at *4, 5 (C.D. Cal. Apr. 11, 2017). In *Holland v. Azevedo*, the district court determined that the officer's use of his baton to break the vehicle's window to remove the plaintiff from the vehicle was reasonable because the officers had probable cause to arrest the plaintiff for traffic violations and driving with expired registration and license and it was undisputed that the plaintiff was actively resisting arrest by ignoring repeated commands to exit her vehicle and attempted to wedge herself into the vehicle to thwart the officers' attempt of removal. Case No. 14-cv-01349-JST, 2016 WL 1754446, at *8-10 (N.D. Cal. May 3, 2016). Under Plaintiffs facts in this case, the officers did not have probable cause to arrest Decedent when Bruce approached and began to strike the driver's side window with his baton. Additionally, neither officer ever gave Decedent any commands or a warning that they were prepared to use force prior to the deployment of the Taser and the shooting and thus did not afford Decedent with the opportunity to comply and avoid the deployments of force. Lastly, Decedent's vehicle was not accelerating rapidly towards anyone at the time of the shooting.

C.  Maxwell and Bruce are Not Entitled to Qualified Immunity Under Plaintiffs' Fourth Amendment Excessive Force Claim

An officer is not entitled to qualified immunity where "(1) facts viewed in the light most favorable to the injured party show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1192 (9th Cir. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is clearly established where its "contours . . . [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This requires "cases relevant to the situation [the officer] confronted," *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004), however it does "not require a case directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In considering existing precedent, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).

Further, the Supreme Court "has firmly rejected the notion that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.'" *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1018 (9th Cir. 2017); *Brosseau*, 543 U.S. at 206 (Stevens, J., dissenting) ("The Court's search for relevant case law applying the Garner standard to materially similar facts is both unnecessary and ill advised.") (quoting *Anderson*, 483 U.S. at 640). In fact, even "[c]losely analogous preexisting case law is not required to show that a right was clearly established." *White v. Lee*, 227 F.3d 1214, 1238 (9th Cir. 2000). "Otherwise, [officials] would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1285. In other words, there may be no published cases with facts exactly like these because of the obviousness of the illegality. *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002); *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) ("The easiest cases do not even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had

found liability in those circumstances."). Accordingly, the "standard is one of fair warning: where the contours of the right have been defined with sufficient specificity that a state official had fair warning that her conduct deprived a victim of his rights, she is not entitled to qualified immunity." *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003); *see also Hope v. Pelzer*, 536 U.S. 730, 740 n.10 (2002). Nonetheless, as discussed below, preexisting in-circuit and out-of-circuit cases placed the officers on notice that their conduct and uses of force violated the constitution.

At summary judgment stage, viewing the facts in the light most favorable to Plaintiffs, Bruce and Maxwell used unreasonable force when Bruce approached a slow-moving vehicle, whose driver had not attempted to assault anyone and had not been given any commands or warning that the officers wanted her to stop or that she as under arrest, and began to strike the driver's window with his baton; and when Bruce directed Maxwell to shoot Decedent and Maxwell did so, despite Decedent never posing an immediate threat of death or serious bodily injury to anyone as the vehicle was stopped when the shooting started and Bruce was neither pinned underneath the vehicle nor in the pathway and in danger of being run over by the vehicle. Under these facts, preexisting case law within the Ninth Circuit placed the officers on notice that their uses of force violated the constitution.

*1. It was Clearly Established that Bruce's Baton Strikes Violated the Constitution*

In *Johnson v. White*, the Eleventh Circuit noted that "officers may not use substantial force to apprehend a nonthreatening suspect who has committed only a minor offense and is not resisting arrest" in holding that the officers were not entitled to qualified immunity for using a baton to break the driver's side window and pull plaintiff out of the car even though the plaintiff refused commands to get out of the car and was warned that if he did not comply the officer would break the window. 725 F. App'x 868, 872 876-77 (9th Cir. 2018). In *Robbins v. Chronister*, the district court held that an officer's use of his baton to smash the driver's side window in an attempt to pull the plaintiff out of the car after the plaintiff refused to comply with commands to get out and instead engaged the door locks and began to reverse his car into the officer's car was unreasonable because at the time the officer approached the vehicle, the plaintiff did not pose an

immediate threat to the safety of the officers or others. 156 F. Supp. 2d 1211, 1213, 1216 (D. Kansas 2001). Similarly here, Decedent had not committed a crime, was not resisting arrest at the time Bruce approached and struck the window as neither officer had told Decedent that she was under arrest or issued any commands to Decedent, and Decedent did not pose an immediate threat to the safety of the officers or others as she very slowly reversed her vehicle with no one in the pathway of the vehicle. Accordingly, these cases are sufficient to place Bruce on notice that his use of the baton to strike Decedent's driver's window was unconstitutional under the circumstances.

Even if the Court were to find that the cases above are not sufficiently analogous, Plaintiffs submit that Bruce's baton strikes were an "obvious case" of excessive force against a non-threatening person. "As the [Supreme] Court explained in [*Rivas-Villegas v. Cortesluna*], in an obvious case, the standards set forth in *Graham* and *Garner*, though case at a high level of generality, can clearly establish that a constitutional violation has occurred even without a body of relevant case law." *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (cleaned up) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)); *see also Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (reaffirming *Hope*'s holding that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question") (per curiam); *A.D. v. State of Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013); *Hope*, 536 U.S. at 740-41. Under Plaintiffs' facts, Decedent had not committed a crime, did not pose a threat of safety to anyone, and was not resisting arrest or attempting to evade arrest by flight when Bruce used his baton to attempt to smash open the driver's side window since the officers did not have enough to detain Decedent or place her under arrest, a reasonable officer would not have believed that Decedent had attempted to assault the officers when the vehicle moved forward, and neither officer ever gave Decedent any commands or a warning, including any indication that they intended to detain her and wanted her to stop the vehicle, prior to the baton strikes.

//

//

2.  *It was Clearly Established that the Shooting of Decedent Violated the Constitution*

The Ninth Circuit stated in *Villanueva v. California*, "We have consistently found use of deadly force to stop a slow-moving vehicle unreasonable when officers could have easily stepped out of the vehicle's path to avoid danger," and ultimately held that the cases of *Acosta v. City and County of San Francisco* and *Orn v. City of Tacoma*, placed the defendant officers on notice in 2016 that their shooting at a vehicle that was stopped shortly before the shooting and slowly moved but did not accelerate when the officers opened fire violated the constitution. 986 F.3d at 1162, 1172-73. In *Acosta v. City and County of San Francisco*, the Ninth Circuit held that the officer was not entitled to qualified immunity for shooting at the driver of a vehicle that was moving or rolling very slowly from a standstill—so slowly that the officer could not have reasonably believed that it posed a threat of great bodily harm despite the officer being in the pathway of the vehicle. 83 F.3d 1143, 1146 (9th Cir. 1996), *as amended* (June 18, 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In *Orn v. City of Tacoma*, the Ninth Circuit reaffirmed the principles stated in *Acosta* in holding that the officer was not entitled to qualified immunity for shooting at a moving vehicle that had previously led the officer in a 15-minute slow-speed pursuit and had clipped one of the police SUVs because "if [the driver] did not accelerate until after being shot, a reasonable jury could conclude that [the officer] lacked an objectively reasonable basis to fear for his own safety, as he could simply have stepped back to avoid being injured." 949 F.3d at 1173, 1179. Similarly here, the vehicle never accelerated prior to the shooting and was stopped at the time Maxwell opened fire. Additionally, under Plaintiffs' facts, Bruce was not pinned underneath the vehicle and was not in the pathway of the vehicle when Maxwell opened fire and thus could have simply moved away from the vehicle.

Preexisting out-of-circuit and district court cases provided further notice to the officers that the use of deadly force against Decedent under these circumstances was unconstitutional. *See Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) (denying qualified immunity because a reasonable officer would not have believed that a vehicle slowly moving in a non-aggressive manner could have posed a threat of serious physical harm); *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005)

(denying qualified immunity because although the officer was in the path of the decedent's vehicle, the officer was not in any danger when he shot four times at the moving vehicle); *Kosakoff v. City of San Diego*, No. 08-CV-1819, 2010 WL 1759455, at *6 (S.D. Cal. Apr. 29, 2010) (denying qualified immunity in part because the car was moving slowly and the shots took place after the officer was already in a position of safety).

Plaintiffs submit that these cases where "[the] officer act[ed] under similar circumstances as [Bruce and Maxwell and] was held to have violated the Fourth Amendment," *White v. Pauly*, 137 S. Ct. 548, 551 (2017), are sufficient to put the officers on notice that their uses of force, including deadly force, violated Decedent's Fourth Amendment to be free from unreasonable and excessive force.

D. Maxwell and Bruce Violated Plaintiffs' Fourteenth Amendment Right to Against Unlawful Interference with Familial Relations

As discussed above, Bruce's batons strike were unreasonable and excessive, Maxwell's use of deadly force against Decedent was unreasonable and excessive, and Bruce was an integral participant in the use of deadly force. *See supra*, Section IV.B. Thus, their use of deadly force violated Plaintiffs' right against unlawful interference of familial relations under the Fourteenth Amendment. The standard for whether due process violations under the Fourteenth Amendment has occurred is when official conduct "shocks the conscience," *Wilkinson*, 610 F.3d at 554, but what that means "depends on the context," *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In *Tennison*, the Ninth Circuit made clear that acting with "deliberate indifference to or reckless disregard for [a person's] rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'" 570 F.3d at 1089. The Ninth Circuit has further explained: "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013).

1    Bruce's decision to use the baton to try to smash the driver's window and pull Decedent

2    out was not a split-second decision. No one was in danger or at risk of being struck by the vehicle

3    nor was the vehicle in the process of fleeing at the time Bruce approached and struck the vehicle's

4    window. Additionally, under Plaintiffs' facts, where Decedent had not committed a crime prior to

5    the baton strikes, was free to leave, and neither officer had attempted to communicate with

6    Decedent or give Decedent commands, a reasonable jury could find that Bruce's baton strikes

7    were a particularly egregious escalation of force that "shocks the conscience."

8    Moreover, the officers' use of deadly force was not a split-second decision. Bruce directed

9    Maxwell to shoot Decedent and Maxwell had sufficient time to assess the situation before

10   discharging his weapon. Under Plaintiffs' facts, Bruce was not pinned underneath the vehicle nor

11   in immediate danger of being run over by the vehicle. Thus, a reasonable jury could conclude that

12   the officers' conduct shocks the conscience and showed a deliberate indifference or reckless

13   disregard for Decedent's and Plaintiffs' rights.

14   The officers are also not entitled to qualified immunity under Plaintiffs' Fourteenth

15   Amendment claim, as the case of *A.D. v. California Highway Patrol*, 712 F.3d 446 (9th Cir. 2013)

16   had similarly analogous facts that provided fair notice that their conduct would violate the

17   Fourteenth Amendment. In *A.D.*, the Ninth Circuit affirmed the district court's denial of qualified

18   immunity under the Fourteenth Amendment to an officer who shot 12 times at a driver who had

19   led officers on a stolen vehicle pursuit and had repeatedly yelled "fuck you" to the shooting officer

20   but whose vehicle was contained in a deadend street where no officer was in the direct pathway of

21   the vehicle and was either stopped or going forward at the time of the shooting. 712 F.3d at 450,

22   458. Under these facts, the Ninth Circuit determined that it was clearly established that a

23   reasonable police officer in the shooting officer's position would have known that the shooting

24   violated due process. 712 F.3d at 454-55. Here, while Bruce alleges that Decedent cursed at him

25   during their conversation and while she was operating her vehicle, neither Bruce nor Maxwell was

26   in the direct pathway of the vehicle, the vehicle slightly moved forward before stopping prior to

27   the start of the shooting, and a reasonable jury could find that the vehicle only moved forward

28   after the first two shots because the shots had struck and incapacitated Decedent, causing her to

27

1    lose control of the vehicle. Accordingly, *A.D.* placed Bruce and Maxwell on notice that their use

2    of deadly force under similar circumstances violated Decedent's Fourteenth Amendment due

3    process rights.

4         E.    <u>Summary Judgment Must Be Denied on Plaintiffs' State Law Battery Claim</u>

5         Under California law, a battery claim arising out of excessive force by a peace officer is

6    evaluated by way of traditional Fourth Amendment analysis under *Graham. See Munoz v. City of*

7    *Union City*, 120 Cal. App. 4th 1077 (2004). As previously discussed, a reasonable jury could find

8    Bruce's baton strikes to be excessive and unreasonable under Plaintiffs' facts, as no crime had

9    been committed and neither officer ever attempted to communicate with Decedent to tell her they

10   wanted her to stop or that she was being detained nor did they give her any commands prior to

11   Bruce escalating the encounter with the baton strikes to the driver's side window.

12        Additionally, the California Civil Jury Instruction for battery by a peace officer by deadly

13   force provides, "A peace officer may use deadly force only when *necessary* in defense of human

14   life." Judicial Council of California Civil Jury Instructions No. 1305B, Battery by Peace Officer

15   (Deadly Force) – Essential Factual Elements (2023) (emphasis added). Deadly force is necessary

16   to defend human life "only if a reasonable officer in the same situation would have believed, based

17   on the totality of the circumstances known to or perceived [by the officer] at the time, that deadly

18   force was necessary to defend against an imminent threat of death or serious bodily harm…"

19   CACI 1305B. The instruction further states:

20        A threat of death or serious bodily injury is "imminent" when…a person has the
         *present ability, opportunity, and apparent intent to immediately* cause death or
21        serious bodily injury to the peace officer or another person. An imminent harm is
         not merely a fear of future harm, *no matter how great the fear and no matter how*
22        *great the likelihood of the harm,* but is one that, from appearances, must be instantly
         confronted and addressed.
23

24   CACI 1305B (emphasis added).

25        Here, viewing the evidence in the light most favorable to Plaintiffs, Decedent did not pose

26   an imminent threat of death or serious bodily injury to Bruce or anyone else at the time of the

27   shooting. Bruce was not pinned underneath the vehicle and was not in the direct pathway of the

28   vehicle when Maxwell opened fire. Defendants' contention that Plaintiff could have run over

Bruce's body or head had the vehicle moved forward with counterclockwise steering is "merely a fear of future harm" as there is no indication that that was about to happen and therefore was not something that "must be instantly confronted and addressed." While it is disputed as to whether Decedent had the present ability, opportunity, or apparent intent to immediately cause death or serious bodily injury prior to the first two shots, it is apparent that none of those requirements existed at the time of the five subsequent shots as Decedent had clearly been incapacitated by the first two shots and Bruce was able to move away from the vehicle. Additionally, in considering the "totality of the circumstances" surrounding an officer's use of deadly force, the California Civil Jury Instruction for battery by a peace officer by deadly force instructs that the jury may consider whether the officer "knew or had reason to know that the person against whom [the officers] used force was suffering from a physical, mental health, developmental, or intellectual disability," and the officer's "tactical conduct and decisions before using deadly force." CACI 1305B. Under Plaintiffs' facts, both officers knew or had reason to know that Decedent was suffering from a mental illness and made poor tactical choices and errors, including failing to follow their training regarding de-escalation in dealing with mentally-ill persons, moving to a position of safety and cover, and choosing to not issue commands or a warning prior to their uses of force. Under these facts, a reasonable jury could find that the officers used unreasonable deadly force against Decedent.

      F.   <u>Maxwell and Bruce were Negligent in Their Pre-Force Conduct and Use of Force</u>

      Curiously, Defendants note that Plaintiffs' negligence claim is being brought as a wrongful death claim but fail to note that Plaintiffs' battery claim is a wrongful death claim. *See* First Amended Complaint, Dkt. No. 13. To clarify, Plaintiffs assert wrongful death under two separate theories of liability: battery and negligence. Moreover, Defendants fail to analyze the officers' pre-shooting conduct, only arguing that their conduct was reasonable because "the incident occurred in seconds or minutes."

      The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes v. Cnty. of San Diego*, 57 Cal.4th 622, 629 (2013). "[A]n officer's lack of due care can give rise to negligence liability for the intentional shooting

death of a suspect." *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979). California "state negligence law, which considers the totality of the circumstances surrounding any use of []force, is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when []force is used." *Hayes*, 57 Cal.4th at 639 (internal citations omitted). The totality of the circumstances necessarily includes the officer's "tactical conduct and decisions leading up to the use of []force." *See id.* at 637-38; see also *Grudt v. City of Los Angeles*, 2 Cal.3d 575, 588 (1970) (failure to follow policies is evidence of negligence); *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016). "Under California law, the officer's pre-shooting decisions can render his behavior unreasonable under the totality of the circumstances, even if his use of deadly force at the moment of the shooting might be reasonable in isolation." *Tabares*, 988 F.3d at 1125 (citing *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1082–83 (9th Cir. 2018); *Grudt*, 2 Cal.3d at 587); *see also Mulligan*, 835 F.3d at 991.

As previously discussed, the officers made poor tactical decisions and tactical errors. In *Tabares v. City of Huntington Beach*, a case in which the officer deployed his Taser causing the mentally-ill decedent to engage in a physical altercation with the officer, the Ninth Circuit found that a reasonable jury could find that the officer acted negligently in his pre-shooting conduct when he failed to consider that the decedent may have had mental issues and failed to deescalate the situation per P.O.S.T. training regarding potentially mentally ill individuals. *Tabares*, 988 F.3d at 1127-28. Likewise here, the officers knew or should have known that Decedent was mentally ill and should have acted pursuant to their training regarding de-escalation of incidents with mentally-ill subjects in order to defuse the situation. Instead, the officers placed themselves near the pathway of the moving vehicle and then moved closer to the moving vehicle in order to escalate the situation with deployments of the baton and knife. The officers also did not attempt to communicate with Decedent nor issue any commands or warnings prior to their uses of force and did not attempt to communicate with each other. Moreover, Bruce's unjustified baton strikes unnecessarily escalated the encounter and was the catalyst for the proceeding events. Plaintiffs' police practices expert opined that had the officers not made such poor tactical decisions and errors, the shooting would not have happened. Under these facts, a jury could reasonably find that

the officers were negligent in their pre-force conduct and their uses of force, including deadly force.

G. Maxwell and Bruce Violated the Bane Act

"The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) (citing *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)). To succeed on a claim under the Bane Act, a plaintiff must only show that the defendant acted with a specific intent to violate the plaintiff's civil rights. *B.B. v. Cnty. of Los Angeles*, 25 Cal. App. 5th 115, 133 (2018) (rev'd on other grounds in *B.B. v. Cnty. of Los Angeles*, 10 Cal. 5th 1 (2020)). "[A] reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Reese*, 888 F.3d at 1045.

In *B.B.*, one of the deputies continued to hold and apply weight to the prone suspect after the suspect had been handcuffed, had labored breathing, and went limp. 25 Cal. App. 5th at 134. Under those facts, the court held that there was sufficient evidence to raise a triable issue of fact as to the question of the defendant deputies' intent because there was evidence that suggested the deputies deliberately subjected the suspect to excessive force beyond what was necessary to make the arrest. *Id*. "Once Defendants' use of force crossed that threshold, their conduct became a coercive interference with [the decedent's] civil rights as proscribed by the Bane Act." *Id.*

Similarly here, Maxwell acted with a reckless disregard for Decedent's rights, when, at the Bruce's direction, he fired at Decedent even though Decedent did not pose an immediate threat of death or serious bodily injury to anyone at the time the shooting started. Maxwell's additional five shots after it had become apparent Decedent had been struck and was incapacitated and Bruce was not in danger of being struck by the car is further evidence that Maxwell subjected Decedent to excessive force "beyond what was necessary to make the arrest." A reasonable jury could also find that Bruce acted with a reckless disregard for Decedent's rights when he struck her vehicle's window with his baton in an attempt to detain Decedent even though Decedent had not committed a crime and was not a threat to anyone at the time. Accordingly, Defendants are not entitled to

summary judgment on Plaintiffs' Bane Act claim.

**V.**      **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants'

Motion for Summary Judgment, or in the Alternative Summary Adjudication as to Plaintiffs'

Fourth Amendment Detention and Arrest claim, Fourth Amendment Excessive Force claim,

Fourteenth Amendment Substantive Due Process claim, and state law claims for Battery,

Negligence, and Violation of California Civil Code section 52.1 (Bane Act).

Respectfully submitted,

DATED: May 13, 2024          **LAW OFFICES OF DALE K. GALIPO**
                             **LAW OFFICE OF STEWART KATZ**


                             By          */s/ Hang D. Le*
                                  Dale K. Galipo
                                  Stewart Katz
                                  Hang D. Le
                                  Attorneys for Plaintiffs
                                  VERONICA MCLEOD, AMADO HERNANDEZ, and
                                  YSIDRA REGALDO