Exhibit 1

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   VERONICA MCLEOD, individually and as  )
     succesor in interest to decedent,     )
 5   DOLORES HERNANDEZ; AMADO HERNANDEZ,    )
     individually and as successor in      )
 6   interest to decedent, DOLORES         )
     HERNANDEZ; and YSIDRA REGALDO,        )
 7   individually,                         )
                                           )
 8                   Plaintiffs,           )
                                           )
 9                   vs.                   ) Case No.
                                           ) 2:22-CV-00585-WBS-JDP
10   CITY OF REDDING; GARETT MAXWELL,      )
     an individual; and DOES 1-10,         )
11   inclusive,                            )
                                           )
12                   Defendants.           )
     _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    GARETT MAXWELL

18            THURSDAY, JANUARY 19, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  430166
```

 1     A.    From my arrival at Redding PD to right at the end of

 2   2015.  In 2016 I moved on to a different assignment.

 3     Q.    What was your assignment that you moved on to?

 4     A.    Into our Neighbor Police Unit.

 5     Q.    What time period were you there?

 6     A.    From the beginning of 2016 to -- again, my personal

 7   record would be the best reflection.  I believe it was mid to

 8   late 2018.

 9     Q.    And did your assignment change again?

10     A.    Yes, it did.

11     Q.    What did it change to at that time?

12     A.    I ended up in our Detective Bureau.

13     Q.    What time period were you there?

14     A.    It would have been to mid 2020.

15     Q.    Did your assignment again change?

16     A.    Yes, it did.

17     Q.    What did it change to?

18     A.    I at that time promoted to corporal and was

19   reassigned back to patrol.

20     Q.    Was that your assignment at the time of the shooting

21   incident, corporal assigned to patrol?

22     A.    Yes, sir, it was.

23     Q.    Now, I know you had a firearm on you at the time of

24   the shooting incident?

25     A.    Yes, I did.

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                        Page 13

1        Q.    What type of firearm?

2        A.    It was a Glock Model 35, 40-caliber semiautomatic

3    pistol.

4        Q.    You have to press the trigger for each shot?

5        A.    Yes, you do.

6        Q.    And did you fire your weapon during the incident?

7        A.    Yes, I did.

8        Q.    How many shots did you fire?

9        A.    Seven shots.

10       Q.    And so you would have had to press the trigger seven

11   times?

12       A.    That's correct.

13       Q.    When you fired your shots were you moving or

14   stationary?

15       A.    Initially stationary, but I began to move.

16       Q.    In what manner did you begin to move?

17       A.    I was side-stepping to the left.

18       Q.    And did you have the weapon in one hand or two?

19       A.    Two hands.

20       Q.    Were your arms extended in some fashion?

21       A.    Yes, they were.

22       Q.    And were you shooting through a particular part of

23   the car?

24       A.    Yes.

25       Q.    What part of the car were you shooting through?

1   time; because the car was moving forward?

2        A.   It was a portion of the reasoning, yes.

3        Q.   It was at least one of the reasons?

4        A.   It was a factor.

5        Q.   And did you see who was seated in the driver's

6   seat?

7        A.   As far as -- can you be more --

8        Q.   Like male or female or age or any description.

9        A.   I knew it was a female from the initial portion of

10   my involvement in the investigation.

11        Q.   And do you have an estimate as to her age?

12        A.   No.  I did not at the tame.

13        Q.   Did you ever speak to her at any time before you

14   fired your weapon at her?

15        A.   Are you referencing did I have a conversation with

16   her?

17        Q.   Yes.

18        A.   I did not have a conversation with her.

19        Q.   Did you ever say anything to her before you fired?

20        A.   Are you referencing specifically to a warning or

21   some fact?

22        Q.   Anything, you know, stop, or stop or I'll shoot, or

23   you know, put the car in park, throw me the keys.

24             I'm just wondering if you said anything to her.

25        A.   Nothing to that effect.

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 17

1        Q.    Did you say anything to her at all?

2        A.    I don't recall being able to address her during that
3    time frame, no.

4        Q.    Do you recall saying anything to her the entire time
5    you were at the scene before you fired?

6        A.    I do not recall having a conversation, no.

7        Q.    How long do you think you were at the scene before
8    you fired?

9        A.    I would have to guess on that.

10              It would be best to reference the video and the
11    dispatch logs.

12       Q.    Okay.  I just didn't know if you had an estimate
13    like, you know, 10 to 30 minutes, 2 to 5 minutes, any range.

14       A.    Between 2 and 15 minutes.

15       Q.    Okay --

16       A.    -- would be a range.

17       Q.    So would it be correct to say you did not give the
18    woman a verbal warning before you shot her; is that
19    correct?

20       A.    I did not provide her a verbal warning before
21    shooting, no.

22       Q.    I take it at some point, though, you at least saw
23    that it was a woman in the car?

24       A.    Yes.

25       Q.    When did you first see that it was a woman in the

1   officer?

2       A.   I was alone in my vehicle.

3       Q.   And, if you know, was anything broadcast about this

4   call before you got to the scene over the police radio

5   separate from the MDC?

6       A.   Are you asking if our dispatch via radio dispatched

7   both of us to that call.

8       Q.   Yes.

9       A.   No.  I believe we -- I specifically saw the call

10  pending on the car's computer and took initiative to go and

11  respond to that call about in a similar time frame as the

12  other officer.

13      Q.   What information, if any, was provided over the MDC

14  regarding the call before you got to the scene?

15      A.   There was a call for service.  One of the citizens

16  there had indicated there was a disturbance involving a

17  female in a vehicle.  And the original call was documented on

18  CAD reports, would be the best reference for all the

19  specifics that I read that night.

20      Q.   I know.  I'm just wondering if you recall anything

21  else right now other than the disturbance with a female in a

22  car.

23      A.   At this point without reviewing that CAD call, what

24  I saw that night, due to time I can't speak to specifics.

25      Q.   Okay.  Have you seen the CAD printout recently?

1      A.    No, sir.   I haven't seen since I originally viewed

2   it on the computer.

3      Q.    But as of right now, what you recall is a

4   disturbance regarding a female in a car?

5      A.    Yes.   And if I'm not mistaken, she was refusing to

6   leave.

7      Q.    Refusing to leave from inside the location, or the

8   parking lot?

9            Or did you know?

10     A.    To my best recollection, refusing to leave the area

11  after causing that disturbance.

12     Q.    And then when you got to the scene -- strike that.

13           Prior to getting to the scene, did you have any

14  other information that you can recall?

15     A.    Not that I recall, no.

16     Q.    And then when you got to the scene, what other

17  information, if any, did you get prior to it the -- let's say

18  prior to when she started moving her car?

19           We'll get to that in a little bit.

20     A.    Can you be more specific to the source of this

21  information you're trying to ask about?

22     Q.    Absolutely.  So any source, really.

23           So you got to the scene.  I've seen the video.

24           So I realize at some point her car starts moving and

25  your partner, you know, try to break out the window.

1           I've seen the video --

2      A.   Okay --

3      Q.   -- I'm kind of asking in the time frame before the

4  car started moving.  You might have gotten information from

5  the reporting party from your partner, from additional

6  updates on the MDC or the police radio.

7           I'm just wondering what additional information, if

8  any, you received.

9      A.   So when I initially arrived, I saw my partner

10  speaking with the female.  I in turn went over and met with a

11  security guard who my understanding was a person that called

12  us to come respond.  And I began discussing with him the

13  nature of this disturbance.

14     Q.   And what did he say?

15     A.   He initially started talking about the female being,

16  for lack of better terms, belligerent, cursing at him,

17  causing a disturbance inside of the Mod Pizza business.

18     Q.   Anything else you recall about what the security

19  officer told you?

20     A.   I didn't get a chance to complete that discussion

21  with him.

22     Q.   Any other additional information that you had?

23     A.   As I was standing there, trying to have that

24  discussion in totally with him, I began to notice the

25  interaction the female was having with my partner.

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 28

1      Q.    Okay.  And what did you notice in that regard?

2      A.    I saw him trying to calmly speak with her, and she

3    was being -- she was -- it seemed pretty apparent she was

4    very angry.  She was cursing at him, and, again, I wasn't

5    first person with what he was trying to do, but I overheard

6    some discussion that he was attempting to get her

7    identification to further the investigation.

8      Q.    And could you hear anything other than that at that

9    time?

10     A.    Can you be more specific?

11     Q.    Sure.  You said that you heard something going on

12   between your partner and this woman, and one of the things

13   you recall hearing is your partner asking for her

14   identification.

15     A.    Correct.

16     Q.    I'm wondering whether you heard anything else as

17   part of the conversation at that time.

18     A.    All I could tell, it was -- she was escalating

19   things verbally.  She was being more confrontational, and as

20   I kind of began to pay more attention to them instead of the

21   security guard I was discussing things with, at some point

22   she began to roll her window up and yell something to the

23   effect of "Fuck you" very loud and angrily at the officer.

24     Q.    Anything else that you recall up to that point in

25   time?

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 33

```
 1     A.   Is that your question --

 2     Q.   Yes --

 3     A.   Sorry.  I did not.

 4     Q.   Did you get any specifics as to what the disturbance

 5   was exactly before the shooting incident took place?

 6     A.   Well, the security guard was attempting to provide

 7   that information.  There's, again, discussion about her

 8   causing a disturbance inside of Mod Pizza.  He mentioned that

 9   the female was belligerent or something to that effect, and

10   cursing at him.

11     Q.   That was the general description you were given?

12     A.   That was the initial part of it.  Again, I didn't

13   get to complete that discussion with him due to the actions

14   of the female.

15     Q.   And is it -- was it your understanding that they

16   wanted her to leave?

17     A.   We were trying to get to that determination

18   on-scene.

19     Q.   And you were still in the process of your

20   investigation; is that fair?

21     A.   Yes.

22     Q.   So the window went up.

23          And are you still this 5 or 15 feet away?

24     A.   I had been drawn closer, again, due to the -- I

25   could observe that behavior starting to escalate on her
```

1      A.   I was working swing shift, and I don't recall

2    exactly my start times.  I believe it was noon, but you would

3    have to refer to our personnel files to get that.

4      **Q.   Okay.**

5           MR. GALIPO:  He's giving me a lot of follow-up

6    homework to do.

7           Have you noticed that, Dale?

8           MR. ALLEN:  Well, you know, Dale, you do get -- we

9    got a lot of material to you last night.

10          MR. GALIPO:  Oh, thanks.  I appreciate that.

11          I appreciate the timeliness.

12          MR. ALLEN:  Yeah.  It was due yesterday.

13          So we tried to get everything to you yesterday, and

14   it does include statements and includes a great deal of what

15   you're inquiring about right now.

16          MR. GALIPO:  Okay.  Thank you.

17   BY MR. GALIPO:

18     **Q.   So after you saw the window go up, what do you do**

19   **next?**

20     A.   Well, I was standing on the sidewalk in proximity to

21   the other officer, and I was contemplating where the

22   investigation was going to go next.

23     **Q.   And did you approach your partner at that point, or**

24   **kind of stay stationary?**

25     A.   Well, again, moving back to kind of what I

1   previously discussed, after speaking with the security guard

2   and watching the behavior begin to escalate, that's when I

3   had initially moved closer to my partner, and I witnessed --

4   that was when, you know, the window was moving up as she had

5   basically said, "F you," and I watched the vehicle start to

6   back out.

7       Q.   And what did you do as the vehicle started backing

8   out?

9       A.   Physically?

10      Q.   Yes.

11      A.   Physically I paused, assessed if the vehicle was

12  going to just -- my thought was that it was going to just

13  leave the parking lot.  And I was going to move into the

14  parking lot to get a better vantage point of the parking

15  area.

16      Q.   How far did the vehicle back up, approximately?

17      A.   In feet?

18      Q.   Yes.  Or any other way you want to describe it.

19      A.   Well, again, I would have to give you my best

20  estimate.  Unfortunately, it's going to be a range.

21           It probably backed up between 5 and 15 feet

22  initially.

23      Q.   Was that the first time you saw the vehicle move?

24      A.   Yes.

25      Q.   And did it back straight out or in some type of an

1   angle, if you know?

2        A.   It began to turn, and forgive me, my directions.

3             If you need clarity, I'll do my best.

4             But it was backing out the tail end was shifting

5   towards the west of the parking lot which if you were looking

6   at the rear of the vehicle, it would be backing out and

7   turning to the right, the rear end of the vehicle would be

8   sweeping to the right.  The front end would he coming towards

9   my partner and I.

10       Q.   How about this:  When the vehicle was in its parked

11  position, which direction was the front of the vehicle

12  facing?

13       A.   The vehicle would be facing south.

14       Q.   And when you saw the vehicle moving backwards 5 to

15  15 feet as you described, were you positioned?

16       A.   Initially I was still standing on the sidewalk area

17  as it initially started to back.

18       Q.   And then did you change your position as it was

19  backing up?

20       A.   Yes, I did.

21       Q.   And how did you change your position?

22       A.   Well, there was an open parking install which would

23  be the east or the driver side, and I began to move into the

24  parking lot to get basically further north into the lot just

25  to observe the vehicle back out and depart the area.

```
 1   populated.

 2           So I was intent with allowing her to leave and

 3   trying to get further information to determine where that

 4   call was going to ultimately go if that makes sense.

 5       Q.   Okay.  So at that point did the vehicle after

 6   backing up move forward?

 7       A.   Yes.

 8       Q.   And how far did it move forward at that point?

 9       A.   Hard for me to speculate how far it moved forward.

10           It lurched forwards towards in a very abnormal

11   fashion.

12       Q.   Do you have any estimate?

13           In other words, you told me 5 to 15 feet going back.

14           Any range lurching forward?

15       A.   Again, this is my best guess.

16           I would say between 5 and 10 feet.

17       Q.   And at that point was anyone struck by the car up to

18   this point in time?

19       A.   You would have to discuss that with Officer Bruce.

20           I personally was not struck by the car at that

21   point, no.

22       Q.   Did you see any officer including Officer Bruce

23   struck by the car up to this point in time?

24       A.   It looked from my vantage point I became very close

25   to striking Officer Bruce if not contacting him, but again,
```

1   you'll have to discuss that with him.

2       Q.   Did you actually see a contact between the car and

3   Bruce at that point?

4       A.   From my vantage point I could just tell if was very

5   close, if not an impact, but I could not speak to it

6   specifically.

7       Q.   That's fine.  And what part of the car do you think

8   got close to Officer Bruce at that point?

9       A.   The front bumper area of the vehicle.

10      Q.   Did the car at some point after moving forward

11  approximately 5 to 10 feet, stop?

12      A.   When you say stop, did it stop going forward or stop

13  altogether?

14      Q.   Stop going forward.

15      A.   Yes.

16      Q.   And at some point did you decide you were going to

17  try to use your knife on the rear tire?

18      A.   Yes.  At some point I did decide that.

19      Q.   And at some point did you see Officer Bruce going to

20  the window trying to break the window out?

21      A.   Yes.

22      Q.   And, if you know, what was Officer Bruce using to

23  try to break the window out?

24      A.   It appeared that he was using a baton.

25      Q.   If you know, did he also have an expandable baton?

1        A.    Yes, he did.

2        Q.    And order wise, do you know that if you were -- you

3   were trying to use your knife on the tire before Officer

4   Bruce was impacting the window with his baton or during the

5   same time?

6        A.    He moved to strike the window before I got to that

7   rear tire.

8        Q.    And when Officer Bruce was striking the window, if

9   you know, was the car at least stopped at that point?

10       A.    I would have to refer to the video for that specific

11  information.

12       Q.    You don't recall right now?

13       A.    I don't recall if he was in slight motion or

14  stopped.

15       Q.    And when you were using your knife on the rear tire

16  on the driver's side, was the car stop or moving at that

17  time?

18       A.    I believe it was slightly moving.

19       Q.    Which direction?

20       A.    I would have to refer to the video, but I believe it

21  was moving somewhat in a rearward fashion.

22             You would have to look at the video.

23       Q.    Do you know how many times Officer Bruce struck the

24  window with his baton?

25       A.    No, I don't.

1   significantly could be subject to different interpretations.

2          But tell me what you observed.

3     A.   So the tire I was at was something that I would

4   refer to as a pivot point of that vehicle's motion.

5          So the apparent movement of the vehicle as a whole

6   is going to be harder for me to determine that place I was

7   looking if that makes some sense.

8          So a small movement at that point if that vehicle

9   was turning or maneuvering would be very -- it would be

10  difficult for me to have a good perception without looking at

11  video.

12    Q.   But when was the last time you've seen the video?

13    A.   I watched it with my attorney.

14    Q.   And when you watched it recently, did you notice

15  whether the car moved at about the time or soon after you

16  were slashing the car?

17    A.   I did see the video.  The video depicted that

18  vehicle moving, yes.

19    Q.   And which way did it move?

20    A.   Initially it appeared to be wheels to the driver's

21  right, and that caused that vehicle to pivot on the tire that

22  I was near and pulled back up and over Officer Bruce.

23    Q.   Right.  But did the car move forward or backwards at

24  that point?

25    A.   The portion I recall in looking at the video is that

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 47

1    the parking lot, and as we were making that move into the

2    parking lot, the vehicle then lurched forward towards us.

3         Q.   Okay.  Weren't you on the driver's side of the

4    vehicle at the time it went forward?

5         A.   I would say more in proximity to the front, me

6    personally, the front left bumper area.

7         Q.   Did the vehicle hit you at that time?

8         A.   The vehicle did not hit me.

9         Q.   When you watched the video, did you see the vehicle

10   hit your partner at that time?

11        A.   It got close to my partner.

12             Again, he would have to testify whether it made

13   physical contact or not.

14        Q.   Did you see your partner go down to the ground at

15   that time?

16        A.   When, in person, my recollection?

17             Is that what you're referring to?

18        Q.   Yes.

19        A.   I did not see him fall on the ground at that moment

20   in time, no.

21        Q.   Did you hear your partner say anything to the woman

22   after the car started backing up?

23        A.   Again, it's a broad range.  After the car started

24   backing up it made a lurch forward towards us, and he at

25   point began to say things to the driver.

VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.
Garett Maxwell on 01/19/2023                          Page 48

1        Q.    What was he saying?

2        A.    He would have to testify to specifics, but I recall

3    something to the effect of "Now you're trying to run us

4    over," something to that effect.

5        Q.    Do you recall your partner saying anything other

6    than, "Now you're trying to run us over?"

7        A.    I remember him talking or yelling, but I don't

8    recall specific words he was using.

9        Q.    Did you hear your partner say, "Now you're trying to

10   run us over" before he started impacting the window with his

11   baton?

12       A.    Yes.

13       Q.    Was there any tactical plan discussed with your

14   partner at that time?

15       A.    There was no time to discuss tactical plan.

16       Q.    Did he tell you that he is going to try to break out

17   the window?

18       A.    There was no time to have a discussion about moving

19   towards what his intents was -- I'm sorry.

20       Q.    Did you form the impression that he was trying to

21   break out the window?

22       A.    Yes.

23       Q.    And did you in your mind think this would help the

24   situation if he could break out the window?

25       A.    It was a step to take towards a resolution.

1   firing, yes.

2        Q.   Which way?

3        A.   It appeared it lurched forward and then continued

4   forward.

5        Q.   And when it went forward, did it at some point based

6   on your observations, release the tire contact from Officer

7   Bruce?

8        A.   In the video it's apparent that that's what

9   happened, but on the scene I did not know how he got out from

10  under that vehicle.  I didn't -- I was focused on the

11  driver.

12       Q.   And I think you've already told me this, but you did

13  not give any commands or verbal warning to the driver prior

14  to firing?

15       A.   I didn't have time to, no.

16       Q.   Where were you aiming on her person when you fired

17  the shots?

18       A.   I believe I previously testified center mass which

19  was the upper left portion of her torso as it was presented

20  to me.

21       Q.   Did you notice whether the window shattered at any

22  time during the shots?

23       A.   The window did break as a result of my shot.

24       Q.   Could you see her in the car while you were

25  shooting?

1      A.   Yes.  Through the circle that was created by the

2   first shot that went through.  Initially through the actual

3   opaque glass and then it was through the circle created by

4   the first shot that went through.

5      Q.   Did you hear her say anything immediately before you

6   fired or during the shots?

7      A.   I don't recall hearing aside from the shots because

8   they're loud, her saying anything during the shots.

9      Q.   Now, did your partner tell you to do something

10   before you started firing?

11      A.   During my initial observations of him, at some point

12   he told me to shoot her.

13      Q.   And when he told you to shoot her, where was your

14   gun?

15      A.   I had either just drawn it or was preparing to draw,

16   but at this point I don't recall.  My firearm was already

17   out.  I know as soon as I -- my recollection is as soon as I

18   witnessed him pinned under the car, I started to draw the

19   firearm.

20      Q.   And would it be fair to say that you may have drawn

21   the firearm after your partner said "Shoot her?"

22      A.   I don't think that's fair to say.

23           I independently came to the decision to use force.

24      Q.   No.  I'm not asking about the independent decision.

25           I'm just trying to get the ordering.

VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.
Garett Maxwell on 01/19/2023                                    Page 65

1            The incident that --

2       A.    --

3       Q.    -- let me just finish my question and then you can

4  answer however you think is appropriate.

5            Do you think you may have drawn your firearm

6  chronologically after your partner said "Shoot her?"

7       A.    Not necessarily.

8       Q.    Do you know one way or the other?

9       A.    Again, when I observed him being crushed by that

10  front left tire, I started to draw my firearm.  I don't

11  believe he said "Shoot her" until I had already started that

12  process.  But I'm not 100 percent sure.  It was very rapid

13  event that were occurring at that moment.

14       Q.    Okay.  Did you have the impression that your shots

15  were striking the woman in the car?

16       A.    Yes.

17       Q.    How did you get that impression?

18       A.    I could see -- trying to think of the best way to

19  describe it -- initial impact, if you will, as I began to

20  shoot.

21       Q.    Okay.  And then did you see your continued shots

22  appear to be striking her?

23       A.    Yes.

24       Q.    What was her body position in the car while you were

25  firing?  Was she looking straight ahead?  Turned towards you?

VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.
Garett Maxwell on 01/19/2023                                    Page 70

1      A.   Approximately two.

2      Q.   And prior to giving your IA statement, did you have

3   the opportunity to look at any video footage?

4      A.   Yes, I did.

5      Q.   And did you have some type of representative present

6   on your behalf for the IA statement?

7      A.   Yes, I did.

8      Q.   And was that a lawyer, to your knowledge?

9      A.   Yes, it was.

10     Q.   There's going to be a few pauses now because I'm

11   looking at your statement, but some of this I already asked

12   you.  So bear with me, please.

13     A.   Certainly.

14     Q.   Do you have certain training with respect to

15   shooting at moving vehicles or policies?

16     A.   There is a policy about it, yes.

17     Q.   What is your understanding of what the policy

18   generally says?

19     A.   Well, generally expected that an officer would get

20   out of the way of a vehicle.  It is not a "shall not" shoot

21   at a moving vehicle, but it's something that the context

22   needs to really require it because it's generally considered

23   to be a policy in effective in the circumstances.

24          I would best frame it is if you're standing it front

25   of it, your primary goal is to get out of the way of that

```
 1   vehicle from that front part.

 2        Q.   What would it fair -- go ahead.

 3        A.   I was going to say it doesn't preclude us from doing

 4   it when necessary.

 5        Q.   Right.  Would it be fair to say the policy generally

 6   discourages shooting at moving vehicles and informs the

 7   officer to stay out of the path or get out of the way if you

 8   can?

 9        A.   Well, generally discouraged would be your word.

10             We would try to attempt other methods, but again,

11   it's not all encompassing.  It doesn't prevent us from doing

12   it when we have no other option.

13        Q.   And what does it say about moving out of the path,

14   if you know?

15        A.   I don't have it memorized verbatim word-for-word.

16             So if you have that policy, if you want to read it

17   or show it to me, I would be happy to discuss it.

18        Q.   I don't have it.  I thought maybe you would have a

19   general understanding of the wording.

20             I don't expect you to say it word-for-word, but just

21   a general understanding.

22        A.   The general understanding is that when able, you are

23   to try to stay out of the path of the vehicle, but again, it

24   doesn't preclude us from using our firearms in the event if

25   necessary to stop some kind of a vehicle related threat.
```

1      Q.    And are you tactically trained that if you believe a

2    vehicle may be trying to leave the scene, to try to position

3    yourself so you're not in the path of the vehicle?

4      A.    Tactically trained to do that?

5      Q.    Yes.   In other words, are you trained that if

6    you have a vehicle that you think is going to try to flee the

7    scene, try not to position yourself in the position where you

8    can get struck by the vehicle if it flees?

9      A.    I generally try not to be in front of a moving

10   vehicle to get run over.   I don't recall receiving tactical

11   training that says that.

12     Q.    Do you recall any training that suggested not only

13   getting out of the path of the vehicle, but trying not to be

14   in the path of the vehicle from the beginning?

15     A.    I don't recall specific training, but I would say

16   it's general knowledge that we try not to be in the path of a

17   moving vehicle when we're able to prevent that from being an

18   issue for us.

19          But it's again unpredictable and things do happen.

20     Q.    In this case, I take it you had the impression that

21   this woman may try to flee, and that's why you were trying to

22   slash her left tire?

23     A.    That was a portion of the considerations.

24     Q.    Did you ever have any specific training that if you

25   think a vehicle's trying to flee, you should try to smash the

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                    Page 76

1      Q.   You don't recall that language being in the Learning

2    Domain?

3      A.   I don't specifically recall that language.

4      Q.   Do you recall there being training in the Learning

5    Domain about reverence for human life?

6      A.   I have reverence for human life, but I don't recall

7    that specific language off the top of my head.

8      Q.   Do you recall being trained that you should give a

9    verbal warning before using deadly force when feasible?

10     A.   When feasible, yes.

11     Q.   Do you recall being trained that you're responsible

12   to justify each shoot?

13     A.   Yes.

14          MR. GALIPO:  Why don't we take our last break for

15   ten minutes, and I'm confident we'll be done by 4:00 if not

16   before.

17          MR. ALLEN:  Sounds good.  Thank you, Dale.

18          (Recess taken.)

19   BY MR. GALIPO:

20     Q.   So by you slashing the tire, I just want to get your

21   thinking.

22          You were thinking if the car takes off, it would be

23   somewhat disabled?

24     A.   That's part of it, yes, and I've done it in the past

25   and had successful outcomes.

**VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.**
Garett Maxwell on 01/19/2023                                           Page 80

 1              Do you see that section?

 2      A.   Yes, I do.

 3      Q.   And you know I didn't expect you to have it

 4   memorized, obviously, but is this the policy that you were

 5   familiar with before the time of this incident regarding

 6   shoot at or from moving vehicles?

 7      A.   So we're clear, you're referencing 300.4.1 shooting

 8   at or from moving vehicles?

 9      Q.   Yes, that's correct.

10              Basically, the policy was the first sentence, "Shots

11   fired at or from a moving vehicle are rarely effective, and

12   may involve additional considerations and risk."

13              Do you see that sentence?

14      A.   Yes, I do.

15      Q.   "When feasible, officers should take reasonable

16   steps to move out of the path of an approaching vehicle

17   instead of discharging their firearm at the vehicle or any of

18   its occupants."

19              Do you see that sentence?

20      A.   Yes.

21      Q.   And you kind of referenced that concept earlier in

22   the deposition; right?  Stepping out of the way if we can?

23      A.   We talked about that, yes.

24      Q.   "An officer should only discharge a firearm at a

25   moving vehicle or its occupants when the officer reasonably

1    believes there are no other reasonable means available to

2    avert the imminent threat of the vehicle or if deadly force

3    other than the vehicle is directed at the officer or others."

4          And then it cites a government code section.

5          Do you see that?

6     A.   Yes, I do.

7     Q.   Now, I think you've already said this, but in this

8    case you didn't see the woman in the car with any gun or

9    pointed at you or anything like that, did you?

10    A.   Not a gun, no.

11    Q.   Okay.

12         MR. GALIPO:  Then we can go to the next exhibit

13   which is now Exhibit 4, which is what you put up previously.

14         (Exhibit 4 was marked for identification.)

15   BY MR. GALIPO:

16    Q.   And I don't even know if you've seen this before.

17         This is part of the investigation materials that

18   showed some of the areas of the gunshot wounds to the woman

19   in the car.

20         Have you seen anything like this before?

21    A.   I don't think so.

22         MR. GALIPO:  Let's go to the next two pages just so

23   he can see all three.

24         MR. ALLEN:  Dale, can the get the title of this

25   document and the Bates stamp number?

```
 1               DECLARATION UNDER PENALTY OF PERJURY

 2

 3   Case Name:  Veronica Mcleod, et al. vs. City of Redding, et

 4   al.

 5   Date of Deposition:  January 19, 2023

 6   Job No.:  430166

 7

 8            I, _____, hereby certify

 9   under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11            Executed this _____ day of _____,

12   20____, at _____, California.

13

14

15

16

17

18                    _____
                              GARETT MAXWELL
19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE

 2                        OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6  Stenographic Shorthand Reporter of the State of California,

 7  do hereby certify:

 8         That the foregoing proceedings were taken before me

 9  at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15         Further, that the foregoing is an accurate

16  transcription thereof.

17         I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  January 19, 2023.

23

24         _____
           Jinna Grace Kim, CSR No. 14151
25
```