# Exhibit 2

| | | |
|---|---|---|
| STATEMENT OF: | | Corporal Garett Maxwell, #354 |
| REFERENCE: | | Internal Affairs Investigation 20-0033 |
| DATE: | | Friday, December 4, 2020, 10:30 a.m. |
| PRESENT: | | Professional Standards Sergeant Brian Torum, #320 |
| | | Administrative Sergeant Rob Peterson, #321 |
| | | Corporal Garett Maxwell, #354 |
| | | David Garcia, Goyette and Associates |
| LOCATION: | | Enterprise Park Conference Room, Redding City Hall |
| Transcribed by: | | M. Dotson |

BT: Brian Torum
RP: Rob Peterson
GM: Garett Maxwell
DG: David Garcia

BT: And I'm recording. Okay, the date is Friday, December 4, 2020. The time is 10:30 a.m. My name is Sergeant Brian Torum. Also present are

RP: Sergeant Rob Peterson.

DG: David Garcia with Goyette and Associates.

GM: Corporal Garett Maxwell with the Redding Police Department.

BT: We are at the Enterprise Park Conference Room in Redding City Hall to discuss IA #20-0033. Corporal Maxwell, are you aware this interview is being recorded?

GM: Yes, I am.

BT: Okay, you are advised that your rights are fully stated in the Public Safety Officers Procedural Bill of Rights Act, Government Code sections 3300 through 3311. Are you aware of these rights?

GM: Yes, I am.

BT: The California Supreme Court in interpreting Government Code sections 3303(e), 3303(g), and 3304(a) state an officer must be given Miranda Rights when it is possible he or she could be charged with a criminal offense. You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to an attorney and have them present with you while you are being questioned. If you cannot afford an attorney, one will be appointed to represent you before any questioning, if you wish one. If you under….excuse me….do you

IA-20-0033 – Statement Corporal Garett Maxwell, December 4, 2020

377 BT: So, in your mind she's free to leave at that point?

379 GM: At that point, while I don't like the idea of it, it was the lesser of two evils, if you can call it that.

382 BT: Okay, did you think it was the safest thing to do at the time?

384 GM: I did. I felt based on the surroundings it was the most prudent thing.

386 BT: Okay, so had the female backed up all the way out and driven towards the exit of Discovery Village, would you have done anything to stop her from doing it?

389 GM: Not right then and there at that point. We may have followed her to a safe location, try a traffic stop and see where it went from there, but in a heavily populated business district I wasn't willing to have that occur right there.

393 BT: So, at the point only when she is backing up, did you perceive any threats from her?

395 GM: Um, during the initial calm backing maneuver, not to my life at that point, no.

397 BT: Okay. You mentioned that she, um, she tried to hit you, or run you guys over, so

399 GM: Correct.

401 BT: um, I've seen the video. Obviously you've talked about the video already and I know at some point the car drives forward.

404 GM: Correct.

406 BT: So, and then you mentioned that she tried to hit you as well, so, when the female went from a backing movement into a forward movement where were you guys positioned, you and Officer Bruce positioned?

410 GM: We were both, uh, near the front of that car near the direction of its travel when it lurched towards us.

413 BT: And did you hear anything when the vehicle moved?

415 GM: As far as?

417 BT: So like did you hear a revving engine or a, you know, the sounds associated with accelerating cars, like screeching tires, a revving engine?

420 GM: It wasn't like she floored it. There was, it was obvious to me that the vehicle lurched forward. It was very unnatural considering the context of where that, again, there was ample space for her to just cautiously back out. There was room for her to depart. She stopped that backing maneuver when her vehicle was facing directly at us, put it

IA-20-0033 – Statement Corporal Garett Maxwell, December 4, 2020

| | | |
|---|---|---|
| 565 | BT: | Why do you think he was doing that, in your experience? |
| 567 | GM: | He was trying to one, get through the window to gain control of the suspect.  Uh, I know the intent of that would be to one, immediate affect her arrest, prevent her from leaving, but also to mitigate any additional risk to bystanders and people in the area. |
| 571 | BT: | After you slashed her tire, or you poked her tire, and Officer Bruce was there, um, trying to break her window, um, describe, describe what happened, what you did after that. |
| 575 | GM: | So, I was facing, uh, kind of down and away from Officer Bruce towards the rear of that tire.  When I slashed the tire, that was effective.  I began to put my knife away and as I began to back off and turn I saw Officer Bruce pinned in a face-down manner being crushed by the front left wheel and tire of that car. |
| 580 | BT: | So, did you believe he had injuries? |
| 582 | GM: | I knew he had injuries.  He, uh, had this look on his face of absolute panic. |
| 584 | BT: | So, after you saw him in that area, you had poked the tire and transitioned.  Uh, did you, what did you do? |
| 587 | GM: | So, I moved back kind of towards Officer Bruce, wanted to get a, my immediate concern was to get a view of the driver.  I had drawn my handgun by this point.  Um, Officer Bruce was again pinned.  He was not, it wasn't like he had been run over and was able to get out of that position.  He was actively being crushed by that tire.  He was not able to get out of that position.  The only thing I could do at that point, based on the context of that scenario, was to utilize force on that female driver to prevent her from running him over further. |
| 595 | BT: | Was there time between when you drew your firearm and when you made the decision to fire? |
| 598 | GM: | ==There was a gap of time from when I drew, uh, my firearm to when I engaged, and during that cycle I assessed Officer Bruce, I assessed the intent of the female, kind of like I discussed earlier.  There was no, absolutely no signs of this is an accident.==  This, in my mind, based on one, the context of our initial interaction, her attempting to run us over, and then seeing that same aggressive, uh, angry demeanor on her face as she continued to manipulate that car, it was very clear to me that her intent was not to stop and help us render aid to Officer Bruce.  She was clearly going to drive over him and my fear was that not only one, she was actively hurting and injuring him significantly, but was that she was going to turn those wheels, grind his legs further into the concrete or pavement and run him over and the natural path of travel for that to occur would have been to make a left turn, which would have put not only that tire crushing his legs further, but the rear wheel would have basically swept right over his head and upper torso and crushed and killed him. |

IA-20-0033 – Statement Corporal Garett Maxwell, December 4, 2020

612 BT: And so, uh, I just want to make sure I get it, from the time that you poked her tire to
613      the time that you had your firearm out and decided to fire, was there, can you
614      estimate an amount of time between?
615
616 GM: It would have been, when I got to the window and made the assessment to drawing
617      and engaging the female, it would have been probably between three and five
618      seconds.
619
620 BT: Did you say anything to her at the time?
621
622 GM: I did not have time.
623
624 BT: You described that she was, she was making motions to, um, to manipulate the car.
625      Can you describe what those were?
626
627 GM: She had, she was controlling the steering wheel, uh, it appears that she had a hand
628      near the gear shift, um, and at some point that vehicle lurched as if it was going to
629      continue motion.
630
631 BT: If you hadn't done, if you hadn't shot the female, what do you believe could have
632      happened, and then just, you've talked about it, but I just want to make this the point
633      that we reiterate what you believe what would have happened.
634
635 GM: I believe that Officer Bruce would have been killed by that female.  He would have
636      been run over and crushed into the ground.
637
638 BT: Okay.  So, um, I'm gonna go back and just ask some generalized questions about the
639      incident.
640
641 GM: Sure.
642
643 BT: You both made contact with the female and, not both made contact with her, but
644      when you both arrived and you were speaking with the security guard and Officer
645      Bruce was speaking with the female, if she had just left at that point, would, would you
646      have been forced to shoot her?
647
648 GM: Absolutely not.
649
650 BT: If the female had stopped and complied after driving forward in your guys' direction,
651      would any of this have happened?  Would you have had to use your firearm?
652
653 GM: Likely no.
654
655 BT: If the female after striking Officer Bruce had clearly not been manipulating her car, or
656      looked like she was going to comply, would you have had to use your firearm against
657      her?
658

| | | |
|---|---|---|
| 659 | GM: | No. |
| 661 | BT: | Um, Corporal Maxwell, how long have you been an Officer? |
| 663 | GM: | I started my law enforcement career in 2000. |
| 665 | BT: | In 2000? |
| 667 | GM: | 2008. |
| 669 | BT: | 2008. |
| 671 | GM: | Yes Sir. |
| 673 | BT: | And what agency was that with? |
| 675 | GM: | Uh, it was with the Anderson Police Department. |
| 677 | BT: | And then is the Redding Police Department the only other agency you've worked for? |
| 679 | GM: | Yes. |
| 681 | BT: | So approximately twelve years in law enforcement? |
| 683 | GM: | Yes Sir. |
| 685 | BT: | Do you have any type of specialized training or experience? |
| 687 | GM: | I do. |
| 689 | BT: | And can you describe, uh, what those, what that specialized training is? |
| 691-704 | GM: | A significant part of my experience revolves around the tactical side of law enforcement. I'm a, I've been to Basic SWAT School. I'm currently on our SWAT team, have been for quite a few years. I've been to a lot of additional trainings within that context, um, that have to do with a lot of the tactics that we employ in law enforcement. Another significant portion of my career I've spent as a department Firearms Instructor. Um, I've also been a Defensive Tactics Instructor, a Taser Instructor, um, I've worked within our Neighborhood Police Unit, which at the time I spent a significant part of that conducting tactical operations with our agency. Um, I was further assigned to our narcotics task force as an investigator where we conducted a lot of different drug related investigations, but a lot of that revolved around, uh, the use of tactics within the confines of law enforcement. Currently I'm a Patrol Corporal with our agency. Um, and over my years of experience within this community I've been involved in, uh, quite a few different types of critical incidents. Is there anything other specific training that you're looking for information on? |

IA-20-0033 – Statement Corporal Garett Maxwell, December 4, 2020