# Exhibit 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

VERONICA MCLEOD, individually and as succesor in interest to decedent, DOLORES HERNANDEZ; AMADO HERNANDEZ, individually and as successor in interest to decedent, DOLORES HERNANDEZ; and YSIDRA REGALDO, individually,

Plaintiffs,

vs.

CITY OF REDDING; GARETT MAXWELL, an individual; and DOES 1-10, inclusive,

Defendants.

Case No. 2:22-CV-00585-WBS-JDP

REMOTE VIDEOCONFERENCE DEPOSITION OF

MATTHEW BRUCE

THURSDAY, APRIL 27, 2023

Reported Stenographically By:

Jinna Grace Kim, CSR No. 14151

Job No.: 450075

He reviewed as of the preparation for the video.
He reviewed it in my presence.
MR. GALIPO: That's fine. Thank you, Dale.
And as I mentioned in my other deposition with you, I don't get to say that very often in a depo, "Thank you, Dale." So I like that.
BY MR. GALIPO:
**Q. What was the nature of the call that you were responding to?**
A. Dispatch had created a call for a -- what they call 415 or just a general disturbance.
**Q. Did you have any specifics before you got to the scene, what was the nature of the disturbance?**
A. Dispatch always provides some sort of description of the compliant, and what I received was that there was a female at the location who was using foul language, cursing if you will, and was creating a disturbance at the location.
**Q. Did you have any information of anybody being injured?**
A. No.
**Q. Any information of anyone being verbally threatened?**
A. No.
**Q. Any information of a weapon?**

A. No.

**Q. Any information as to who this woman was, specifically?**

A. No.

**Q. And have you listened at any time to the radio dispatch the recording of that?**

A. No.

**Q. So right now you're just going off of general recollection and the review of your statement?**

A. That's correct.

**Q. And so when you got to this location, what street was it on, if you recall?**

A. It's -- I don't know if the -- it's a shopping center, and it's right off of Dana Drive. It's -- it's on the south side of Dana Drive. I -- I couldn't tell you the exact address.

**Q. What was your assignment at the time?**

A. Patrol officer. I believe it was -- I was assigned to Beat 2.

**Q. How long had you been a patrol officer before the date of this incident?**

A. For the City of Redding, or in general?

**Q. Let's just talk about Redding.**

A. I was a lateral transfer to Redding.

So I think I had been employed by the City of

Q. Yes, you know. And no, it did not?
A. No. The answer is no, it did not.
And yes, I would know if there was a dash cam, yes.
Q. Okay. Did you have any recording device on your person --
A. I did not --
Q. -- audio recording?
A. No.
Q. To your knowledge, is any of the conversations between you and this woman recorded anywhere?
A. Not to my knowledge.
Q. Did you talk to anyone at the scene before talking to the woman?
A. No.
Q. Were you aware that your partner had arrived at some point?
A. Yeah. When I arrived I noticed my partner shortly behind me.
Q. Did you have any conversations with your partner before you began speaking to the woman?
A. No. I kind of waited for him to make our approach, but there was no conversation had.
Q. And what do you recall initially saying to the woman?
A. I walked up to the car and engaged her, and she

**point?**

A. It was on.

**Q. And do you know what gear the car it was in at that point?**

A. I believed that I did look at it, and it was in park.

**Q. Do you recall where the gear shift was, whether it was up, high, by the steering column, or in between the seats?**

A. I remember checking to see what position it was in, and I don't remember if I checked by noticing the lights because, you know, when you put a car in reverse the backup lights come on, or if I looked at the gear shift lever.

I don't -- I couldn't really tell you how exactly I knew that it was in park. I knew that the reverse lights were not on, that the brake lights were on, and I might have just assumed because of that situation, that it was in park, but I also possibly -- I don't 100 percent recall looking at the -- the shift lever because when I'm going back through my mind, I can't remember if it had one of those shift levers that's in the middle, or if it's the one on the column.

So I couldn't -- I couldn't tell you for certain what position the shift lever was in. I don't remember where it was located in the car.

**Q. Okay. The window on the driver side during this**

initially conversations, was it up, or down, or somewhere in between?

A. When I first contacted her, it was all the way up.

I then shined my flashlight in vehicle because she wasn't looking at me. She was looking straight forward. So I shined my flashlight into the vehicle to get her attention. Then she turned and she lowered the -- the window approximately two inches.

Q. Do you know if she was wearing her seat belt or not?

A. I do not.

Q. Do you know if -- do you recall if there was music playing in the car or the radio was on?

A. Yes. The radio was on and she as playing music very, very loudly.

Q. Okay. So when you initially approached, would it be correct that the driver's window was all the way up?

A. Yes.

Q. And then at some point after you tried to make contact and flashed your flashlight at her, she lowered the driver's side window just slightly, maybe a few inches?

A. Yes.

Q. And your impression was the car was on, but it was in park?

A. Yes.

Q. Did you tell her she was not free to go?
A. No.
Q. Were you intending to arrest her at that point for anything prior to her initially backing up?
A. No.
Q. In your mind, did you think if she wants to leave, go ahead and let her.
Was that your basic thinking at the time?
A. Yes.
Q. Okay. Now, when she put the car from drive into reverse, it sounds like you were still on the driver's side?
A. I was --
Q. And you saw -- I'm sorry.
I didn't mean to cut you off. Go ahead.
A. That's okay. Standing same position approximately B-Pillar about a foot away, foot and a half away, something like that.
Q. Did you have an impression as to where your partner was at that time when she put the car into reverse?
A. No.
Q. And when the car started going backwards, did you remain in the same spot, initially?
A. It's -- it's hard to say. I -- if I recall correctly, I did start to move away. I -- I remember my

mindset when she began backing up was that she was problem solved; she's free to leave, and that I was going to meet up with my partner, look for my partner, and talk to him about what had occurred, and what she had said, but I don't know -- yeah, that's -- that's what I recall.

**Q. In terms of your conversation with her, do you recall anything else during the conversation?**

**Because you told me about the initial part of it.**

**Anything else that was said between you and her before she started backing up other than what you've already told me?**

A. I -- I do remember asking her for her driver's license.

**Q. And do you recall her response?**

A. She told me that she wasn't going to give me shit, and I didn't have the authority, and that she wasn't driving.

**Q. Did you say anything in response to that?**

A. When she started backing up, I -- I waved at her, and I told her that she was now driving.

**Q. So right now I just want to focus before she starts backing up, and then we're going to go through what happened next, but --**

A. Okay.

**Q. -- it sounds like you said that after she started**

**backing up.**

A. No. The -- precisely how I remember it, I asked for the driver's license; she told me that I didn't have the authority, and that she wasn't going to give it to me, and that she was parked, and that she wasn't driving.

And then as soon as I asked for that, she then put the vehicle immediately in reverse and started backing up.

And then I waved at her, and I told her you're driving.

**Q. I see. In other words, she said she wasn't driving, and then you just pointed out the obvious, that she was driving?**

A. That she was moving, yes.

**Q. Okay. And it sounds like at that point you were just going to let her go.**

A. Yes.

**Q. Had she verbally threatened to harm you in any way --**

A. No.

**Q. -- up to that point --**

A. No. Other -- other than the strange conversation about being a murderer, accusing me of being a murderer, and that all -- I'm assuming she meant all law enforcement are murderers, other than that strange conversation, no, no threats were made.

**Q. And this was -- you've already said, this woman, do you have an estimate as to her age?**

A. I don't know -- I don't know if I can gauge it correctly in -- if I was to just throw out an estimate, it -- somewhere in her early 50's, late 40's.

It's -- it's hard to tell because she's in a, you know, a dark vehicle with the window up. So I -- I couldn't get a real gauge on it.

**Q. When you shined your flashlight in, did you see any weapons in the car?**

A. I did not.

**Q. And how far would you say the car backed up, initially?**

A. So I witnessed it; I watched it back up.

I would say four, maybe five feet, and then I stopped watching.

**Q. So you looked; you watched it back up four or five feet, and then you looked away?**

A. Yes.

**Q. And when it initially backed up that four or five feet, could tell if it went more or less straight back or at some angle?**

A. I couldn't really -- I -- I don't recall.

I'm -- it -- I could tell you that when it was backing up, and I watched it back up, it appeared to be going

**Q. Did you form the impression that this woman might be having a mental health crisis when she started telling you about murderers and Jesus and all that?**

A. I -- I -- I couldn't agree that the statements that she made were odd and troubling, but mental health crisis, it's hard -- it's hard to say. There -- there -- there is a lot of factors in a mental health crisis.

She could just be, you know, religious. I don't -- I don't really know. I was unable to tell at all what her motivations or her, you know, I didn't really have much information at all from her.

**Q. And it appears from reading your statement that you really didn't have an opportunity to assess her like you normally would to see if they was under the influence of drugs or alcohol; is that a fair statement?**

A. That's a fair statement.

**Q. Now, at some point did you see the car coming back towards you?**

A. I specifically recall seeing the headlights.

The -- the shopping center is -- is kind of a darker shopping center. There is not a whole lot of streetlights. And so as my kind of peripheral vision picked up a light coming in, I turned and noticed the vehicle.

**Q. And when you turned would you have turned back to your left?**

**Q. So did the car make contact with you when it moved forward?**

A. No. The initial time that it moved forward, it did not.

**Q. And when it moved forward, at some point did it come to a stop again?**

A. Yes.

**Q. And was there an angle at that point?**

A. Yes. When -- when it came back in initially and I turned and spotted the headlights, I could see the front end of the car, and it was -- and like I said, I'm just guessing because I was more so focused on the vehicle than its actual positioning on -- on the parking spaces, but as I remember it, it was approximately probably less than 45, but maybe at a 45-degree angle with the front of the vehicle facing me, and I had jumped out of the way which would have been towards the driver's side.

Or if I was -- it's hard to explain.

If I was standing where the license, front license plate was, I would have gone north towards the driver side of the vehicle to get out of the way.

**Q. And did you move out of the way?**

A. I did.

**Q. And that was kind of a natural reaction?**

A. Yes.

**Q. And then did the vehicle momentarily stop?**

A. Yes.

**Q. And when it was stopped in that position, did you approach the vehicle again?**

A. I didn't approach the vehicle at that point.

I noticed the driver had two middle fingers up in the air and was screaming. I couldn't hear what she was scheming. Obviously, the music was turned up, but she, you know, visibly was screaming, and I believe what she screamed was, "Fuck you," and to middle fingers.

And then that's -- that's right at when the vehicle stopped. I just stepped out of the way; vehicle stopped; she gave me two middle fingers and said, "Fuck you," like screamed it.

I obviously couldn't hear it, but you know how when you see somebody yelling, you can read their lips and you know what they're saying.

**Q. Do you know if the window was up or down at that point?**

A. I don't recall if it was still cracked, but I know it was up.

**Q. So are you saying --**

A. So it might have been still down two inches or it might have been all the way up, but it was definitely up more than three quarters of the way up.

**Q. So you're saying that you saw her give you in essence the middle finger with both hands at that point?**

A. Yeah, two middle fingers.

**Q. So her hands would have been off the steering wheel at that point?**

A. Yes.

**Q. And the vehicle was at a stop?**

A. At a stop.

**Q. And you didn't actually hear the words "Fuck you," but that was your impression?**

A. That's what I read off of her lips.

**Q. Okay. So and the car was still in this stopped position at this angle you described?**

A. Yes.

**Q. And then what did you do next?**

A. I started to approach the vehicle.

**Q. For what purpose?**

A. I had -- I'd come to -- at that point that's was not -- it's not a kind of normal behavior. I was -- I was afraid obviously because I had just noticed the car graze my legs, and I said this is -- this is not good behavior, and I needed to stop this person from driving.

And so I made the -- I formed the -- I knew I had to stop the car. I knew I had to stop her from driving.

And so I like quickly just thought I need to break

the window, and I need to go in, and I need to stop the car; I need to stop her from being able to drive.

**Q. And how did you want to break the window?**

A. I -- without even giving it two thoughts, I grabbed the baton which I carry right here on my vest, and I began striking the window with -- with the bottom of the baton.

**Q. What type of baton was it?**

A. This is a -- it's a 26 inch -- I forget the brand name. It's a collapsible aluminum baton.

**Q. Okay. And how many times did you strike the window with the baton?**

A. I believe three times, two or three times.

**Q. And when the car moved forward as you described and then came to a stop, do you know what distance it moved forward, approximately?**

A. From -- do you mean from when I got out of the way?

Because it stopped after I got out of the way.

**Q. Right. I guess what I'm getting at, and maybe you're not sure, you saw it back up the first four or five feet, and then you looked away; is that correct?**

A. Yes, that's correct.

**Q. I'm just wondering, when you looked back, how far did it move forward before stopping?**

A. From when I noticed it -- from -- from when I picked it up in my peripheral view, peripheral view, the light

 out of the vehicle, but putting the vehicle in park, turning it off, preventing it from driving.

**Q. Did you -- how much time do you think passed between the vehicle coming to a stop and you approaching the window and striking it with your baton?**

A. It felt like -- it felt like milliseconds.

I mean -- I -- I could not even give you an accurate representation of time. It just felt like it just happened, like there was no --

**Q. Okay --**

A. -- maybe -- maybe a second, maybe two.

**Q. Had you ever done that before in your career, try to strike the window of a vehicle that was occupied with the engine on?**

A. I've never been able to break a window to -- but I had successfully climbed through a driver's side window and turned the vehicle off, but the window was down.

That's the difference.

**Q. I'm just wondering whether you have had ever --**

A. Broken a window out?

**Q. -- yeah. Broken a window out while the driver was in the car and the engine was on?**

A. No.

**Q. But that's what you were trying to do in this instance?**

A. That was my plan.

**Q. Did you say anything to the woman before you started striking the window such as "Stop" or "Turn your engine off," or anything like that?**

A. No.

**Q. Did you give her any warning that you were going to strike or start striking her window with your baton?**

A. No.

**Q. Were you aware based on past experience that if you did shatter the window, some of the glass could go in the car on her?**

A. I've done quite a bit of testing on safety glass on vehicles, and they're generally pretty safe when -- when you break therm. They break up into little pellets, but I wasn't -- I think I was thinking more of like me having to climb through that window in which I was willing to do and not really fearing glass cuts or anything like that.

**Q. Did you ever try to open the car door.**

A. No. It was -- it was pretty clear to me when she pulled out because when I was speaking with her, the doors were locked, that the doors were still locked.

**Q. And when you were hitting the driver side window with your baton, I think you've already told me this, but what part of the baton were you using to strike it?**

A. The bottom.

**Q. Do you recall stating in your original statement that you were going to bash out her driver side window and pull her out of the vehicle?**

A. If it's -- if it's in my statement, I -- I mean I definitely could have said that.

**Q. I'm just wondering, is that something that you were thinking about at the time?**

A. Yeah. Stopping the vehicle was definitely by any means I needed to stop that vehicle.

**Q. And were also thinking about pulling her out of the vehicle?**

A. I believed that would be -- I mean, it's definitely part of my thought process, yeah, absolutely.

**Q. And I take it you would have extended the baton before striking the window?**

A. Yes. Because it wasn't working on the -- the butt of the baton was not making any impact on the window.

It was just bouncing off.

**Q. Just take me through the sequence.**

**Did you strike it initially several times with the butt?**

A. Yes.

**Q. And how many times did you strike it with the butt of the baton?**

A. Two to three. That's what we were speaking about.

**Q. Okay. And then when you extended the baton, did you strike it any additional times?**

A. I never got to fully extend the baton.

**Q. Do you know if the window cracked at all or had any effect from you striking it?**

A. I don't believe it did.

**Q. Have you ever seen photographs of the window after the incident?**

A. I've never seen photographs of the window.

**Q. Where was your left foot in relation to the driver's side front tire of the vehicle when you were attempting to smash the vehicle with your baton?**

A. My left front foot would have been extended forward of my body like a baseball swing stance.

**Q. Do you know if your left foot was in the area of the tire?**

A. When I was standing next to the vehicle, I would have placed myself directly in front of the door in which the window I was striking. So I don't believe it was in front of the tire when I was striking the window.

**Q. Did the car go further in forward at that point?**

A. I don't know if it was moving forward or backwards.

I was mainly focused on the window and stopping the car.

**Q. Do you know -- what I'm getting at, if you know,**

**during the time you were striking the window, do you know if the car was moving forward or backwards at that point?**

A. No. I was standing on the driver side of the vehicle, focused on breaking the window. So I'm standing along side -- I couldn't tell if it was moving when I was doing it.

**Q. And then after your two or three attempts, is that when the car went in reverse?**

A. Like I said, I was focused on the window.

So if the car would have moved backwards at that point, I would have moved backwards with it or forward with it, or I couldn't -- I wasn't watching the movement of the vehicle. You'd have to stand off to see a vehicle moving, but I was right on the door. So I was looking at the door and the window.

**Q. I guess what I'm getting at, after your two or three attempts to break the window --**

A. Uh-huh --

**Q. -- did you have a sense that the vehicle moved?**

A. I did not have a sense that the vehicle moved.

**Q. Okay. At some point did you find yourself in a different position?**

A. Than my --

**Q. Than standing up on the side of the vehicle.**

A. Yeah. I found myself on the ground.

**Q. Okay. And do you know, in other words, did you have a sense at the time how that happened, whether the car had moved and that caused it to happen, and you were not sure?**

A. I was not sure what happened, what brought me off my feet, but I quickly figured out as the tire rolled over my leg, what had happened.

**Q. And what did you think had happened at that point?**

A. I thought I was getting run over at that point.

**Q. You thought the wheel went over a portion of your body?**

A. I could see the wheel on my leg.

**Q. Okay. What portion of your leg was the wheel on at that point?**

A. At that point it -- I watched the wheel come -- I remember pretty vividly the moment that I realized exactly what position I was in, and I looked down at my left leg, and I could see the tire cupping over my knee.

**Q. Do you remember trying to back out of the way when the car starting going in reverse?**

A. Which time?

**Q. I guess the first time it went in reverse, as I understand it, you just watched it go about four or five feet and then looked away?**

A. Yes.

**Q. The second time it went in reverse, if I'm**

**Q. Look at your response on Lines 869 to 871.**

A. Yeah. Okay.

So reading that, no. It was pinned with it.

I -- I think they're talking about my right knee.

**Q. Okay --**

A. They're asking -- they're asking me if my right leg was free, and I said, "No, it was pinned with it."

So the two legs were -- the two legs were together, but the weight of the vehicle was not on my right leg.

**Q. Okay. So you're now in this position, and then do you say anything to the woman at all at this point?**

A. No.

**Q. So it sounds like from the time she initially starting backing up to the time you're down in the position you described, you did not say anything to her; is that a fair statement?**

A. From the time that she backed up initially, put it in reverse and I thought she was leaving to the time that I got ran over, no, no comments. I made no communication with her other than banging on her window.

**Q. And after the front wheel was in contact with you, with your leg, did you say anything to her at that point?**

A. No.

**Q. And did you say anything to your partner at that point?**

A. Initially, when I found myself on the ground I didn't see my partner until what felt like moments later, but he came back around the vehicle towards me, and I looked up at him, and I told him to shoot her.

**Q. Okay. You were telling your partner to shoot the woman who was driving the car?**

A. Yes.

**Q. And I'm assuming you were meaning with his firearm?**

A. Yes.

**Q. And was your thinking at the time that for him to shoot her, he would have to shoot through the driver side window?**

A. I wasn't thinking anything about how he was going to do it. I just knew that I was thinking the whole time that I was going to get killed.

**Q. So in your mind you were directing your partner to shoot this woman; is that a fair statement?**

A. That's a fair statement.

**Q. And were you aware that if your partner followed your command or request, that this would woman would be seriously injured or killed?**

A. I'm aware of that.

**Q. And did you expect your partner to follow your command or request to shoot her?**

(Recess taken.)
MR. GALIPO: Back on the record.
BY MR. GALIPO:
**Q. Did you have any broken bones as a result of this incident?**
A. No.
**Q. Any bleeding as a result of this incident?**
A. Yes.
**Q. And where were you bleeding?**
A. Several different spots in my leg.
**Q. Were those photographed, if you know?**
A. They were.
**Q. Did you have any surgeries related to this incident?**
A. No.
**Q. Any information that you had, you know, torn anything in your knee or torn meniscus or anything like that?**
A. I think -- so I went -- I -- I couldn't tell you my -- my prognosis. I know that I went in for two separate MRIs and got two separate answered from two different doctors.
**Q. Did either doctor recommend surgery?**
A. No.
**Q. When did you next work after this incident?**

A. Straight back, yeah.

**Q. Right. That's assuming it went straight back, but it didn't go straight back; correct?**

A. Hindsight, yeah, it did not go straight back.

**Q. Right. I mean do you think sometimes that if you had not gone up to smash the window, then the car -- you would have not ended up underneath the car as you did?**

MR. ALLEN: Objection. Calls for speculation.

You have to answer the question, Matt.

THE WITNESS: Yeah. I'm -- I'm thinking about -- I'm thinking about my response.

Can you ask it one more time?

BY MR. GALIPO:

**Q. Sure. Did you ever think after the fact that if you had not gone up to smash her window or tried to smash her window, you would not have been in that position?**

**And if the car went backwards the way it did, you wouldn't have got pinned under the car?**

A. Yeah. I think -- I think it's fair to say that in what I was thinking, I would have never -- I would have actually never thought that a vehicle would move in the direction that it did. Instead of moving straight on or straight back, it instead kind of curled around, and I would have never anticipated that.

**Q. When the vehicle moved forward, it was at an angle,**

**wasn't it?**

A. It was at a 45-degree angle. So if -- if the vehicle was at a 45-degree angle and it goes straight in and straight out, I placed myself in the best position I could think of to avoid getting struck by the car because it -- the car turns on an axis here. So if it was to back up, then I would be able to get out of the way because I was alongside the vehicle instead of being in front of it or behind it.

**Q. I understand that. But your impression was this woman was somewhat agitated; is that fair?**

A. Yeah. The two middle fingers and the -- and the "fuck you" definitely led me to believe that she was agitated.

**Q. Did you, by the way, ever give her any gestures with your hands like to stop or anything like that?**

A. No.

**Q. Did you ever consider that smashing or attempting to smash someone's window who is already agitated may cause the car to move forward or backwards to get out of the way of having their window smashed?**

A. I anticipated the vehicle moving forward or backwards. That's why I stood where I should on the side of the vehicle because I figured I was in the best place tactically.

**Q. So you're saying when you approached the vehicle on**

**the driver side to smash out the window, you anticipated it could move forward or backwards with you in that position?**

A. I anticipated that the vehicle would move forward or backwards, and I would be alongside of it avoiding the largest portion of the vehicle.

**Q. Were you thinking that if the vehicle moved forward or backwards while you were trying to smash out the window, you would continue to try to smash out the window as the vehicle was moving?**

A. If I'm understanding your questioning correctly, did I continue -- would -- it's -- it's hard for me to say what -- what I would have done differently while keeping in mind that my plan was simply just to break the window out and to stop her.

And if you're asking me if I would have continued to do that, had she been driving forward, yes. The answer's yes. I would have advanced forward with the vehicle going along it.

**Q. And how about if it went backwards straight, the same?**

A. I felt like I was in the position that absolutely if it went backwards, I would just go down along side it and matched its angle.

**Q. Did you know where your partner was when you were smashing out the window or trying to?**

A. No. I did not know where may partner was.

**Q. When did you become aware your partner was to your right?**

A. When I saw him come around the backside of the vehicle.

**Q. Were you aware at the time that your partner was trying to put a knife through the rear tire of the vehicle?**

A. I was not aware of what my partner was doing.

**Q. Did you learn that at some point after the fact?**

A. I don't know if I heard the story of it when -- when I was doing my investigation, or if it was when I reviewed the video for the first time that I noticed it, but I don't -- in the moment I didn't recall anything that he was doing. I was focused on purely what I was doing.

**Q. Did you make any tactical plan or have any discussion with your partner after the vehicle moved forward towards you, but before you bashed the window?**

A. No.

**Q. Did you tell your partner you were going to bash the window?**

A. No.

**Q. Have you heard the term before "situational awareness?"**

A. I have heard it before.

**Q. Is it kind of referring to being aware of what it**

A. If I knew he was directly behind the vehicle, would I have continued to smash out the window, yes. I would have -- I would have tried to stop her because no matter -- no matter what we come to in this, when -- when -- when I was focused on the situation at hand, I wanted to stop her.

There was no telling what the next move in her card would be, and if my partner was standing behind her, I would be even more worried that she would put it in reverse and run over my partner.

So if he was standing behind her, I would be concerned that she would try to run my partner over.

So I -- I -- I would want to get through the window even more.

**Q. In your career how many times can you recall, and this is a situation where a vehicle is on, in gear, driver is in the vehicle, of a officer attempting to smash the window of a vehicle to get in, how many times have you seen that in your career?**

A. How many times have I seen that exact situation?

**Q. Right. The vehicle's on, it's in gear, there is a driver in the vehicle, and an officer tried to smash out the window like a side window to get in the car.**

A. I have been through tactical training in which in the training we've done that dozens of times.

**Q. How about in real life, had you ever seen that**

**before?**

A. As far as breaking out a window and stopping somebody from driving, in my experience not that I can recall with a window up.

However, it had worked several times where the window was down.

**Q. Yeah. But if the window was down, you would not have to smash it, would you?**

A. If the window was down, I wouldn't have to smash it.

**Q. Right. Have you heard the term "de-escalation?"**

A. I have.

**Q. And is that generally mean trying to calm a situation down if you can?**

A. I guess in -- it's a roundabout definition of what de-escalation means.

**Q. It sounds like when she backed up, initially you were okay with her leaving; is that a fair statement?**

A. It's a fair statement.

**Q. At that point she was not under arrest; is that correct?**

A. That's correct.

**Q. And you were not trying to detain her at that point?**

A. That's correct.

**Q. Okay. After she pulled forward towards you as you described, the vehicle came to a stop; is that correct?**

A. Yes, that's correct.

**Q. And at that point in your mind, you did not want her to drive any further?**

A. Yes.

**Q. And you're an experienced officer; right?**

**You've been an officer I guess at that time how many years?**

A. Ten or eleven, something like that, ten, eleven, twelve.

**Q. Okay --**

A. Over ten years.

**Q. Right. And is there a reason why prior to approaching to smash her window, you didn't try to give her a command or some gesture or something to let her know you wanted her to stop?**

A. I was purely focused on the task at hand.

**Q. Right. But in terms of -- aren't officers trained to give commands when they can?**

A. When they can.

**Q. And to give a person an opportunity to follow the commands if it's safe to do so?**

A. Yeah. In -- in -- in an academy atmosphere or in a -- in a general arrest atmosphere where you have a

 A. Yes.

**Q. Okay --**

A. But you make it sound like it was like seconds that it was stopped when it was literally I jumped out of the way and then I immediately approached the vehicle.

It wasn't -- there wasn't like a ten-second like we're having a stare-off, you know what I mean?

**Q. I understand that. But it's not like at the time that just before your first strike to the window, the car was moving forward or backwards.**

**You would admit it was at least stopped before your first strike?**

A. Absolutely. I'll -- I'll agree with on that.

It was stopped when I started striking the window.

**Q. And you were the one obviously that decided to strike the window; no one told you to do that.**

A. That's correct.

**Q. And you also decided not to give any commands or any gestures.**

A. I did.

**Q. Okay. And did you ever consider that by striking the window, this woman already is a little agitated or off; who knows what she might do if I start striking the window; she might panic and the car might go backwards or forward to try to avoid me from breaking her window?**

**Q. And it sounds like -- do you know how many shots were fired?**

A. I only heard two. I know I heard the first one, and I felt the vehicle -- I heard two back to back, and then I felt the vehicle come off my leg, and that's the extent of it, and it was extremely muffled. I -- yeah.

**Q. So I guess at least we know now that the vehicle went further back at an angle which caused you to get in the position you were relative to the left front tire; is that fair?**

A. Yes. I believe that's fair.

**Q. And it sounds like your impression was if the vehicle went further back with you in that position, it would not have been good for you?**

A. I remember thinking while under the vehicle with my leg pinned, that it was going to be bad either way, that if -- if she went forward, that she would see me on the ground, and that she would be able to hit me with the back wheels of the vehicle, and that if she went -- and that's if she backed up, she would see me on the ground and she would be able to come forward at me again.

**Q. Well, would it be fair to say that you were hoping the vehicle would move a little forward off of your leg?**

A. My only hope was that it would get off the -- off of my leg so I could escape.

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Veronica Mcleod, et al. vs. City of Redding, et al.

Date of Deposition: April 27, 2023

Job No.: 450075

I, ___________________________, hereby certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ______ day of ________________, 20____, at _________________, California.

______________________________
MATTHEW BRUCE

CERTIFICATE

OF

CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

I, JINNA GRACE KIM, CSR No. 14151, a Certified Stenographic Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me, using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action, nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have subscribed my name, this date: April 27, 2023.

Jinna Grace Kim, CSR No. 14151