1 | DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
2 | AMEET D. PATEL, State Bar No. 343413
apatel@aghwlaw.com
3 | ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
4 | San Francisco, CA  94104
Telephone:      (415) 697-2000
5 | Facsimile:      (415) 813-2045

6 | Attorney for Defendant
CITY OF REDDING, GARRETT MAXWELL, AND
7 | MATTHEW BRUCE

8

9 | UNITED STATES DISTRICT COURT

10 | EASTERN DISTRICT OF CALIFORNIA

11 | VERONICA MCLEOD, individually and
as successor in interest to decedent,
12 | DOLORES HERNANDEZ; AMADO
HERNANADEZ; individually and as
13 | successor in interest to decedent,
DOLORES HERNANDEZ; and YSIDRA
14 | REGALDO, individually,

Case No. 2:22-cv-00585-WBS-JDP

**DECLARATION OF AMEET D. PATEL IN SUPPORT OF DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION [F.R.C.P. 56]**

15 | Plaintiff,

Hon. WILLIAM B. SHUBB

16 | v.

Date:      June 10, 2024.
Time:      1:30 p.m.
Ctrm:      5

17 | CITY OF REDDING; GARRETT
MAXWELL, an individual; MATTHEW
18 | BRUCE, an individual; and DOES 2-10,
inclusive,

Trial:      September 10, 2024

19 |
20 | Defendants.

21 | I, Ameet D. Patel, declare as follows:

22 | 1.  I am an attorney licensed to practice law in the State of California. I am an associate at the

23 | law firm of Allen, Glaessner, Hazelwood & Werth LLP, and am counsel of record for

24 | defendants City of Redding, Garrett Maxwell and Matthew Bruce (collectively,

25 | "Defendants") in this matter.

26 | 2.  I have personal knowledge of the statements made in this declaration and could competently

27 | testify to them if called as a witness.

28

1

DECL. OF AMEET D. PATEL ISO REPLY
2:22-CV-00585-WBS-JDP

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

661902.1

3.  Marked as Exhibit "I" is a true and correct copy of the relevant portion of the deposition transcript of Scott DeFoe, taken on April 12, 2024.

4.  Marked as Exhibit "J" is a true and correct copy of the relevant portion of the deposition transcript of Matthew Bruce, taken on April 27, 2023.

5.  Marked as Exhibit "K" is a true and correct copy of the relevant portion of the deposition transcript of Aiden Phillips, taken on February 15, 2024.

6.  Marked as Exhibit "L" is a true and correct copy of the relevant portion of the deposition transcript of Richard Bell, taken on February 27, 2024.


I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my own personal knowledge. Signed this 28th day of May 2024 in the City of Dublin, California.


Respectfully submitted,

Dated:  May 28, 2024                    ALLEN, GLAESSNER,
                                        HAZELWOOD & WERTH, LLP


                                        By:  _/s/ AMEET D. PATEL_____
                                            AMEET D. PATEL, Declarant

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

661902.1

DECL. OF AMEET D. PATEL ISO REPLY
2:22-CV-00585-WBS-JDP

# EXHIBIT "I"

Transcript of the Testimony of:

# SCOTT A. DEFOE

MCLEOD, et al.

vs.

CITY OF REDDING, et al.

April 12, 2024

Volume I



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERONICA MCLEOD, individually and as successor in interest to decedent, DOLORES HERNANDEZ; AMADO HERNANADEZ; individually and as successor in interest to decedent, DOLORES HERNANDEZ; and YSIDRA REGALDO, individually,,<br><br>            Plaintiffs,<br><br>      vs.<br><br>CITY OF REDDING; GARRETT MAXWELL, an individual; MATTHEW BRUCE, an individual; and DOES 2-10, inclusive,,<br><br>            Defendants.<br>_____ | )<br>)<br>)<br>)<br>) CASE NO.<br>) 2:22-cv-00585-WBS-JDP<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

REMOTE DEPOSITION OF SCOTT A. DeFOE

April 12, 2024

REPORTED BY:  ASHLEY L. PROXMIRE, CSR
           License No. 13664

Scott A. DeFoe                                                    April 12, 2024

```
 1                    UNITED STATES DISTRICT COURT

 2                   EASTERN DISTRICT OF CALIFORNIA

 3

 4  VERONICA MCLEOD,            )
    individually and as        )
 5  successor in interest to   )
    decedent, DOLORES          )
 6  HERNANDEZ; AMADO           ) CASE NO.
    HERNANADEZ; individually   ) 2:22-cv-00585-WBS-JDP
 7  and as successor in        )
    interest to decedent,      )
 8  DOLORES HERNANDEZ; and     )
    YSIDRA REGALDO,            )
 9  individually,,             )
                               )
10          Plaintiffs,        )
                               )
11       vs.                   )
                               )
12  CITY OF REDDING; GARRETT   )
    MAXWELL, an individual;    )
13  MATTHEW BRUCE, an          )
    individual; and DOES 2-10, )
14  inclusive,,                )
                               )
15          Defendants.        )
    _____)

16

17

18

19

20

21              REMOTE DEPOSITION OF SCOTT A. DeFOE,

22  taken via Zoom videoconference, on Friday, April 12,

23  2024, at 9:02 a.m., before Ashley L. Proxmire, Certified

24  Shorthand Reporter, License No. 13664, in and for the

25  State of California.
```

1      A.    No, that's fine.  The 2024 fee schedule is 450

2   per hour for review, 550 per hour for depositions and

3   trial testimony.

4      Q.    Right.  And you charge just a minimum.  Is that

5   correct?

6      A.    Yes.

7      Q.    And what is the minimum?

8      A.    1,650 for deposition.

9      Q.    And is that to include -- so if I do this in

10   two hours, are you going to give us a refund?

11      A.    I can.

12      Q.    Okay.  I work for public entities; I have to

13   ask those questions.

14      A.    Sure.  I understand.

15      Q.    Have you spoken with any of the witnesses in

16   this case?

17      A.    I have not.

18      Q.    All right.  In your report -- and I'm going to

19   just -- if you want to follow along, we are just going

20   to go through the report as you go, just to take care of

21   my checklist.

22          Have you spoken with Deirdre Amaro, the

23   forensic pathologist?

24      A.    No.

25      Q.    Have you reviewed her autopsy report, forensic

Scott A. DeFoe                                           April 12, 2024

1    report?

2        A.   I don't believe I have.

3        Q.   You don't hold yourself out as a -- as an

4    expert in forensic pathology, do you?

5        A.   Do not.

6        Q.   Okay.  Any opinions that you might render that

7    relate back to this, whether it is now or how it comes

8    up in trial, would that be really reliant upon what she

9    finds in it?

10       A.   No, it has no bearing at all.  I'm not offering

11   any medical opinions.

12       Q.   All right.  How about trajectory opinions,

13   anything of that nature?

14       A.   No, sir.

15       Q.   Captain Snyder of the fire department, captain

16   of Engine 5, he is listed as a nonretained expert in the

17   disclosure.  And I should -- I want to clear something

18   up.  I'm reading from the disclosure that was made by

19   Mr. Galipo's office.

20           Dr. Amaro is disclosed as a nonretained expert.

21   That is not part of your report, but I'm asking that

22   question.  You cleared it up.  With respect to Captain

23   Snyder of the Redding Fire Department, are you familiar

24   with that name?

25       A.   I'm not.

Scott A. DeFoe                                               April 12, 2024

```
 1    You are familiar with the Monell --
 2         A.   Yes.
 3         Q.   -- liability.  For the Monell component, is
 4    there anything in their POST profiles that suggest to
 5    you or support a -- an opinion on your part that the
 6    Redding Police Department was not training them to
 7    recognize people suffering from a mental health crisis?
 8         A.   Nothing specific other than what my
 9    observations were based on the officers' actions.
10         Q.   Okay.  You cannot point to anything that the
11    City of Redding was failing to do in training the
12    officers to recognize someone in a mental health crisis?
13         A.   Based on the material I reviewed, correct.
14         Q.   With regard then -- and I'm trying to parse out
15    what's opinion and -- what's basis for your opinion on
16    the one, but I need to question you on that.  At the
17    point in time -- let me go on.
18              Midway through your Opinion Number 1, second
19    paragraph that says:  These correct and reasonable
20    methods are recognizing cues and other indicators in
21    order to make appropriate decisions regarding
22    intervention strategies.
23              That is in reference to cues they should be
24    looking for in order to intervene with somebody in a
25    mental health crisis?
```

Scott A. DeFoe                                                    April 12, 2024

1    A.   Yes.

2    Q.   All right.  And that's what is the murderers,

3  profanities, rolling her window up, lack of cooperation,

4  appearing -- did not appear right or some words to that

5  effect.  Is that correct?

6    A.   That and the reason for the call regarding her

7  actions inside the location.

8    Q.   Okay.  And in order to make appropriate

9  decisions regarding intervention, they decided not to

10 intervene beyond letting her go because the security

11 guard did not want to sign a citizen's arrest.  If I

12 understood correctly, is that decision something you

13 were critical of?

14   A.   No, I don't believe there was reasonable

15 suspicion to detain her for any type of crime connecting

16 her to any criminal activity.

17   Q.   Okay.  You are familiar with the 5150 Welfare

18 and Institutions Code, correct?

19   A.   Correct.

20   Q.   And law enforcement is taught, in all your

21 training and experience as well, that in order to detain

22 somebody for a 5150, they have to have probable cause to

23 do so.  Is that correct?

24   A.   Correct.

25   Q.   Because in fact a detention under 5150 is going

Scott A. DeFoe                                              April 12, 2024

1   to deny the person's liberty until such time as --

2   sorry, a psychiatric evaluation is done, which could be

3   up to 72 hours, correct?

4        A.   Correct.

5        Q.   And based on the facts as you understand them

6   and the time of interaction from the arrival of Bruce at

7   her window to the time that she started to drive out of

8   the parking space, was there any probable cause based on

9   a 5150 Welfare and Institutions Code violation of her

10  posing a threat to herself or others present?

11       A.   At that point, no.

12       Q.   Okay.  And did I correctly frame what the

13  Welfare and Institutions Code violation is?  In other

14  words, can you tell me your understanding of what the

15  probable cause is to take somebody and ask them to be

16  evaluated under Welfare and Institutions Code 5150?

17       A.   Yes.  There's three factors, mentioned two of

18  them:  danger to self, danger to others, or gravely

19  disabled.

20       Q.   And at least at the point in time she started

21  to reverse initially, none of those factors were

22  present.  Am I correct?

23       A.   Based on -- based on the information that they

24  knew at the time, correct.

25       Q.   Right.  And from the standpoint of a reasonable

Scott A. DeFoe                                                    April 12, 2024

1    believe there is any reason for them to stand in the

2    proximity of the vehicle for their own safety.

3        Q.    All right.  You are not an accident

4    reconstruction expert, are you?

5        A.    No.

6        Q.    Okay.  And in your time in law enforcement, did

7    you take accident reports?

8        A.    Yes.

9        Q.    Were you ever sworn as an expert witness in any

10   traffic investigation where someone was being prosecuted

11   or civilly sued and you were the person who took that

12   accident report?

13       A.    Other than testifying in trial like a DUI case

14   or something like that as the individual who took the

15   active report, not as a hired or retained expert in any

16   matter.

17       Q.    Right.  Your expertise in that case would have

18   been either as arresting officer and the probable cause

19   for the DUI, or perhaps have you testified in criminal

20   trials as an expert on someone manifesting signs of

21   driving under the influence?

22       A.    Yes.  I'm a former drug recognition expert with

23   the LAPD.

24       Q.    Right.  And on that point, there was no

25   indication by any of her mannerisms, even as she starts

Scott A. DeFoe                                              April 12, 2024

1    backing her car out -- well, there was no indication

2    that you could see in the reporting on this that she was

3    driving under the influence or impaired as she started

4    to drive -- back up from her parking space.  Am I

5    correct?

6        A.   You could not make that determination until you

7    conducted a field sobriety test or a 12-step drug

8    recognition evaluation.

9        Q.   That wasn't done by the officers on this

10   occasion, was there?

11       A.   No, sir.

12       Q.   And is it your opinion that there was probable

13   cause -- reasonable belief, not probable cause --

14   reasonable belief to have her get out of the car to give

15   her a field sobriety test based on her sitting in the

16   car and using profanities directed at the officer and

17   failing to give them a driver's license?

18       A.   No.

19       Q.   So there is an empty parking space and --

20   strike that.

21            Have you reviewed the accident reconstruction

22   report prepared by Dr. Rajeev Kelker?

23       A.   No.

24       Q.   Have you been to the site of the incident?

25       A.   No.

Scott A. DeFoe                                                    April 12, 2024

1        Q.   Do you have any measurements in mind of the

2   space that she had to negotiate backing out of a parking

3   space and pulling into the lane of traffic to leave the

4   parking lot?

5        A.   No.

6        Q.   And if someone is standing in an empty parking

7   stall as someone is pulling their car out of the

8   adjacent stall, is that person violating any traffic

9   codes to your understanding?

10       A.   No.

11       Q.   And if the parking space is empty and the

12  persons, such as the officers that night, are standing

13  in that, are they putting themselves in danger or

14  assuming a risk, at least under the training officers

15  received in the POST Academy and their learning domains,

16  as the car is pulling out of a space adjacent to them?

17       A.   Based on the facts in this case, I believe that

18  they put themselves --

19            (Whereupon, the Court Reporter asked for

20  clarification.)

21            THE WITNESS:  Based on my review of the facts

22  in this case, they put themselves in a poor tactical

23  position.

24  BY MR. ALLEN:

25       Q.   And just so we are clear, it is a poor tactical

Scott A. DeFoe                                                April 12, 2024

1    decision, in your opinion, that they stood in an empty

2    parking space to watch somebody back out of a parking

3    space to leave whom they did not have any reasonable

4    belief or probable cause to suspect she is mentally ill,

5    she is a danger to herself, or a danger to others.  Is

6    that correct?

7        A.   Based on the information that they did -- did

8    know at the time, yes.

9        Q.   Yes, meaning they didn't have reasonable belief

10   or probable cause to suspect she was a danger to herself

11   or others, right?  I want to make sure that I frame that

12   question so we are not confused by the answer.

13       A.   Yes.  Even though they did not have reasonable

14   suspicion to detain or probable cause to arrest, I still

15   believe the tactics were poor based on her -- her

16   mannerisms, her statements, and the reason why they were

17   called to the location initially.

18       Q.   Okay.  And you have a very stellar resume, so I

19   know what your experience is.  So rather than based on

20   your experience, I'd like to know what, based on your

21   training through your -- the days of your academy

22   through the days of your perishable skills training and

23   all the various classes and training sessions you have

24   attended over your career, can you tell me an instance

25   or a document or a training scenario where officers were

Scott A. DeFoe                                                    April 12, 2024

1    told that if they were to let somebody leave, that

2    they'd left themselves in a poor tactical place by

3    standing in a parking space, and when they begin to walk

4    out, they walk diagonally away from the car that is

5    pulling out while still in that parking space puts them

6    in danger?

7        A.   Well, based on my experience -- I don't know if

8    there's a document or directive for specific training on

9    it -- if I reasonably believe that someone may not be --

10   may be mentally ill, may be experiencing a mental

11   crisis, may be acting bizarre based on the individual's

12   mannerisms, I'm not going to stand anywhere where I

13   could be potentially struck by that vehicle, especially

14   after being cussed at, called a murderer, and her

15   refusing, rightfully so, to provide her driver's

16   license.

17           And in addition, the information that they knew

18   that she was causing a disturbance, that a reasonable

19   officer would know there was something going on with

20   Ms. Hernandez, and I would not want to be standing

21   anywhere near that car when she was exiting, or driving

22   our of the parking lot for the fear that -- for one,

23   that she could potentially strike me.  Or there is no

24   reason to stand in the parking lot where I can view

25   those actions from the curb just in front of them or

Scott A. DeFoe                                                    April 12, 2024

1    between a barrier and the car and her leaving the

2    parking lot.

3        Q.   So where should they have gone to stand?

4        A.   Either just to walk towards their -- being that

5    she was backing out, I would walk away from the car, not

6    as the car is backing out towards my police vehicle.  I

7    would have walked and stood in front of the pizza

8    location until she had left.

9            You are probably going to need to take a report

10   from the security officer anyway, so you have to go to

11   that point anyway to see if there is a report you may

12   need to take or not.  There is no use in standing in the

13   parking lot.  I wouldn't walk towards my vehicle at the

14   time because my vehicle is behind her vehicle, and I

15   wouldn't want somehow to be struck as she was backing

16   up.

17       Q.   If they look up on the sidewalk and she decides

18   to drive the vehicle forward suddenly, that would put

19   them in jeopardy as well, wouldn't it?

20       A.   Potentially, but I think it is the best of the

21   alternatives they had at the time.

22       Q.   But the alternatives you're posing are based

23   upon a suspicion, a reasonable belief that she is

24   someone who is dangerous and might be in fact -- drive

25   their vehicle at them regardless of whether they were

Scott A. DeFoe                                                     April 12, 2024

1   walking diagonally away from the direction of the car as

2   it backed out or if they went up on the sidewalk.  Isn't

3   that correct?

4        A.   Just more so, Counsel, because what Bruce --

5   Officer Bruce had stated about, you know, she was

6   becoming more agitated.  There is no doubt that she is

7   not in a right state of mind, not displaying normal

8   behavior.

9            I think separating yourself from the vehicle in

10  the safest manner possible would be the best course of

11  action.  Yes, if she drove at you in the front of the

12  pizza place, but that wasn't what she was doing.  She

13  was backing up to leave at the time, and putting

14  yourself in proximity of the vehicle that's backing up

15  in any parking lot is not -- not being safe.

16       Q.   Okay.  So they are walking back out, and at

17  1:28 -- and let me back up.  You would -- in looking at

18  this, can you determine the path they were taking as she

19  started to back out?

20       A.   No, I couldn't determine.  I mean, it seemed

21  like they were walking as the vehicle was backing up

22  alongside of it in the direction in which she was

23  backing up and not towards a position of -- or not

24  towards the restaurant, as I believe they should have

25  been.

Scott A. DeFoe                                                April 12, 2024

1      Q.   Now, there is caution in people that would look

2    at a parking space and decide I won't walk out of that

3    empty parking space if a car is pulling in or pulling

4    out.  But in terms -- and we will finish here on this

5    one point.

6          In terms of training, is it your testimony

7    you're unaware of any particular training given to a

8    police officer in any stage in their career that would

9    tell them it is not reasonable actions as a police

10   officer to walk along a car pulling out if you are in an

11   adjacent empty parking space, absent the totality of the

12   circumstances of those things that they knew about at

13   the time?

14     A.   No, I can't cite to a specific document or

15   training doctrine or module.

16     Q.   Okay.  Your opinion is that because Bruce was

17   aware she was the subject of a disturbing the peace

18   investigation and she called him some names and wouldn't

19   cooperate with him, that rose to the level that they

20   didn't act reasonably in walking out of that parking

21   space while she was backing up adjacent to them.  Is

22   that the testimony?

23     A.   I think it is one -- I think all of that is

24   true, but one part that you missed was the fact that he

25   said her behavior wasn't normal and she was becoming

Scott A. DeFoe                                                    April 12, 2024

1   increasingly agitated while he was attempting to talk to

2   her.  So once again, it wasn't just a disturbance.  It

3   was how she reacted towards him when he contacted her at

4   the window, which would have created some concern or

5   should have created some concern that she may be

6   experiencing some type of mental health crisis.

7           Nonetheless, I would not want to stand -- it is

8   common sense.  I mean, no different if you were in a

9   parking lot at a grocery store and someone is backing

10  out of their spot.  You typically don't walk alongside

11  that vehicle.  We allow them to back away in the event

12  the person may be elderly, couldn't see us, or whatever.

13  I think it is safe to say a poor decision on the

14  officer's part.

15      Q.   Okay.  In terms of de-escalation, Officer Bruce

16  reported her behavior, and then he stopped talking to

17  her and he started to -- he stopped talking to her to

18  allow her to go.  That is a form of de-escalation,

19  correct?

20      A.   It can be, yes.

21      Q.   In this case once he stopped talking to her

22  because she started to activate her car, he was letting

23  her go, correct?

24      A.   He was.

25      Q.   Okay.  And at the point that he was letting her

Scott A. DeFoe                                                    April 12, 2024

1   go, there was no manifestation of any other behavior by

2   her to suggest to him she was a danger to him or to

3   Maxwell or to others.  Am I correct?

4        A.   Other than what I already testified to,

5   correct.

6        Q.   Right.  Which I'll stop at the point that he --

7   she rolled her window up, looked forward, according to

8   his testimony, and he just stopped directing attention

9   to her.  Am I correct?

10       A.   I don't know if he stopped directing attention

11  to her.  I know there wasn't any conversation at that

12  point.

13       Q.   Have you seen any evidence in this case by any

14  reports or any of the witnesses that Officer Bruce did

15  anything more than what he reported he did as he

16  interacted with her?

17       A.   No, sir.

18       Q.   Okay.  So the only evidence we have is that

19  when he asked her for her driver's license or attempted

20  to talk to her, she rolled the window up after calling

21  him names, turned the volume up on her radio, activated

22  her car so that the taillights indicated she was going

23  to back up, and she started backing up.  And he didn't

24  have any interaction with her during that time frame

25  until she had nearly struck him.  Am I correct?

Scott A. DeFoe                                                          April 12, 2024

1        A.    Correct.

2        Q.    Okay.

3              THE WITNESS:   Can we take five minutes?

4              MR. ALLEN:   Absolutely.

5              (Whereupon, a break was taken.)

6   BY MR. ALLEN:

7        Q.    And again, what we've done is stop at 1:26, and

8   I just want to go through a few things with you, see if

9   you would agree or disagree.

10             Up until that point, is there any indication

11  that Bruce has not spoken simply or moved slowly?

12       A.    Correct.

13       Q.    Any indication -- and normally what it comes

14  down to is what you read of his actions up to that point

15  of time.  Do you have any criticism of his actions up

16  until that point in time dealing with her, where she now

17  has started to move out and before she first gets close

18  to him as she is moving out, as to his actions directed

19  to her other than he shouldn't have remained in that

20  lane?

21       A.    No, sir.

22       Q.    All right.  At that point, has he acted in a

23  manner that is slow and cautious up until the point that

24  he doesn't get out of the lane?

25       A.    No, I don't have any criticisms of any of his

Scott A. DeFoe                                                    April 12, 2024

1    actions or comments or movements other than -- other

2    than just not being away from the car once she decides

3    to back up.

4        Q.   All right.  So then back up -- your estimates

5    of time on the timeline -- at approximately 1:26, is

6    that the moment in time where Bruce begins to walk out

7    of the lane where he comes in proximity of her car that

8    has been moving out of the lane?

9        A.   Well, it is a tough question to ask because he

10   is still at the window close to all the way at 1:30 or

11   even 1:34.

12       Q.   All right.  So again, we are jumping through

13   timelines.  Let's start with 1:26.  I have written down

14   Bruce moves towards car.  Because you said up through --

15   up through 1:26 -- Bruce had not moved until

16   approximately 1:26.  Do I have that correct or

17   incorrect?

18       A.   Well, there is some movement.  He moved like

19   towards the front quarter panel, but he was still in

20   that area between the window and the front quarter panel

21   of the vehicle at that time.  So there was some

22   movement, but he was still in the general area of the

23   driver's side door.

24       Q.   All right.  So I understand that -- in my

25   review of the video, that he and Maxwell are standing

1   detained for an investigation of whether she is a danger

2   to herself, others, perhaps even committed an attempted

3   battery on a police officer with her car?

4       A.   I still don't believe it rises to the level of

5   a detention for danger to self or others.  The issue of

6   intent, was she intending on doing that, I have no way

7   of providing an opinion on that if she turned her wheels

8   in a manner to negotiate to leave the parking lot, which

9   is what I believe she was trying to do, preceding the

10  use of the baton on the window.

11          But once again, I don't know -- I'm not

12  offering legal opinions either if it rose to the level

13  where there would be reasonable suspicion to detain at

14  that point based on what Officer Bruce's perception of

15  what her actions were at the time.

16      Q.   All right.  So I'm going to parse that out,

17  that last part.  You are not offering an opinion on

18  whether or not he had reasonable belief to detain her to

19  investigate whether she was a danger to herself or

20  others based on the objective facts I just listed for

21  you?

22      A.   Correct.

23      Q.   All right.  And your opinion is you do not know

24  whether or not she intended to turn her wheels to get

25  out of the parking space or she turned her wheels to

Scott A. DeFoe                                                    April 12, 2024

1    strike at Officer Bruce.  Is that correct?

2        A.    Correct.  I can't speak to intent.

3        Q.    And you are not an accident reconstruction

4    expert and have not analyzed this as to the turning

5    radius of her car to whether or not when she turned her

6    car and then interacted with Officer Bruce in such a way

7    that that turning radius was the proper turning radius

8    to get out of the parking space or in fact was a turning

9    radius that would put her in interaction with Officer

10   Bruce or Officer Maxwell?

11       A.    Correct.

12       Q.    So at the point in time that Officer Bruce

13   makes a determination that it's necessary to use his

14   baton and strike her car, is it your opinion that it was

15   an improper use of his baton to attempt to break that

16   window and cause her to stop driving the car?

17       A.    Yes.

18       Q.    And what is the basis of that opinion?

19       A.    For one, it was a poor tactical decision

20   because the vehicle still has the ability to move, and

21   if you are reasonably concerned that Ms. Hernandez

22   intended on striking you with the vehicle, the last

23   place you would want to be is anywhere in close

24   proximity to that vehicle.  At that point he reasonably

25   believed that, and he should have moved to a position of

1   in fact should have moved into a position of cover, and

2   then in some form he and Maxwell should have used their

3   vehicles to try and effectuate a stop of Ms. Hernandez.

4   Do I have that correctly?

5        A.   Yes.  If they formed reasonable suspicion to

6   detain her for potentially attempting to strike Officer

7   Bruce with the vehicle.

8        Q.   Okay.  And that would be based on the objective

9   facts that they articulated, and that is actually a

10  question of law for the jury using the jury instruction,

11  correct?

12       A.   Correct.

13       Q.   Now the point in time that he is attempting to

14  break the window, what point in time -- and I have that

15  as 1:34.  At what point on the video timeline does it

16  appear he goes to the ground and the vehicle rolls over

17  him, as he has testified?

18       A.   The strikes occur at 1:30.  The -- it appears

19  that he goes down at the rear of the car, rear quarter

20  panel at 1:34.

21       Q.   Okay.  In the time from 1:18, when the

22  taillights of the car go on, to 1:34, is there -- do you

23  have any criticism or do you have an opinion that a

24  reasonable police officer or the two police officers

25  present should have formed a tactical plan?  Am I

Scott A. DeFoe                                                    April 12, 2024

1    correct?

2        A.    That was prior to.  If they were going to -- if

3    the decision was they were going to let her go, then

4    they should have just let her go and get out of the way.

5    If the decision was they were going to try to stop her,

6    there should have been a discussion as to what, you

7    know, the -- they were going to do based on the -- my

8    review of the facts, the video in this case.

9        Q.    All right.  So I'm going to take from 1:18 to

10   1:30, which is when the officers are in the parking lane

11   while the taillights are on and through 1:18, the

12   taillights were on, the officers were down near her car,

13   through 1:30 when Bruce strikes the window.

14            During that time frame, the officers allowed

15   her to leave.  Is that right?

16       A.    Correct.

17       Q.    And you can see on the video that they are

18   engaged in a conversation or -- they are standing there.

19   I can't -- not fair to ask you to speculate about that

20   because I can't tell either, but their testimony is they

21   engaged in a conversation while they are standing next

22   to her car.  Do I remember that correctly?

23       A.    Yes.

24       Q.    And isn't it true that part of that

25   conversation is a reporting of Maxwell to Bruce that the

Scott A. DeFoe                                                    April 12, 2024

1   security guard doesn't want to do anything, Bruce

2   telling Maxwell words to the effect that she was profane

3   towards me and she won't talk to me, and she begins to

4   back out, and they just decide to let her go?

5       A.   Correct.

6       Q.   And that's a tactical plan on their part at

7   this point, isn't it?

8       A.   Partially, yes.

9       Q.   Partially.  And is the criticism that partially

10  it should have been let's get on the sidewalk and get

11  out of the path?

12      A.   Correct.

13      Q.   And they failed to do that?

14      A.   Yes.

15      Q.   Is there anything else about what they failed

16  to do to discuss getting out of her path that you find

17  fell below the standard of a reasonable police officer

18  at the time they are discussing what to do with her and

19  she then decides to start backing out?

20      A.   No.

21      Q.   All right.  At 1:30 -- between 1:30 and 1:34 is

22  the movement of the car where Bruce believes she has

23  attempted to strike him, and he takes out his baton and

24  starts breaking the window.  Are you with me?

25      A.   I am.

Scott A. DeFoe                                                                April 12, 2024

1     Q.   And that is an accurate summary of what we have

2   been talking about?

3     A.   It is.

4     Q.   And at that point in time, Maxwell is slightly

5   ahead of Bruce walking out of the parking lane as well,

6   correct?

7     A.   Correct.

8     Q.   Prior to her movement leading to Bruce taking

9   out his ASP, correct?

10    A.   Correct.

11    Q.   At the point -- during those four seconds, in

12  the actions perceived by Bruce, was there a time in your

13  opinion for the officers to form a tactical plan of what

14  to do once Bruce came to the conclusion she attempted to

15  strike him and he takes his ASP out while Maxwell

16  goes -- takes his knife out runs to the back tire?

17    A.   Other than get away from the vehicle -- I would

18  have yelled to my partner to move away from the car.

19  But a tactical plan -- nothing more than get away from

20  the car, based on what I just observed, and advised both

21  officers just to get out of the path of that vehicle,

22  either to the side of it, front of it, or rear of it.

23  Get out of the way.

24    Q.   Okay.  They -- the failure to form a tactical

25  plan in terms of at least or -- preliminarily anything

Scott A. DeFoe                                              April 12, 2024

1   else is just get out of the way, and they failed to get

2   back to each other?

3       A.    Correct.

4       Q.    Do you agree that under the police learning

5   domains, the academy, scenario training, perishable

6   skills, that officers have to make split-second

7   decisions in tense and certainly rapidly evolving

8   situations?

9       A.    Yes.

10      Q.    And they have to make those decisions under the

11  totality of the circumstances, considering not only the

12  jeopardy to their lives but the jeopardy to others?

13      A.    Yes.

14      Q.    And officers are trained that indecision can be

15  the greatest detriment to how they perform their jobs on

16  the street?

17      A.    Potentially, yes.

18      Q.    And that officers are trained to be decisive

19  and use their training and experience in the manner in

20  which they should act under the constraints, again, of

21  their training and experience, including policy on use

22  of force and where it is appropriate?

23      A.    Yes.

24      Q.    One of the things they are trained is distance

25  covered time, time equals options?

Scott A. DeFoe                                          April 12, 2024

1      A.   Yes.

2      Q.   And your criticism is that they should have

3  used distance and cover, but would you agree that their

4  timeline was only four seconds to make that decision?

5      A.   Well, once again, distance and cover creates

6  time.

7      Q.   Okay.  And the time in this case would have

8  been time to allow her to drive out and get to their

9  cars and effectuate a plan to stop her once she is

10  leaving the parking lot?

11     A.   Allow her to leave the parking lot, but yes.

12     Q.   And the risk in that assessment under the tense

13  and certainly rapidly evolving situation is assuming she

14  is going to leave the parking lot and not bring danger

15  to others in the parking lot by the means in which she

16  drives her car if the officers have perceived her to be

17  a threat to themselves and to others?

18     A.   Correct.

19     Q.   The -- is it your opinion -- I think it is your

20  opinion, but I just want to confirm this -- that the

21  situation of her moving her car in the direction of

22  Officer Bruce, based on your review of the video, was

23  not active violence and an immediate threat to Officer

24  Bruce or others?

25     A.   Correct.

1    from endangering the officer.  Is that correct?

2        A.    Yes.

3        Q.    That it is better to let a car -- to get out of

4    the way of the car where you can -- rather than get in

5    the way of the car to effectuate the car to stop?

6        A.    Correct.  Or use a force option to effectuate

7    the car to stop.

8        Q.    Right.  As opposed to put out a spike strip or

9    chasing a vehicle and a road block where officers get

10   away from the cars and they are trying to stop a fleeing

11   felon of the highest degree, correct?

12       A.    Or pursuit intervention technique like a pit

13   maneuver that is coordinated with officers while they

14   are formulating a plan --

15       Q.    Okay.  But to a vehicle -- your criticism -- if

16   I understand correctly, your criticisms of Officer

17   Maxwell are that he should not have run to the side of

18   the car to puncture the side of her tire, as depicted in

19   the video, because that was putting himself in a

20   position of danger as she's trying to back out?

21       A.    Correct.

22       Q.    Okay.  And can you tell me, is that under the

23   general rubric, you shouldn't get near a car that is

24   moving, or is there some specific learning domain or

25   current policy in the Redding, best practices, POST

Scott A. DeFoe                                                    April 12, 2024

1   perishable skills that says you should not attempt to

2   disable the car from the side by puncturing the wheel

3   because that could put you in danger?

4       A.   Well, for one, the officers are taught that you

5   typically don't walk up on a car even for a basic

6   traffic stop.  Now this situation, according to Officer

7   Bruce, is transitioned where they are now going to

8   retain her if they reasonably believe that she

9   intentionally tried to strike him with the car.  Now

10  that would be a felony vehicle pullover, which would be

11  under the Learning Domain Number 19, which means there

12  are specific tactics that officers should use, none of

13  which are walk up on the car and try to deflate the tire

14  with a knife or to use an ASP or an impact weapon to

15  break a window of the vehicle.

16      Q.   There is no training that you can't do it that

17  way, is there?

18      A.   I've never read --

19      Q.   Or -- I gave you a double negative.  I

20  apologize.  Let me strike that question.

21           Are you aware of any training that tells an

22  officer they cannot use an ASP to break a window to gain

23  entry to a vehicle to stop or to -- to stop a person

24  from driving?

25      A.   No.

Scott A. DeFoe                                              April 12, 2024

1    it or because he slipped and fell and now the car rolled

2    over his leg.

3        Q.   Well, I'll ask the question again.  I'm not

4    asking you to determine whether it is intentional or not

5    because you don't know the intent of Ms. Hernandez, as

6    you've testified earlier.  I'm asking you:  Is the car a

7    lethal threat of great bodily injury or death to Officer

8    Bruce if the car were to run over him before Officer

9    Maxwell stops her?

10       A.   The car could be a lethal threat if it was to

11   run over someone, yes.

12       Q.   Okay.  You agree that we don't know what the

13   intent of Ms. Hernandez was at the time the officers

14   were assessing under the totality of the circumstances

15   their options to detain her and then Officer Maxwell's

16   determination to shoot her?

17       A.   Correct.

18       Q.   And you have not done any reconstruction

19   analysis as to whether or not the car was in a position

20   to run over Officer Bruce at the moment in time Corporal

21   Maxwell made a determination to fire his gun at her to

22   stop her from driving the car.  Is that right?

23       A.   Correct.

24       Q.   And at that time when Officer Maxwell made the

25   determination to use his gun, the alternatives to the

1   any other type of felony vehicle pullover if you

2   reasonably believe that her acts were intentional based

3   on the totality of the circumstances.

4          If she left the scene, even if it was

5   unintentional, it would be a felony because it would be

6   a felony hit-and-run of an individual.  So felony

7   vehicle pullover tactics would be appropriate based on

8   the totality of the circumstances.

9          But what you can see at 1:40 of the video is --

10  in fact I can see the tire at that point, and I can see

11  the tire is not on Officer Bruce's leg, and Officer

12  Maxwell continues to fire his third through seventh

13  round from his 9 millimeter pistol into the driver

14  compartment of the vehicle when it is clear that the

15  vehicle -- where you can see that the space, the tire is

16  not on Officer Bruce's leg.

17      Q.   That wasn't my question, so I will try it a

18  different way.  At the point in time that Officer

19  Maxwell had made a determination, which will be judged

20  by a jury as to whether it was reasonable or not, that

21  Officer Maxwell determines that I have to use lethal

22  force -- he has to use lethal force, what other force

23  options did he have to stop Ms. Hernandez from operating

24  her car so that it would not be a lethal weapon causing

25  grave bodily injury or death to Officer Bruce if it ran

1    over him?

2        A.   On his person, there would be no

3    less-than-lethal force options available.

4        Q.   And officers are taught they have to make a

5    decision without the benefit of 20/20 hindsight in

6    tense, rapidly evolving situations under split-second

7    decision-making.  Is that correct?

8        A.   All but with the caveat on the 20/20 hindsight

9    is that all use-of-force investigations, including this

10   one, are properly reviewed to determine if the force was

11   reasonable and the tactics and actions preceding the use

12   of force were reasonable and appropriate based on the

13   totality of the circumstances.

14       Q.   And in fact that was what was determined by

15   both the Shasta Sheriff's Department and the district

16   attorney in this case, correct?

17       A.   I don't -- didn't receive either of their

18   findings, so I don't know, Counsel.

19       Q.   We would agree that it is still in the province

20   of a jury in a civil lawsuit, and it doesn't matter what

21   they determine, correct?

22       A.   Correct.

23       Q.   And this is commonly called the Graham factors?

24       A.   Yes.

25       Q.   And -- but in fact, under the learning domain

Scott A. DeFoe                                                    April 12, 2024

1       A.    Correct.

2       Q.    In this case, Maxwell firing seven shots is --

3    in a second and a half, is that an appropriate response

4    as he perceived the need to stop a deadly threat?

5       A.    No.

6       Q.    Is there a number of shots he should have fired

7    versus the seven that he did fire that would be

8    appropriate if he correctly perceived there was a deadly

9    threat to Officer Bruce?

10      A.    Well, based on the clarification because I do

11   not -- no, I don't believe any of the shots were

12   reasonable.

13      Q.    No, I understand that.  You don't believe that

14   they should have -- he should have fired -- let me

15   correct that.

16            You -- it is your opinion Officer Maxwell never

17   should have used lethal force on Ms. Hernandez under the

18   circumstances that you reviewed?

19      A.    Correct.  And the -- from 1:40 on, it is

20   apparent he fires two rounds -- from what I can see.  I

21   did not do a reconstruction, just watching the video and

22   slowing it down -- into the driver compartment of where

23   Ms. Hernandez was seated.  And then he continues to fire

24   five additional rounds.

25            And it is clear at the point after the second

Scott A. DeFoe                                                April 12, 2024

1   round, just by the movement that -- it is clear that the

2   vehicle was not on top of Mister -- pardon me, Officer

3   Bruce, and there were five additional rounds fired from

4   that point.

5           So I think obviously you only can use the

6   reasonable amount of force when the subject's level of

7   resistance, which only way you can use lethal force is

8   if it life threatening, immediate threat of life, exists

9   at the time you fire.  You just can't continue to fire

10  because at one point you perceived that a lethal threat

11  exists.

12      Q.   Right.  I'm going to break that down.  I want

13  to make sure we are on the same page here.

14           He fired a total of seven shots.  Your --

15  you're distinguishing two shots and then five shots.  Do

16  I understand that correctly?

17      A.   Yes.

18      Q.   All right.  And we are working off the

19  presumption already that your opinion is that he never

20  should have used lethal force.  So I'm now focusing on

21  why he believed he should use lethal force.  So with

22  that understanding, how long did it take him to fire the

23  first two shots?

24      A.   All the shots were fired within two seconds.

25      Q.   All right.  You have not done any forensic

Scott A. DeFoe                                                    April 12, 2024

 1   analysis to break down the timeline of the shots, that
 2   is first two shots in four-tenths of a second, there is
 3   a three-tenths of a second pause, and five shots in 1.3
 4   seconds or something like that.  I'm just using that as
 5   an example.  You haven't done that kind of a breakdown
 6   have you?
 7        A.   I have not.
 8        Q.   And you say that at -- after the first two
 9   shots, whatever that timeline was, there is evidence
10   that you could see that the threat had stopped and was
11   no longer -- the car was no longer a deadly threat or
12   threat of grievous bodily injury to Officer Bruce?
13        A.   Yes.  Once again, with the caveat that I didn't
14   believe it was a deadly threat preceding the two shots.
15        Q.   You don't have to keep repeating it.  It is
16   well documented in the record.  What I want to do is get
17   your testimony directly to my question because it will
18   be an issue for the court to decide whether it has
19   evidentiary value.
20             And to shorten our depo, I accept this shooting
21   shouldn't have occurred.  That is your opinion.  You
22   don't have to repeat it every time.  If you'll humor me
23   so we can wrap the depo up.  So I will repeat my
24   question.
25             As I understand your testimony, there is a

Scott A. DeFoe                                                        April 12, 2024

1    pause at some point but -- there is some form of a pause

2    after two shots.  What evidence do you have that the

3    pause was a result or should have been seen by Officer

4    Maxwell -- Corporal Maxwell, to mean the threat of the

5    car running over Officer Bruce on the ground had

6    stopped?

7         A.   Based on my review of the video, it appears

8    right at 1:40, it is clear just on the positioning and

9    the angle of the video, maybe because the phone moved or

10   whatever it may have been, that I can see now that there

11   is nothing underneath that tire, that being nothing as

12   in Officer Bruce.

13             And he still continued to fire five rounds at

14   that point of once I could see, based on the video, that

15   Officer Bruce was not underneath the car or being pinned

16   by the vehicle in any way.

17        Q.   All right.  Thank you.

18             With respect to that video, have you done

19   anything forensically to break down the video to

20   determine a timeline in tenths of a second?

21        A.   No.

22        Q.   Have you done any forensic work on the video to

23   determine whether or not the vehicle was in a position

24   where it could still roll over Officer Bruce -- well,

25   just roll over Officer Bruce on some portion of his

Scott A. DeFoe                                           April 12, 2024

1    body?

2         A.    No.

3         Q.    That would be part of an accident

4    reconstructive forensic analysis of the path of the

5    vehicle or potential paths of the vehicle as it started

6    to move.  Would you agree?

7         A.    Yes, sir.

8         Q.    Okay.  And you don't have any of that

9    information -- I'm sorry.  Shouldn't say that.  You have

10   not reviewed any information that details the path of

11   that car as created by the accident reconstruction

12   expert, Dr. Rajeev Kelker.  Is that correct?

13        A.    Correct.

14        Q.    But had that -- you would agree -- you've

15   testified already.  I just want to make sure we are

16   clear, clear sentences, hopefully short sentences.  You

17   would agree a car can pose a lethal threat by running

18   over somebody's body depending upon where the car rolls

19   over the body?

20        A.    Yes.

21        Q.    For example, based on your training and, sadly,

22   your experience, as was mine, you have visited the

23   scenes of grievous bodily injury and death to people who

24   have been struck or rolled over by cars?

25        A.    Correct.

```
 1                    REPORTER'S CERTIFICATION

 2

 3    I, ASHLEY L. PROXMIRE, do hereby certify:

 4         That I am a licensed Certified Shorthand

 5    Reporter, duly qualified and certified as such by the

 6    State of California.

 7         That prior to being examined, the witness named

 8    in the foregoing deposition was duly sworn to testify

 9    under oath.

10         That the preceding deposition was recorded

11    stenographically by me at the time and place herein

12    mentioned; and that the preceding pages constitute a

13    complete and accurate record of the testimony given by

14    the aforementioned witness.

15         That I am a neutral party, in no way interested

16    in the outcome of said action, and that I am not related

17    to or otherwise connected with any of the parties

18    involved with this matter or their respective counsel.

19

20         Dated: May 3, 2024

21

22

23         _____

24         ASHLEY L. PROXMIRE, CSR No. 13664

25
```

# EXHIBIT "J"

1                  UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF CALIFORNIA

3

4    VERONICA MCLEOD, individually and as  )
     succesor in interest to decedent,     )
5    DOLORES HERNANDEZ; AMADO HERNANDEZ,    )
     individually and as successor in      )
6    interest to decedent, DOLORES         )
     HERNANDEZ; and YSIDRA REGALDO,        )
7    individually,                         )
                                           )
8                  Plaintiffs,             )
                                           )
9                  vs.                     ) Case No.
                                           ) 2:22-CV-00585-WBS-JDP
10   CITY OF REDDING; GARETT MAXWELL,      )
     an individual; and DOES 1-10,         )
11   inclusive,                            )
                                           )
12                 Defendants.             )
     _____)

13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      MATTHEW BRUCE

18               THURSDAY, APRIL 27, 2023

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  450075

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4     VERONICA MCLEOD, individually and as   )
      succesor in interest to decedent,      )
5     DOLORES HERNANDEZ; AMADO HERNANDEZ,    )
      individually and as successor in       )
6     interest to decedent, DOLORES          )
      HERNANDEZ; and YSIDRA REGALDO,         )
7     individually,                          )
                                             )
8                    Plaintiffs,             )
                                             )
9                    vs.                     ) Case No.
                                             ) 2:22-CV-00585-WBS-JDP
10    CITY OF REDDING; GARETT MAXWELL,       )
      an individual; and DOES 1-10,          )
11    inclusive,                             )
                                             )
12                   Defendants.             )
      _____)

13

14

15

16           The remote videoconference deposition of MATTHEW

17    BRUCE, taken on behalf of the Plaintiffs, beginning at 2:42

18    p.m., and ending at 4:32 p.m., on Thursday, April 27, 2023,

19    before Jinna Grace Kim, a Certified Stenographic Shorthand

20    Reporter No. 14151.

21

22

23

24

25

1      Q.   Did you form the impression that this woman might be

2   having a mental health crisis when she started telling you

3   about murderers and Jesus and all that?

4      A.   I -- I -- I couldn't agree that the statements that

5   she made were odd and troubling, but mental health crisis,

6   it's hard -- it's hard to say.  There -- there -- there is a

7   lot of factors in a mental health crisis.

8           She could just be, you know, religious.  I don't --

9   I don't really know.  I was unable to tell at all what her

10  motivations or her, you know, I didn't really have much

11  information at all from her.

12     Q.   And it appears from reading your statement that you

13  really didn't have an opportunity to assess her like you

14  normally would to see if they was under the influence of

15  drugs or alcohol; is that a fair statement?

16     A.   That's a fair statement.

17     Q.   Now, at some point did you see the car coming back

18  towards you?

19     A.   I specifically recall seeing the headlights.

20          The -- the shopping center is -- is kind of a darker

21  shopping center.  There is not a whole lot of streetlights.

22  And so as my kind of peripheral vision picked up a light

23  coming in, I turned and noticed the vehicle.

24     Q.   And when you turned would you have turned back to

25  your left?

1        A.   I don't know if I looked over my right shoulder or

2    left shoulder.  I can't specifically say in what position I

3    was walking or I had looked away.  I don't know if like I had

4    just turned my body and, you know, I really wasn't paying

5    that close of attention to my body position to know if I

6    looked to my right or my left.  I just saw the headlight and

7    looked at what was -- when you -- when you see movement in

8    your peripheral vision, you kind of just turn and look into

9    it.

10        I -- I didn't really -- I don't recall whether it

11    was right or left or over the shoulder or how I had spotted

12    him.

13        Q.   And when you looked, did you observe the car moving

14    forward in your direction?

15        A.   Yes.

16        Q.   And do you know at that point whether you were in

17    the parking space the car originally was in, or the next one

18    over?

19        A.   I couldn't say for -- for 100 percent certainty,

20    certainty, but as I remember it, I was in the parking space

21    next to the one.  I began walking east.

22        Q.   Did you have an impression as to where your partner

23    was at that point?

24        A.   I knew he was east of me.

25        Q.   And would that be to your right?

1      A.   So if I was looking at the -- if I was looking up at

2   the business which would be facing south like the vehicle

3   was, that would be to my left.

4      Q.   Okay.  But I got the impression that after the

5   vehicle started to turn, that you at some point -- started to

6   back up, you at some point turned and started walking more

7   north?

8      A.   It would have been more I guess east, but --

9      Q.   Okay --

10      A.   So -- so there was a -- there was a parked car maybe

11   one or two spots down, and because that's all I could use for

12   reference right now.  I don't stare at my feet when I walk.

13   So I couldn't tell you exactly where in the parking stalls I

14   was in reference to where I was standing originally.  I just

15   know I started to move towards that parked car, and that

16   parked car is the area in which I had last saw my partner.

17           So I was just -- I was assuming or I saw him, and

18   that was the general direction that I was heading.

19      Q.   And it the parked car that you're referring to a

20   parked car that would have been east of the space that the

21   woman's car was in?

22      A.   Yes.

23      Q.   Okay.  With that one, at least one space in

24   between?

25      A.   Yeah.  At least one space in between.

VERONICA MCLEOD, ET AL. vs CITY OF REDDING, ET AL.

Matthew Bruce on 04/27/2023                    Page 30

```
 1        Q.    So did the car make contact with you when it moved
 2   forward?
 3        A.    No.  The initial time that it moved forward, it did
 4   not.
 5        Q.    And when it moved forward, at some point did it come
 6   to a stop again?
 7        A.    Yes.
 8        Q.    And was there an angle at that point?
 9        A.    Yes.  When -- when it came back in initially and I
10   turned and spotted the headlights, I could see the front end
11   of the car, and it was -- and like I said, I'm just guessing
12   because I was more so focused on the vehicle than its actual
13   positioning on -- on the parking spaces, but as I remember
14   it, it was approximately probably less than 45, but maybe at
15   a 45-degree angle with the front of the vehicle facing me,
16   and I had jumped out of the way which would have been towards
17   the driver's side.
18              Or if I was -- it's hard to explain.
19              If I was standing where the license, front license
20   plate was, I would have gone north towards the driver side of
21   the vehicle to get out of the way.
22        Q.    And did you move out of the way?
23        A.    I did.
24        Q.    And that was kind of a natural reaction?
25        A.    Yes.
```

1        Q.    And then did the vehicle momentarily stop?

2        A.    Yes.

3        Q.    And when it was stopped in that position, did you

4    approach the vehicle again?

5        A.    I didn't approach the vehicle at that point.

6              I noticed the driver had two middle fingers up in

7    the air and was screaming.  I couldn't hear what she was

8    scheming.  Obviously, the music was turned up, but she, you

9    know, visibly was screaming, and I believe what she screamed

10   was, "Fuck you," and to middle fingers.

11             And then that's -- that's right at when the vehicle

12   stopped.  I just stepped out of the way; vehicle stopped; she

13   gave me two middle fingers and said, "Fuck you," like

14   screamed it.

15             I obviously couldn't hear it, but you know how when

16   you see somebody yelling, you can read their lips and you

17   know what they're saying.

18       Q.    Do you know if the window was up or down at that

19   point?

20       A.    I don't recall if it was still cracked, but I know

21   it was up.

22       Q.    So are you saying --

23       A.    So it might have been still down two inches or it

24   might have been all the way up, but it was definitely up more

25   than three quarters of the way up.

1      Q.   Okay.  And then when you extended the baton, did you

2   strike it any additional times?

3      A.   I never got to fully extend the baton.

4      Q.   Do you know if the window cracked at all or had any

5   effect from you striking it?

6      A.   I don't believe it did.

7      Q.   Have you ever seen photographs of the window after

8   the incident?

9      A.   I've never seen photographs of the window.

10     Q.   Where was your left foot in relation to the driver's

11  side front tire of the vehicle when you were attempting to

12  smash the vehicle with your baton?

13     A.   My left front foot would have been extended forward

14  of my body like a baseball swing stance.

15     Q.   Do you know if your left foot was in the area of the

16  tire?

17     A.   When I was standing next to the vehicle, I would

18  have placed myself directly in front of the door in which the

19  window I was striking.  So I don't believe it was in front of

20  the tire when I was striking the window.

21     Q.   Did the car go further in forward at that point?

22     A.   I don't know if it was moving forward or backwards.

23          I was mainly focused on the window and stopping the

24  car.

25     Q.   Do you know -- what I'm getting at, if you know,

1     Q.    Okay.  And do you know, in other words, did you have

2     a sense at the time how that happened, whether the car had

3     moved and that caused it to happen, and you were not sure?

4     A.    I was not sure what happened, what brought me off my

5     feet, but I quickly figured out as the tire rolled over my

6     leg, what had happened.

7     Q.    And what did you think had happened at that point?

8     A.    I thought I was getting run over at that point.

9     Q.    You thought the wheel went over a portion of your

10    body?

11    A.    I could see the wheel on my leg.

12    Q.    Okay.  What portion of your leg was the wheel on at

13    that point?

14    A.    At that point it -- I watched the wheel come -- I

15    remember pretty vividly the moment that I realized exactly

16    what position I was in, and I looked down at my left leg, and

17    I could see the tire cupping over my knee.

18    Q.    Do you remember trying to back out of the way when

19    the car starting going in reverse?

20    A.    Which time?

21    Q.    I guess the first time it went in reverse, as I

22    understand it, you just watched it go about four or five feet

23    and then looked away?

24    A.    Yes.

25    Q.    The second time it went in reverse, if I'm

 1   understanding your testimony, would be after you tried to

 2   break the window with your baton?

 3       A.   I don't remember or recall if the vehicle was moving

 4   when I was attempting to break the window.  So I don't know

 5   if it was going forward or backwards.  I couldn't tell you.

 6            I do know that when I saw it run over my leg, I knew

 7   it was going backwards.

 8       Q.   And did it feel like it had grabbed your foot and

 9   pulled you down?

10       A.   It happened so quickly.  I didn't know how I had

11   gotten pulled down, and then I saw the tire on my leg, and I

12   knew at that point.

13       Q.   And were both of your legs together at that point?

14       A.   They were next to each other, yeah.

15       Q.   And was the tire essentially kind of on your knee or

16   a portion of your knee?

17       A.   Yes.  I believe it was -- it's kind of stopped

18   almost perfectly on the center of my knee, just above it.

19       Q.   Would that be your left knee?

20       A.   Left knee, yes.

21       Q.   And at that point did the car -- was the car

22   stopped?

23       A.   Yes.  The car did stop on my knee.

24       Q.   So I'm assuming you're hoping that the car didn't

25   move at that point?

1      A.   Straight back, yeah.

2      Q.   Right.  That's assuming it went straight back, but

3   it didn't go straight back; correct?

4      A.   Hindsight, yeah, it did not go straight back.

5      Q.   Right.  I mean do you think sometimes that if you

6   had not gone up to smash the window, then the car -- you

7   would have not ended up underneath the car as you did?

8           MR. ALLEN:  Objection.  Calls for speculation.

9           You have to answer the question, Matt.

10          THE WITNESS:  Yeah.  I'm -- I'm thinking about --

11   I'm thinking about my response.

12          Can you ask it one more time?

13   BY MR. GALIPO:

14      Q.   Sure.  Did you ever think after the fact that if you

15   had not gone up to smash her window or tried to smash her

16   window, you would not have been in that position?

17          And if the car went backwards the way it did, you

18   wouldn't have got pinned under the car?

19      A.   Yeah.  I think -- I think it's fair to say that in

20   what I was thinking, I would have never -- I would have

21   actually never thought that a vehicle would move in the

22   direction that it did.  Instead of moving straight on or

23   straight back, it instead kind of curled around, and I would

24   have never anticipated that.

25      Q.   When the vehicle moved forward, it was at an angle,

1   wasn't it?

2       A.   It was at a 45-degree angle.  So if -- if the

3   vehicle was at a 45-degree angle and it goes straight in and

4   straight out, I placed myself in the best position I could

5   think of to avoid getting struck by the car because it -- the

6   car turns on an axis here.  So if it was to back up, then I

7   would be able to get out of the way because I was alongside

8   the vehicle instead of being in front of it or behind it.

9       Q.   I understand that.  But your impression was this

10  woman was somewhat agitated; is that fair?

11      A.   Yeah.  The two middle fingers and the -- and the

12  "fuck you" definitely led me to believe that she was

13  agitated.

14      Q.   Did you, by the way, ever give her any gestures with

15  your hands like to stop or anything like that?

16      A.   No.

17      Q.   Did you ever consider that smashing or attempting to

18  smash someone's window who is already agitated may cause the

19  car to move forward or backwards to get out of the way of

20  having their window smashed?

21      A.   I anticipated the vehicle moving forward or

22  backwards.  That's why I stood where I should on the side of

23  the vehicle because I figured I was in the best place

24  tactically.

25      Q.   So you're saying when you approached the vehicle on

1   the driver side to smash out the window, you anticipated it

2   could move forward or backwards with you in that position?

3        A.   I anticipated that the vehicle would move forward or

4   backwards, and I would be alongside of it avoiding the

5   largest portion of the vehicle.

6        Q.   Were you thinking that if the vehicle moved forward

7   or backwards while you were trying to smash out the window,

8   you would continue to try to smash out the window as the

9   vehicle was moving?

10       A.   If I'm understanding your questioning correctly, did

11   I continue -- would -- it's -- it's hard for me to say

12   what -- what I would have done differently while keeping in

13   mind that my plan was simply just to break the window out and

14   to stop her.

15           And if you're asking me if I would have continued to

16   do that, had she been driving forward, yes.  The answer's

17   yes.  I would have advanced forward with the vehicle going

18   along it.

19       Q.   And how about if it went backwards straight, the

20   same?

21       A.   I felt like I was in the position that absolutely if

22   it went backwards, I would just go down along side it and

23   matched its angle.

24       Q.   Did you know where your partner was when you were

25   smashing out the window or trying to?

1      Q.   Okay.  After she pulled forward towards you as you

2   described, the vehicle came to a stop; is that correct?

3      A.   Yes, that's correct.

4      Q.   And at that point in your mind, you did not want her

5   to drive any further?

6      A.   Yes.

7      Q.   And you're an experienced officer; right?

8           You've been an officer I guess at that time how many

9   years?

10     A.   Ten or eleven, something like that, ten, eleven,

11   twelve.

12     Q.   Okay --

13     A.   Over ten years.

14     Q.   Right.  And is there a reason why prior to

15   approaching to smash her window, you didn't try to give her a

16   command or some gesture or something to let her know you

17   wanted her to stop?

18     A.   I was purely focused on the task at hand.

19     Q.   Right.  But in terms of -- aren't officers trained

20   to give commands when they can?

21     A.   When they can.

22     Q.   And to give a person an opportunity to follow the

23   commands if it's safe to do so?

24     A.   Yeah.  In -- in -- in an academy atmosphere or in

25   a -- in a general arrest atmosphere where you have a

1    compliant subject, you often provide commands, put your hand

2    on top of your head, do this, and -- and -- and when all the

3    steps are followed, it works beautifully.

4         Q.   Right.  But you don't know whether the commands are

5    going to be followed or not; is that fair?

6         A.   It's -- yeah.  It's -- it's -- it's a gamble every

7    situation that we find ourselves in.

8         Q.   Yeah.  But the training is to give commands if you

9    can and give the person an opportunity to comply with the

10   commands if you can?

11        A.   It you can.  If the situation lends itself to

12   providing commands, and there are so many situations that do

13   not provide the opportunity to give commands, that action is

14   needed immediately, then you don't give commands; you take

15   action.

16        Q.   And in this case when the car moved forward and

17   stopped, for whatever reason you decided not to give any

18   commands; is that fair?

19        A.   That's fair.

20        Q.   And you didn't give any gestures to the woman that

21   you wanted her to stop the car or anything like that; is that

22   also fair?

23        A.   That's also fair.

24        Q.   Your decision at the time was to go and break out

25   the window, and I guess try to reach into the car after

1    the way, do we know if she would have continued to run me

2    over into a parked car?  I could easily say that in the

3    position that I was in, if I had turned my back all the way

4    to her and she had come in at that same angle with me

5    standing right there, she would have hit me and ran me into a

6    parked car.

7              There is a million things that were going through my

8    mind at that time, and in her actions and like you said, they

9    were odd actions.  They were unexpected by me at all.

10             I thought honestly, that I was de-escalating the

11   situation.  I waved goodbye to her.  I felt that the best

12   solution to this entire event was her backing up and leaving,

13   and I was totally okay with it.

14        Q.   But what I'm getting at is when the car came forward

15   again, it stopped at some point; correct?

16        A.   After I had got out of the way.

17        Q.   Right.  But it didn't continue going into you or

18   turning left in you or into the next parked car; it did

19   stop --

20        A.   If -- if she would have kept going, she would have

21   hit an unoccupied parked car.

22        Q.   I know.  But would you agree a least with me she

23   didn't keep going; she stopped?

24        A.   She did stop after I got out of the way.

25        Q.   Okay.  That's fine --

```
1                        CERTIFICATE

2                            OF

3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8            That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  April 27, 2023.

23

24           _____
             Jinna Grace Kim, CSR No. 14151
25
```

**EXHIBIT "K"**

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4   VERONICA MCLEOD, individually )
     and as successor in interest  )
 5   to decedent, DOLORES          )
     HERNANDEZ, AMADO HERNANADEZ;  )
 6   individually and as successoor)
     in interest to decedent,      )
 7   DOLORES HERNANDEZ; and        )
     YSIDRA REGALDO, individually, )
 8                                 )
             Plaintiffs,           )
 9                                 )
                                   )
10       vs.                       ) Case No.
                                   )
11                                 ) 2:22-cv-00586-WBS-JDP
     CITY OF REDDING; GARRETT      )
12   MAXWELL, an individual;       )
     MATTHEW BRUCE, an individual; )
13   and DOES 2-10, inclusive,     )
                                   )
14           Defendants,           )
                                   )
15   _____)

16

17

18

19

20

21

22          ZOOM VIDEOTAPED DEPOSITION OF AIDEN PHILLIPS,

23   commencing at 1:06 p.m. PDT on Thursday, February 15,

24   2024, before KIMBERLY CRANE, Certified Shorthand

25   Reporter 11594, in and for the State of California.
```

| | | |
|---|---|---|
| 01:18:02 | 1 | standing next to it, were you in or out of your car? |
| | 2 | A.   I was in my vehicle. |
| | 3 | Q.   Was your car parked or were you driving? |
| | 4 | A.   We were heading out of the shopping center, |
| 01:18:18 | 5 | so we were driving. |
| | 6 | Q.   Okay.  Just to get a reference, do you know |
| | 7 | what direction you were traveling through the parking |
| | 8 | lot? |
| | 9 | A.   I believe it was east heading towards the |
| 01:18:28 | 10 | exit. |
| | 11 | Q.   Okay.  Do you know what street that exits |
| | 12 | onto? |
| | 13 | A.   Dana. |
| | 14 | Q.   Is that Dana Road or Dana Drive? |
| 01:18:38 | 15 | A.   Dana Drive, yeah. |
| | 16 | Q.   When you came across the officers, were they |
| | 17 | standing next to the vehicle or were they some |
| | 18 | distance from the vehicle? |
| | 19 | A.   They were standing right next to the |
| 01:18:52 | 20 | driver's side door, yeah. |
| | 21 | Q.   How many officers were there? |
| | 22 | A.   Just two. |
| | 23 | Q.   Can you describe to me in relation to this |
| | 24 | car that you saw where each officer was standing? |
| 01:19:01 | 25 | A.   I believe the furthest one from me was |

01:19:03  1   standing closer to the driver's side mirror about,

2   and the one that was closer to us was standing about

3   where the door handle to the driver's side door was.

4   They were pretty close together.

01:19:17  5       Q.   Okay.  And approximately how far were you

6   from the officers when you first noticed them?

7       A.   I would say we were about 30-ish feet from

8   the back of the vehicle.

9       Q.   You said you were facing the back of the

01:19:35 10   vehicle, correct?

11       A.   Yes, sir.

12       Q.   At that time were your car windows rolled

13   down, either your front or back windows?

14       A.   No.  I believe they were all rolled up at

01:19:46 15   the time.

16       Q.   Okay.  When you first noticed the officers,

17   were you in the driver's seat or IN the passenger's

18   seat?

19       A.   I was in the driver's seat.

01:19:57 20       Q.   Okay.  And it was only your aforementioned

21   roommate that was with you at the time in the car?

22       A.   Yes, sir.

23       Q.   Can you tell me what happened after you saw

24   the officers?

01:20:06 25       A.   Yeah.  We looked up and it all happened

01:34:03   1    legs -- scratch that.

2             When the car ran over his legs, what

3    direction was the car traveling?  Was it traveling

4    forwards or rearwards?

01:34:17   5        A.   Rearwards.

6        Q.   Okay.  And at that point did it fully drive

7    over that officer's body or was it stopped on top of

8    his body or how was it positioned in relation to his

9    body?

01:34:32  10        A.   It looked like it went completely over.

11        Q.   So was the officer pinned under the vehicle

12    at any point with the vehicle stopped on top of him?

13        A.   Not that I remember.

14        Q.   What do you recall the vehicle doing after

01:34:48  15    it had run over the officer's legs?

16        A.   It had stopped I would assume to go back

17    into drive to go forward, but that's when the shots

18    were fired so that was the last movement it made.

19        Q.   So the first and last movement it made was

01:35:02  20    it moving forward that the vehicle was making at that

21    time?

22        A.   It was the reverse movement was the last

23    one.

24        Q.   Okay.  So after the shots were fired by the

01:35:19  25    firing officer, the vehicle did not move forward at

```
 1   STATE OF CALIFORNIA )

 2                      : SS.

 3   COUNTY OF SAN DIEGO )

 4

 5          I, Kimberly Crane, in and for the County of

 6   San Diego, do hereby certify:

 7          That as such reporter, I reported in

 8   machine shorthand the videoconference proceedings

 9   held in the foregoing case;

10          That my notes were transcribed into

11   typewriting under my direction, and the proceedings

12   held on Thursday, February 15, 2024, contained within

13   pages 1 through 47, are a true and correct

14   transcription.

15          Dated this 19th day of March, 2024.

16

17

18                    Kimberly Crane

19                    Kimberly Crane, CSR No. 11594

20

21

22

23

24

25
```

**EXHIBIT "L"**

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4    VERONICA MCLEOD, et al.,    )
                                 )
5            Plaintiff,          )
                                 )
6    vs.                         ) Case No. 2:22-cv-00585-WBS-JDP
                                 )
7    CITY OF REDDING, et al.,    )
                                 )
8            Defendant.          )
     _____

9
       REMOTE VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
10
                      RICHARD BELL
11

12             Tuesday, February 27, 2024

13              1:09 PM Pacific Time

14

15

16

17

18

19

20

21

22

23   Reported by:
     April D. Biedermann, RSR, WA CCR No. 21028823
24   Steno Agency
     concierge@steno.com
25   (888) 707-8366

```
 1                     APPEARANCES VIA ZOOM:

 2   FOR THE PLAINTIFF:

 3                  HANG D. LE
                    Law Offices of Dale K. Galipo
 4                  21800 Burbank Boulevard
                    Suite 310
 5                  Woodland Hills, California 91367-6479
                    (818) 347-3333
 6                  hlee@galipolaw.com

 7
     FOR THE DEFENDANT:
 8
                    AMEET D. PATEL
 9                  Allen Glaessner Hazelwood & Werth, LLP
                    180 Montgomery Street
10                  Suite 1200
                    San Francisco, California 94104
11                  (415) 697-2000
                    apatel@@aghwlaw.com
12

13   LEGAL VIDEOGRAPHER:

14                  THOMAS MCDONOUGH
                    Steno Agency
15                  concierge@steno.com

16
                         ---oOo---
17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 01:34:24 | 1 | A.   Yeah.  I would say put it in reverse and wasn't going |
| 01:34:29 | 2 | slow.  I mean, obviously had intentions of getting out |
| 01:34:32 | 3 | of there in a hurry. |
| 01:34:37 | 4 | Q.   Okay.  And did you see the reverse indicator lights on |
| 01:34:41 | 5 | the woman's car come on when it started to back up? |
| 01:34:46 | 6 | A.   Yes, sir. |
| 01:34:47 | 7 | Q.   Okay.  Okay.  And did that officer that got hit by the |
| 01:34:55 | 8 | woman's car fall to the ground? |
| 01:34:57 | 9 | A.   Yes, sir. |
| 01:35:00 | 10 | Q.   Okay.  Did you see that driver's side front tire roll |
| 01:35:04 | 11 | over the officer? |
| 01:35:06 | 12 | A.   Yes, sir.  I did. |
| 01:35:08 | 13 | Q.   Okay.  And when it rolled over the officer, did the car |
| 01:35:11 | 14 | stop on the officer at any point? |
| 01:35:13 | 15 | A.   No, sir.  It rolled right off. |
| 01:35:20 | 16 | Q.   Okay.  So there was no point in time where the car |
| 01:35:25 | 17 | stopped or slowed down even while it was running over |
| 01:35:28 | 18 | that officer's body? |
| 01:35:29 | 19 | A.   It ran over it and then right when it got off of it, it |
| 01:35:34 | 20 | kind of halted to a stop. |
| 01:35:37 | 21 | Q.   Okay.  And when it halted to a stop, it had driven over |
| 01:35:41 | 22 | the officer's portion of -- whatever portion of the |
| 01:35:44 | 23 | body of the officer that had been run over; is that |
| 01:35:47 | 24 | correct? |
| 01:35:47 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 02:23:34 | 1 | BY MR. PATEL: |
| 02:23:34 | 2 | Q.   You can answer, Richard, if you have a response. |
| 02:23:38 | 3 | A.   Oh, um, it -- it very well could have, but from where I |
| 02:23:44 | 4 | was sitting and from where I could see, I would say he |
| 02:23:49 | 5 | was out of the way enough to not get ran over again. |
| 02:24:09 | 6 | Q.   All right.  Give me one second.  Just looking over my |
| 02:24:14 | 7 | notes. |
| 02:24:17 | 8 | Okay.  Richard, give me one second, okay? |
| 02:24:19 | 9 | A.   Yes, sir. |
| 02:24:21 | 10 | MR. PATEL:  All right.  Everyone, is it okay |
| 02:24:25 | 11 | if we go off the record real quick so I can take a look |
| 02:24:28 | 12 | at my notes and get an exhibit ready? |
| 02:24:31 | 13 | MS. LE:  Sure, no problem. |
| 02:24:32 | 14 | MR. PATEL:  Thank you. |
| 02:24:32 | 15 | THE VIDEOGRAPHER:  All right.  The time is |
| 02:24:34 | 16 | 2:24 p.m. Pacific Time.  We are now off the record. |
| 02:24:37 | 17 | (Off the record.) |
| 02:24:37 | 18 | (On the record.) |
| 02:30:04 | 19 | THE VIDEOGRAPHER:  The time is 2:30 p.m. |
| 02:30:08 | 20 | Pacific Time and we are now back on the record. |
| 02:30:10 | 21 | BY MR. PATEL: |
| 02:30:11 | 22 | Q.   Richard, do you recall that exhibit that I had you take |
| 02:30:14 | 23 | a look at where I circled where you believed your car |
| 02:30:19 | 24 | was located when you stopped when you witnessed this |
| 02:30:21 | 25 | incident? |

| | | |
|---|---|---|
| 02:30:21 | 1 | A.   Yes, sir. |
| 02:30:22 | 2 | Q.   Okay.  How far away from the woman's car and the |
| 02:30:26 | 3 |      officers would you say that was, approximately? |
| 02:30:30 | 4 | A.   I'd probably say 10 or 15 feet. |
| 02:30:33 | 5 | Q.   Okay.  And earlier, you mentioned something about |
| 02:30:37 | 6 |      another vehicle, tinted windows that somewhat |
| 02:30:41 | 7 |      obstructed your view; is that correct? |
| 02:30:43 | 8 | A.   Yes, sir. |
| 02:30:43 | 9 | Q.   Okay.  Was that vehicle -- did that vehicle at all play |
| 02:30:48 | 10 |      a role in obstructing your view at the time that you |
| 02:30:51 | 11 |      saw this officer on the ground crawling away? |
| 02:30:56 | 12 | A.   No, sir. |
| 02:30:57 | 13 | Q.   Okay.  Okay.  And can you describe the angle of the |
| 02:31:12 | 14 |      woman's car again as it moved forward and -- I'm sorry. |
| 02:31:18 | 15 |      Let me ask you a different question. |
| 02:31:20 | 16 |          Can you describe the angle of the woman's car as |
| 02:31:24 | 17 |      this officer on the ground was moving away from the |
| 02:31:29 | 18 |      car? |
| 02:31:31 | 19 | A.   The direction of the car? |
| 02:31:33 | 20 | Q.   Yeah, the direction of the woman's car.  Which way was |
| 02:31:36 | 21 |      it facing? |
| 02:31:37 | 22 | A.   It was -- I would say southeast. |
| 02:31:40 | 23 |                       (Exhibit No. 2 marked for |
| 02:31:40 | 24 |                        identification.) |
| | 25 | /// |

RICHARD BELL                                                                          JOB NO. 881053
FEBRUARY 27, 2024

```
1              CERTIFICATE OF REPORTER

2         I, APRIL D. BIEDERMANN, Washington State Certified
   Court Reporter and NCRA Registered Skilled Reporter, do
3  hereby declare:

4         That prior to being examined, the witness named in
   the foregoing deposition was by me duly sworn pursuant to
5  Section 30(f)(1) of the Federal Rules of Civil Procedure and
   the deposition is a true record of the testimony given by
6  the witness.

7         That said deposition was taken down by me in
   shorthand at the time and place therein named and thereafter
8  reduced to text under my direction.

9  __XX__   That the witness requested to review the
            transcript and make any changes to the transcript
10           as a result of that review pursuant to Section
            30(e) of the Federal Rules of Civil Procedure.
11
   _____  Signature is waived.
12
   _____  The changes made by the witness are appended to
13           the transcript.

14  _____  No request was made that the transcript be
            reviewed pursuant to Section 30(e) of the Federal
15           Rules of Civil Procedure.

16         I further declare that I have no interest in the
   event or the action.
17
           I declare under penalty of perjury under the laws
18  of the United States of America that the foregoing is true
   and correct.
19
           Witness my hand this 14th day of March, 2024.
20

21

22
                          _____
23                        April D. Biedermann, CCR, RSR
                          WA CCR No. 21028823
24

25
```