1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12   VERONICA MCLEOD, individually        No. 2:22-cv-00585 WBS JDP
     and as successor in interest to
13   decedent, DOLORES HERNANDEZ;
     AMADO HERNANADEZ; individually
14   and as successor in interest to      MEMORANDUM AND ORDER RE:
     decedent, DOLORES HERNANDEZ; and     DEFENDANTS' MOTION FOR
15   YSIDRA REGALDO, individually,        SUMMARY JUDGMENT

16              Plaintiffs,

17        v.

18   CITY OF REDDING; GARRETT
     MAXWELL, an individual; MATTHEW
19   BRUCE, an individual; and DOES
     2-10, inclusive,
20
                Defendants.
21

22                           ----oo0oo----

23        Plaintiffs Veronica McLeod and Amado Hernandez,

24   individually and as successors-in-interest to decedent, and

25   Ysidra Regaldo,[1] individually, brought this § 1983 action against

26

27   _____

28        [1]   Veronica McLeod and Amado Hernandez are decedent's
     adult children.  Ysidra Regaldo is decedent's mother.

                                  1

1  defendants City of Redding, Garrett Maxwell, and Matthew Bruce,

2  alleging several constitutional and state law violations in

3  connection with the police detention and shooting of decedent

4  Dolores Hernandez.  (Docket No. 1.)  Defendants now move for

5  summary judgment.  (Docket No. 27.)

6  I.   Facts[2]

7          On December 2, 2020, at approximately 6:27 p.m.,

8  officers Bruce and Maxwell were called to the Discovery Village

9  Shopping Center in Redding, California to respond to a report of

10  a woman -- decedent Dolores Hernandez (hereinafter "Hernandez")

11  -- who had used foul language and created a disturbance at the

12  Center and then left to sit in her vehicle in the Center's

13  parking lot.  (See Defs.' SUF (Docket No. 32) ¶ 1; Bruce Dep.

14  (Docket No. 36-5) at 9:12-18; Maxwell Dep. (Docket No. 36-3) at

15  25:13-19.)

16          Bruce approached the vehicle and spoke with Hernandez

17  for approximately one minute without any weapons drawn. (Incident

18  Video (Exhibit C to Patel Decl., Docket No. 29) at 0:00-1:15.)

19  During the conversation, Hernandez "rolled her window down

20  approximately two inches and became uncooperative and

21  argumentative with [Bruce] (telling him that he was a 'murderer,'

22  and that she did not have to speak with him)."  (Defs.' SUF ¶

23  10.)  Bruce asked for Hernandez's driver's license and Hernandez

24  "told [Bruce] she was not driving and did not have to give him

25          [2]    Because there is a video recording of the entire

26  incident (recorded by a witness in a car parked across the
   driving lane behind Hernandez's vehicle), the court relies

27  largely on that recording to understand the events that occurred,
   but resorts to other evidence in the record where helpful to

28  provide additional information or context.

1  'shit.'"  (<u>Id.</u> ¶ 12.)  Bruce later stated that based on

2  Hernandez's "erratic" behavior during their conversation, he

3  believed she was "[n]ot . . . of right or sound mind," possibly

4  due to drug use or a "mental health problem."  (Bruce Internal

5  Affairs Interview (Docket No. 36-6) at 9:368-12:531.)

6       Hernandez reversed the vehicle a few feet past the end

7  of the parking stall while Bruce and Maxwell stepped to the left

8  side of the parking stall from the perspective of the driver,

9  apparently to allow her to leave.  (<u>Id.</u> at 1:18-1:24; <u>see also</u>

10  Bruce Dep. at 62:10-13; Maxwell Dep. at 36:16-22.)  As they were

11  walking away, the car stopped reversing and moved forward,

12  swerving counterclockwise towards the officers.  (Incident Video

13  at 1:24-1:27.)  Bruce hastened his pace, apparently to avoid

14  getting hit by the vehicle, and the vehicle stopped a few feet

15  away from his body.  (<u>See id.</u> at 1:26-1:27; <u>see also</u> Bruce Dep.

16  at 30:16-17.)  The vehicle briefly stopped moving and Hernandez

17  "screamed 'fuck you' and extended both of her middle fingers."

18  (<u>See</u> Incident Video at 1:27-1:28; Defs.' SUF ¶ 16.)

19       Bruce next took out his baton.  (Incident Video at

20  1:28-1:29.)  The car began to reverse again and Bruce started to

21  hit the window with the baton.  (<u>Id.</u> at 1:30.)  The vehicle

22  briefly halted when Bruce started to hit the window (which did

23  not break), then continued to reverse, but did so while moving in

24  a counterclockwise direction such that the front of the vehicle

25  moved closer to Bruce.  (<u>Id.</u> at 1:30-1:33; <u>see also</u> Bruce Dep. at

26  38:4-6.)  Maxwell moved towards the rear left wheel and stabbed

27  the tire with his knife.  (Incident Video at 1:33-1:34; Maxwell

28  Dep. at 40:16-18.)  At almost the same moment, Bruce suddenly

1   fell to the ground face forward and the front left tire ran over

2   his left leg.  (Incident Video at 1:34-1:36; <u>see also</u> Bruce Dep.

3   at 40:4-17; Phillips Dep. (Docket No. 36-8) at 27:6-10; Bell Dep.

4   (Docket No. 36-9) at 23:16-25.)[3]  Maxwell drew his gun and aimed

5   it at the driver's side window.  (Incident Video at 1:37.)  As

6   Bruce was lying on the ground after being run over, positioned at

7   most a few inches from the tire that had run over his leg, he

8   told Maxwell to shoot Hernandez.  (<u>See id.</u>; Bruce Dep. at 46:1-

9   10.)

10          After Maxwell drew his firearm, the vehicle moved

11  slightly forward and then stopped.  (Incident Video at 1:38.)

12  Maxwell fired a volley of seven shots without providing any

13  verbal command or warning to Hernandez.  (<u>See id.</u> at 1:38-1:39;

14  Maxwell Dep. at 17:17-21.)  In the middle of the volley, the car

15  moved slowly forward while Bruce crawled away from the car on all

16  fours, and the car stopped when it ran into a nearby parked car.

17  (<u>Id.</u> at 1:39-1:43.)  After the car stopped, Bruce repositioned

18  himself so that he was lying on his back and clutching his left

19  leg.  (<u>Id.</u> at 1:42-1:48.)

20          Hernandez died as a result of the gunshot wounds.  (<u>See</u>

21  Autopsy Report (Docket No. 36-11).)

22  II.  <u>Standard of Review</u>

23          Summary judgment is proper "if the movant shows that

24  _____

25         [3]  It is disputed whether the car stopped on Bruce's leg
    or rolled over it quickly, as the video does not clearly enough
26  show the manner in which the wheel ran over his leg.  Two
    witnesses testified that the tire did not stop on Bruce's leg
27  (Phillips Dep. at 27:6-13; Bell Dep. at 23:10-25), while Bruce
    testified that the tire remained on his leg and pinned him down
28  (Bruce Dep. at 45:6-9).

1  there is no genuine dispute as to any material fact and the

2  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

3  P. 56(a).  A material fact is one "that might affect the outcome

4  of the suit under the governing law," and a genuine issue is one

5  that could permit a reasonable trier of fact to enter a verdict

6  in the non-moving party's favor.  <u>Anderson v. Liberty Lobby,</u>

7  <u>Inc.</u>, 477 U.S. 242, 248 (1986).  While the moving party bears the

8  initial burden of establishing the absence of a genuine issue of

9  material fact, <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23

10 (1986), the underlying facts must be viewed in the light most

11 favorable to the non-moving party, <u>see</u> <u>Matsushita Elec. Indus.</u>

12 <u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

13 III. <u>Federal Claims</u>

14        Plaintiffs' opposition brief states that they

15 "voluntarily dismiss" the third claim alleging denial of medical

16 care under the Fourth Amendment, and fifth, sixth, and seventh

17 claims alleging municipal liability.  (Docket No. 36 at 2 n.1.)

18 Accordingly, the court will grant defendants' motion for summary

19 judgment on the abandoned claims.  <u>See</u> <u>Est. of Shapiro v. United</u>

20 <u>States</u>, 634 F.3d 1055, 1060 (9th Cir. 2011) (affirming district

21 court's grant of summary judgment in favor of defendant on claims

22 abandoned by plaintiff).

23        Remaining are the first and second claims under § 1983

24 alleging unlawful detention and excessive force in violation of

25 the Fourth Amendment, respectively; fourth claim under § 1983

26 alleging violation of the substantive due process clause of the

27 Fourteenth Amendment; eighth claim alleging battery under

28 California law; ninth claim alleging negligence under California

1   law; and tenth claim alleging violation of the Tom Bane Act, Cal.

2   Civil Code § 52.1.  Because plaintiffs have abandoned their

3   municipal liability claims, the only remaining defendants are

4   officers Bruce and Maxwell.  Defendants argue that they are

5   entitled to summary judgment on all claims, including qualified

6   immunity on the excessive force and substantive due process

7   claims.[4]

8       A.   Excessive Force

9           "Qualified immunity is applicable unless the official's

10  conduct violated a clearly established constitutional right."

11  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  "The relevant,

12  dispositive inquiry in determining whether a right is clearly

13  established is whether it would be clear to a reasonable officer

14  that his conduct was unlawful in the situation he confronted."

15  Saucier v. Katz, 533 U.S. 194, 202 (2001).

16          The Supreme Court has "repeatedly told courts -- and

17  the Ninth Circuit in particular -- not to define clearly

18  established law at a high level of generality."  Kisela v.

19  Hughes, 584 U.S. 100, 104 (2018) (quoting City & County of San

20  Francisco v. Sheehan, 575 U.S. 600, 613 (2015)).  "Because use of

21  excessive force is an area of the law in which the result depends

22  very much on the facts of each case, police officers are entitled

23  to qualified immunity unless existing precedent 'squarely

24  governs' the specific facts at issue."  Est. of Hernandez v. City

25  of Los Angeles, 96 F.4th 1209, 1218 (9th Cir. 2024) (quoting

26  Kisela, 584 U.S. at 104) (cleaned up).

27  _____

28      [4]   Defendants do not seek qualified immunity on their §
    1983 unlawful detention claim.

6

1    Here, the court concludes that there is no clearly

2   established law indicating that the use of deadly force in these

3   circumstances was unlawful.  To the contrary, controlling Ninth

4   Circuit precedent -- which the officers here were entitled to

5   reasonably rely upon -- establishes that an officer does not

6   violate the Fourth Amendment when he shoots the driver of a

7   vehicle after observing his partner get run over by the vehicle

8   and his partner remains at immediate risk of being struck by that

9   vehicle.

10    The Ninth Circuit case Wilkinson v. Torres, 610 F.3d

11   546 (9th Cir. 2010), is the most directly on point.  There, two

12   officers  -- Key and Torres -- approached the driver of a stolen

13   vehicle on foot.  As described by that court:

14        Key attempted to open the driver-side front door and
         fell on the ground about the same time as the minivan
15        started moving in reverse.  The front of the minivan
         swung toward the driver side, and the rear of the
16        minivan swung toward the passenger side.  The wheels
         on the minivan were spinning and throwing up mud.
17        After one to two seconds, . . . Key got up and
         'walked[ ] or jumped out of the way . . . so he
18        wouldn't get ran (sic) over.'  Once he saw Key fall
         down, Torres yelled at the driver to stop.  Torres
19        believed that Key had been run over.  The minivan
         continued to back up, and Torres began shooting
20        through the passenger-side window.  After a slight
         pause during which he assessed the situation, Torres
21        continued firing at the driver of the minivan.

22   Id. at 549.  The Ninth Circuit -- applying the rule that courts

23   look to the "totality of the circumstances" in determining

24   whether a use of force was "objectively reasonable," see Graham

25   v. Connor, 490 U.S. 386, 396-97 (1989) -- concluded that officer

26   Torres did not violate the Fourth Amendment because an officer

27   facing such circumstances could reasonably believe the vehicle

28   posed a "deadly threat."  See Wilkinson, 610 F.3d at 553.

7

1    Many of the salient facts here are strikingly similar

2    to those in Wilkinson.  Most importantly, as in Wilkinson,

3    Maxwell saw his partner fall down and perceived that he had been

4    run over (as he had, in fact, been run over).  Also as in

5    Wilkinson, Maxwell perceived that his partner remained in the

6    vehicle's path.[5]  See Wilkinson, 610 F.3d at 551 (officer had

7    reasonable fear that driver posed a threat because his "fellow

8    officer was nearby either lying fallen on the ground or standing

9    but disoriented" while the driver "attempted to accelerate within

10   close quarters of two officers on foot").

11   It was entirely reasonable for Maxwell to believe that

12   the use of deadly force was lawful because his partner was lying

13   on the ground in the vehicle's path.  Indeed, that Bruce was in

14   danger of being run over by the vehicle is the only conclusion

15   the court can draw based on the incident recording, which the

16   court has had the benefit of watching numerous times with the

17   ability to pause, rewind, and slow down the video.  As clearly

18   depicted in the video recording, Bruce was lying on the ground at

19   most a few inches from the very tire that had just run him over,

20   while essentially pleading for his life by asking Maxwell to

21

22   _____

23   [5]   As Maxwell testified at deposition, he drew his firearm
     "when [he] observed" that Bruce's leg had been "crushed" by "that
     front left tire."  (Maxwell Dep. at 65:5-10.)  Maxwell also
24   stated in his internal affairs interview that immediately prior
     to the shooting, he believed Hernandez was "clearly going to
25   drive over [Bruce]," "crushing his legs further" and possibly
     "kill[ing] him."  (Maxwell Internal Affairs Interview (Docket No.
26   36-4) at 13:598-610.)  Maxwell's statements about his perception
     of the danger the vehicle posed to Bruce are uncontradicted by
27   any evidence in the record and are fully supported by the video
     recording.
28

1  shoot decedent.[6]

2        It is only common sense that "[a] moving vehicle can of

3  course pose a threat of serious physical harm" where "someone is

4  at risk of being struck by it."  See Orn v. City of Tacoma, 949

5  F.3d 1167, 1174 (9th Cir. 2020); see also Villanueva v.

6  California, 986 F.3d 1158, 1172 (9th Cir. 2021) (explaining that

7  the use of deadly force was not unlawful in Wilkinson because the

8  officer confronted a "chaotic" situation in which, inter alia,

9  "the officer who shot the driver had good reason to believe that

10  another officer was . . . not able to easily move out of the way

11  of an oncoming car no matter its speed"); Gonzalez v. City of

12  Anaheim, 747 F.3d 789, 794, 796-97 (9th Cir. 2014) (reversing

13  grant of summary judgment for defendant because, unlike in

14  Wilkinson, the officer -- who was inside the vehicle while

15  decedent was driving under ten miles per hour -- "was not on foot

16  next to a vehicle that might run him over at any moment should it

17  have accelerated" and "did not express concern that his partner

18  was vulnerable to being run over") (citing Wilkinson, 610 F.3d at

19  551-52).

20        Plaintiffs argue that Bruce was not actually in danger

21  prior to the shooting because the wheel had rolled over Bruce's

22  leg (rather than stopping on top of his leg) and was not trapping

23  him under the vehicle.  However, Bruce was plainly on the ground

24  in the vehicle's path; whether the car had briefly stopped on top

25  of his leg or run quickly over his leg makes no difference.

26

27        [6]  Bruce asking Maxwell to shoot decedent cannot be heard
on the video, but the parties do not dispute that Bruce made that
28  statement.

9

1   Further, "even if [Bruce] was in fact out of harm's way by the

2   time of the shooting . . . the critical inquiry is what [Maxwell]

3   perceived."  See Wilkinson, 610 F.3d at 551; see also Graham, 490

4   U.S. at 396 ("[t]he 'reasonableness' of a particular use of force

5   must be judged from the perspective of a reasonable officer on

6   the scene, rather than with the 20/20 vision of hindsight").

7         Because it was reasonable for Maxwell to believe Bruce

8   was in danger, this case is easily distinguishable from those

9   cited by plaintiffs in which the Ninth Circuit denied qualified

10  immunity to officers who used deadly force on drivers.  In Orn,

11  the Ninth Circuit denied qualified immunity because "a reasonable

12  jury could conclude both that [the officer] was never in the path

13  of [decedent's] vehicle and that he fired through the passenger-

14  side windows and rear windshield as the vehicle was moving away

15  from him," and even if the vehicle was moving towards him, the

16  officer "could simply have stepped back to avoid being injured."

17  949 F.3d at 1178.

18        In Villanueva, the Ninth Circuit denied qualified

19  immunity because a jury could conclude that the driver fatally

20  shot by officers was operating the vehicle "cautiously," was 15-

21  20 feet away from the officers, and was driving slowly without

22  the vehicle "aimed" at any officer.  986 F.3d at 1171.  In Acosta

23  v. City and County of San Francisco, the Ninth Circuit denied

24  qualified immunity to the officer because the driver was neither

25  driving fast nor directing his vehicle at the officer.  83 F.3d

26  1143, 1148 (9th Cir. 1996), as amended (June 18, 1996).

27        This case is also distinguishable from the non-binding

28  authority cited by plaintiffs.  In Kirby v. Duva, the Sixth

10

Circuit denied qualified immunity to officers who shot a driver
who "was moving slowly and in a non-aggressive manner, could not
have hit any of the officers, and was stationary at the time of
the shooting."  530 F.3d 475, 482 (6th Cir. 2008).  In Smith v.
Cupp, the Sixth Circuit denied qualified immunity because a jury
could conclude that "no person at the scene was ever in danger"
and that the officer "fired as he ran toward the driver side of
the car after the car passed him."  430 F.3d 766, 774 (6th Cir.
2005).  Finally, in Kosakoff v. San Diego, the district court
denied qualified immunity because a jury could conclude that the
driver was "backing away from the officers" and therefore "there
was no longer any threat to the officers."  No. 08-cv-1819 UEG
NLS, 2010 WL 1759455, at *6 (S.D. Cal. Apr. 29, 2010).

Unlike the above authorities cited by plaintiffs, the
instant case presents a situation in which Maxwell "saw [Bruce]
fall, thought [Bruce] had been run over, and was afraid" that the
vehicle would again run Bruce over.  See Wilkinson, 610 F.3d at
551.  As the Ninth Circuit explained in Wilkinson, an officer
could "reasonably believe that the [vehicle] posed a deadly
threat" under these circumstances, justifying the use of deadly
force.  See id. at 553.

Plaintiffs present various arguments as to why the use
of force was unreasonable, suggesting that defendants should have
given verbal warnings to Hernandez before resorting to force, or
that defendants should have used less intrusive means to control
the situation, especially given that decedent was mentally ill.
These arguments ignore that the officers here confronted a
"tense, uncertain, and rapidly evolving" situation in which they

11

1   believed that decedent posed a risk to their physical safety.

2   See Graham, 490 U.S. at 396.  Under the chaotic, apparently life-

3   threatening circumstances presented here, it was not "feasible"

4   for the officers to pause to issue warnings or to deliberate on

5   factors such as what medical conditions decedent may have had and

6   what alternative tactics may or may not have been available.  See

7   Tennessee v. Garner, 471 U.S. 1, 11-12 (1985).  In the now famous

8   words of Justice Holmes, "[d]etached reflection cannot be

9   demanded in the presence of an uplifted knife." Brown v. United

10  States, 256 U.S. 335, 343 (1921).

11          The Supreme Court has taught us that qualified immunity

12  protects "'all but the plainly incompetent or those who knowingly

13  violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)

14  (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also

15  Kisela, 584 U.S. at 104 (same).  For the reasons discussed above,

16  this court cannot in good conscience brand these defendants as

17  plainly incompetent, nor can it send the public message that they

18  knowingly violated the law.  Accordingly, the court grants the

19  officers qualified immunity on the excessive force claim.

20          B.   Detention[7]

21          [7]     The court has doubts about whether a detention -- as
22  distinct from the use of deadly force -- is cognizable as a
    standalone Fourth Amendment claim in a survivor's action.  See
23  Alderman v. United States, 394 U.S. 165, 174 (1969) ("Fourth
    Amendment rights are personal rights which . . . may not be
24  vicariously asserted."); Moreland v. Las Vegas Metro. Police
    Dep't, 159 F.3d 365, 369 (9th Cir. 1998) ("In § 1983 actions,
25  however, the survivors of an individual killed as a result of an
    officer's excessive use of force may assert a Fourth Amendment
26  claim on that individual's behalf if the relevant state's law
    authorizes a survival action.").  Nevertheless, because the
27  question was not discussed in the parties' briefing, for purposes
    of this motion the court assumes that such a claim is cognizable
28

                                  12

1          Plaintiffs argue that Bruce smashing the car window

2    with his baton and Maxwell deflating one of the car tires with a

3    knife constituted an illegal detention because the officers did

4    not have probable cause.  Defendants argue that they had probable

5    cause to arrest decedent for assault with a deadly weapon.  See

6    Cal. Penal Code § 245(a)(1).

7          "To determine whether an officer had probable cause for

8    an arrest, [courts] examine the events leading up to the arrest,

9    and then decide whether these historical facts, viewed from the

10   standpoint of an objectively reasonable police officer, amount to

11   probable cause."  Dist. of Columbia v. Wesby, 583 U.S. 48, 56–57

12   (2018) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003))

13   (cleaned up).  "Because probable cause deals with probabilities

14   and depends on the totality of the circumstances, it is a fluid

15   concept that is not readily, or even usefully, reduced to a neat

16   set of legal rules."  Id. (quoting Pringle, 540 U.S., at 371;

17   Illinois v. Gates, 462 U.S. 213, 232 (1983)) (cleaned up).

18         Here, it is not clear from the video whether decedent

19   intentionally drove at the officers, or whether she simply made

20   an error in driving because she was not expecting the officers to

21   have moved towards her car.  Further, the vehicle stopped and did

22   not make contact with either officer prior to the officers

23   attempting to gain control of the vehicle.  Based on the evidence

24   before the court, a jury could conclude that the officers lacked

25   probable cause to believe decedent had committed assault with a

26   deadly weapon.  See McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th

27

28   and addresses the merits.

1   Cir. 1984) ("The factual matters underlying the judgment of

2   reasonableness generally mean that probable cause is a question

3   for the jury, and summary judgment is appropriate only if no

4   reasonable jury could find that the officers did or did not have

5   probable cause to arrest.") (internal citations omitted).

6   Accordingly, the court will deny summary judgment on the unlawful

7   detention claim.[8]

8          C.   Substantive Due Process

9          Plaintiffs contend that defendants interfered with

10  their right to familial association under the substantive due

11  process clause of the Fourteenth Amendment.  Under the rubric of

12  substantive due process, plaintiffs must ultimately show that the

13  officers' conduct "shocks the conscience -- a standard that

14  requires more of the plaintiffs than the Fourth Amendment

15  excessive-force standard often applied in police shooting cases."

16  Ochoa v. City of Mesa, 26 F.4th 1050, 1054 (9th Cir. 2022).

17         Where, as here, the situation confronted by an officer

18  involved "'fast paced circumstances presenting competing public

19  safety obligations'" and "'escalate[d] so quickly that the

20         [8]   It is important to note that whether the officers had
21  probable cause prior to their attempts to gain control of the
    vehicle is a separate question from that of the reasonableness of
22  the use of deadly force.  The Supreme Court has unequivocally
    rejected the Ninth Circuit's former "provocation rule" that
23  "ma[de] an officer's otherwise reasonable use of force
    unreasonable if (1) the officer intentionally or recklessly
24  provokes a violent confrontation and (2) the provocation is an
    independent Fourth Amendment violation."  See County of Los
25  Angeles v. Mendez, 581 U.S. 420, 426-27 (2017).  Thus, even if
    the officers lacked probable cause to detain plaintiff at the
26  beginning of the incident and unnecessarily escalated the
    situation by doing so, their use of deadly force once decedent
27  had run over Bruce with her car was nonetheless protected by
28  qualified immunity, as discussed above.

14

officer [had to] make a snap judgment,'" courts apply the "purpose-to-harm" test.  See id. (quoting Porter v. Osborn, 546 F.3d 1131, 1137) (9th Cir. 2008)) (alterations in original). This is not a case where "actual deliberation [by the officers] is practical," and therefore the "deliberate indifference" standard does not apply.  See Wilkinson, 610 F.3d at 554 (holding that the purpose-to-harm standard "clearly" applied to "a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); see also Porter, 546 F.3d at 1137 (applying purpose-to-harm standard to minutes-long incident during which officer used deadly force on driver accelerating towards officer, even though officer later testified that he did not perceive a high likelihood of being harmed by the vehicle). The purpose-to-harm test "requires a more demanding showing that the officers acted with a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives," which include "arrest, self-protection, and protection of the public."  Ochoa, 26 F.4th at 1054 (cleaned up).

Plaintiffs have not pointed to any evidence indicating that the officers acted with a purpose to harm unconnected to legitimate law enforcement objectives.  To the contrary, the video of the encounter shows that the officers initially approached decedent to speak with her without any weapons drawn and then moved away from the car to allow her to leave.  And as already discussed, the use of deadly force was motivated by the desire to protect the safety of an officer.  Cf. A.D. v. Cal. Highway Patrol, 712 F.3d 446, 457-58 (9th Cir. 2013) (agreeing with jury's conclusion that officer had purpose to harm and

1  therefore violated substantive due process when he emptied his

2  gun at driver who was either stationary or driving away from

3  officers, officers were not in vehicle's path, and other officers

4  at the scene testified that they did not feel their safety was

5  threatened).

6           Accordingly, the court concludes that defendants are

7  entitled to summary judgment on the familial association claim,

8  as plaintiffs have not put forth any evidence that might tend to

9  show the officers acted with a purpose to harm.  For the same

10  reason, defendants are entitled to qualified immunity on the

11  substantive due process claim.  See <u>Porter</u>, 546 F.3d at 1140

12  (where there is no genuine dispute that the purpose-to-harm test

13  applies, the availability of qualified immunity "turns on whether

14  [plaintiffs] can present facts to the district court that would

15  justify a jury finding that [defendants] acted with an

16  unconstitutional purpose to harm").

17  IV.  <u>State Claims</u>

18      A.   <u>Negligence</u>

19           Under California law, police officers have a duty "to

20  act reasonably when using deadly force."  <u>Hayes v. County of San</u>

21  <u>Diego</u>, 57 Cal. 4th 622, 628 (2013).  "The reasonableness of an

22  officer's conduct is determined in light of the totality of

23  circumstances," including "the officers' preshooting conduct."

24  <u>Id.</u> at 629, 638.  "[P]reshooting circumstances might show that an

25  otherwise reasonable use of deadly force was in fact

26  unreasonable."  <u>Id.</u> at 630.  California negligence law is

27  "broader" than the Fourth Amendment excessive force analysis,

28  which typically focuses on the officer's conduct "at the time of

1  shooting" and does not examine the officer's "pre-shooting

2  decisions."  Tabares v. City of Huntington Beach, 988 F.3d 1119,

3  1125 (9th Cir. 2021).

4         The evidence here is sufficient to establish a genuine

5  dispute of material fact as to whether the officers' pre-shooting

6  conduct negligently escalated the situation, culminating in the

7  use of deadly force.  See Tabares, 988 F.3d at 1126–27 (9th Cir.

8  2021) (denying summary judgment on California negligence claim

9  where jury could conclude that officer's tactical decision making

10 did not take into account that decedent was mentally ill and

11 unnecessarily escalated the encounter); see also Grudt v. City of

12 Los Angeles, 2 Cal. 3d 575, 587 (1970) ("even if the jury

13 believed that [decedent] accelerated his automobile toward

14 [officer], they might have found negligence on the part of the

15 officers in interpreting the circumstances as necessitating a

16 shotgun blast and four rounds from a revolver, designed to

17 kill").

18        Accordingly, the court will deny summary judgment on

19 plaintiffs' negligence claim.

20     B.    Battery

21        To maintain a state law battery claim against a police

22 officer, "a plaintiff must prove that the [officer's] use of

23 force was unreasonable."  Brown v. Ransweiler, 171 Cal. App. 4th

24 516, 527 (4th Dist. 2009).  This requires the same "totality of

25 the circumstances" inquiry applied to negligence claims,

26 discussed above.  See Hayes, 57 Cal. 4th at 638 (state tort law

27 considers "the totality of circumstances surrounding the

28 shooting, including the officers' preshooting conduct");

1    <u>Villalobos v. City of Santa Maria</u>, 85 Cal. App. 5th 383, 389 (2d

2    Dist. 2022) (evaluating both battery and negligence claims

3    against police officers under the reasonableness standard

4    articulated in <u>Hayes</u>); <u>Koussaya v. City of Stockton</u>, 54 Cal. App.

5    5th 909, 937 (3d Dist. 2020) (same); <u>see also</u> Cal. Civ. Jury

6    Instr. 1305B (explaining that in determining whether a police

7    officer's use of deadly force constituted a battery, jurors must

8    consider the "totality of the circumstances . . . including the

9    conduct of [the officer] leading up to the use of deadly force").

10        Because the court has determined that there is

11   sufficient evidence for a jury to conclude that the officers'

12   actions were unreasonable under California law, the court will

13   deny the motion for summary judgment on the battery claim.

14        C.   <u>Tom Bane Act</u>

15        The Tom Bane Act, Cal. Civil Code § 52.1, requires that

16   defendants had "specific intent" to violate plaintiffs' rights.

17   <u>See</u> <u>Cornell v. City & County of San Francisco</u>, 17 Cal. App. 5th

18   766, 801 (1st Dist. 2017).  This requirement may be satisfied by

19   demonstrating that the officers acted with "reckless disregard of

20   constitutional or statutory prohibitions or guarantees."  <u>See</u> <u>id.</u>

21   at 803-04; <u>see also</u> <u>Reese v. County of Sacramento</u>, 888 F.3d 1030,

22   1045 (9th Cir. 2018).

23        The evidence shows that Officer Bruce attempted to

24   smash the window and Officer Maxwell attempted to puncture the

25   tire of a vehicle that had not hit either of them and was either

26   stationary or moving very slowly, without trying to communicate

27   with the driver or move out of the vehicle's path.  A jury could

28   conclude that these actions evidence reckless disregard to

18

decedent's right to be free from unreasonable seizure.  See
Cornell, 17 Cal. App. 5th at 804 (specific intent standard was
satisfied where officers had doubts about existence of probable
cause but nonetheless detained plaintiff rather than taking the
"opportunity to exercise restraint").  Accordingly, the court
will deny summary judgment on the claim brought under the Tom
Bane Act.

IT IS THEREFORE ORDERED that defendants' motion for
summary judgment (Docket No. 27) be, and the same hereby is,
GRANTED as to the second claim alleging excessive force and
fourth claim alleging violation of substantive due process.  The
motion is DENIED in all other respects.

Dated:  June 11, 2024

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

19